UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


MELANIE CHISOLM, ON BEHALF OF          CIVIL ACTION
MINORS, CC and MC, ET AL.


VERSUS                                 NO: 97-3274


BRUCE GREENSTEIN, SECRETARY,           SECTION: J(5)
LOUISIANA DEPARTMENT OF HEALTH
& HOSPITALS


**ORDER AND REASONS**

This matter is before the Court on Plaintiffs' Motion to
Enforce Stipulations and Orders (**Rec. Doc. 275).**  The Defendant,
Bruce Greenstein, the acting Secretary of the Louisiana
Department of Health and Hospitals, opposes the motion.

**PROCEDURAL HISTORY AND BACKGROUND FACTS**

Medicaid is a federal-state cooperative program providing
federal funding for state medical services to the poor.  See
Wilder v. Va. Hosp. Ass'n., 496 U.S. 498, 502 (1990).  Although
state participation in Medicaid is voluntary, once a State elects
to participate in the program, it must administer a state
Medicaid plan in compliance with federal requirements.  Frew ex
rel. Frew v. Hawkins, 540 U.S. 431, 433-44 (2004).  One such
requirement is that every participating state must have an Early

1

and Periodic Screening, Diagnosis, and Treatment ("EPSDT")

program.  Id. (citing 42 U.S.C. §§ 1396a(a)(43), 1396d(r)).

Under the EPSDT program, states are required to assure the

availability and accessibility of health care resources for the

treatment, correction, and amelioration of medical conditions

affecting Medicaid recipients under the age of 21.

This case was first brought in October of 1997 to require

the Louisiana Department of Health and Hospitals ("LDHH" or, "the

Department"), the Louisiana Medicaid agency, to comply with its

statutory duty to arrange for a class of children with severe

disabilities to receive medically necessary health care

services.[1]  In their original complaint, Plaintiffs alleged that

LDHH had failed to uphold its statutory duties to arrange for

medically necessary treatments and diagnostic services for a

class of children with severe disabilities, by employing an

unnecessarily cumbersome prior authorization system which failed

to authorize EPSDT services for reasons other than a finding that

the services were not medically necessary or not coverable by

Medicaid.

While the case was pending, however, the parties were able

_____

[1]  The Court recognizes that the named Defendant is Bruce D.
Greenstein, but because the suit is against him in his official
capacity, the Court hereinafter refers to the Defendant as "LDHH"
or "the Department" for the sake of convenience.  See Will v.
Mich. Dep't. of State Police, 491 U.S. 58, 71 (1989) (suit
against a state official in his official capacity is generally
suit against the State itself).

to resolve their dispute through a series of court-approved
stipulations.  These stipulations and the orders of dismissal
approving them created a set of procedures to be utilized when
the LDHH communicated with class members, their physicians, or
other service providers about prior authorization requests, as
well as when LDHH authorized or denied services.[2]  This Court
retained jurisdiction over this matter to ensure that the
stipulations were implemented and enforced, as well as to resolve
any future disputes regarding the parties' agreements.
Plaintiffs have filed a motion alleging that the LDHH has
violated, and continues to violate, various provisions of three
of the stipulations and orders, and seeking an order requiring
the Department to remedy its alleged non-compliance.

## LEGAL STANDARD

A "consent decree" is a court order that embodies the terms
agreed upon by the parties as a compromise to litigation.  Thus,
consent decrees are akin to contracts but also function as
enforceable judicial orders.  United States v. Chromalloy Am.
Corp., 158 F.3d 345, 349-350 (5th Cir. 1998).  When construing
the terms of a consent decree, general principles of contract
interpretation govern.  Id.; Dean v. City of Shreveport, 438 F.3d
448, 460 (5th Cir. 2006); see also United States v. ITT Cont'l
Baking Co., 420 U.S. 223, 236-37 (1975) (noting that consent

---

[2] See Rec. Docs. 43; 117; 139; 144.

3

decrees "should be construed basically as contracts."). As such, consent decrees should normally be construed by reference to the "four corners" of the order itself. <u>Chromalloy Am. Corp.</u>, 158 F.3d at 350. In interpreting a consent decree, a court should construe the decree's terms according to their ordinary meaning and should not impose additional obligations beyond those memorialized in the parties' agreement. <u>United States v. Alcoa, Inc.</u>, 533 F.3d 278, 286 (5th Cir. 2008). Nonetheless, because consent decrees are also judicial orders, district courts are afforded wide discretion to enforce the terms of a decree if it is found that such have been violated. <u>Id.</u>

## DISCUSSION

Generally speaking, the allegations of Plaintiffs' enforcement motion can be classified into two parts. The first set of allegations concerns the substantive criteria used and factors considered by LDHH in determining whether a service a class member has requested is "medically necessary." The second set of allegations concerns certain procedural requirements and protocols that must be followed when LDHH denies a class member's prior authorization request. The Court will address each part in turn.

### A. Part One: The Determination of "Medical Necessity" for Services Requested Through LDHH's Prior Authorization Framework

The Medicaid statute requires participating states to

provide all health care services that are "medically necessary"
to correct or ameliorate an eligible recipient's illness or
medical condition, provided the service is coverable under the
EPSDT program.  See 42 U.S.C. § 1396d(r)(5); S.D. ex rel. Dickson
v. Hood, 391 F.3d 581, 593 (5th Cir. 2004).  However, federal law
does not define the term "medically necessary," but rather grants
participating states the authority to promulgate "reasonable
standards" for determining whether and to what extent requested
services are medically necessary.  Hope Med. Grp. for Women v.
Edwards, 63 F.3d 418, 425 (5th Cir. 1995); 42 U.S.C. §
1396a(a)(17) (requiring the state plan to "include reasonable
standards . . . for determining . . . the extent of medical
assistance under the plan which are consistent with the
objectives of [the Medicaid Act]"); 42 C.F.R. § 440.230(d)
(permitting state Medicaid agency to "place appropriate limits on
a service based on such criteria as medical necessity").  A
state's standards, however, must remain "consistent with the
Act's objective of providing a broad range of health-sustaining
services."  Hope Med. Grp., 63 F.3d at 427-28.

     Under Louisiana's EPSDT program, Medicaid recipients must
obtain the Department's prior approval for certain covered
services in order to allow the Department to document the medical
necessity of those services.  One type of service for which prior
authorization is required is home nursing service.  In order to

obtain approval for such services, a Medicaid recipient must
submit a written request to LDHH through its prior authorization
process.  A recipient must submit a new prior authorization
request for such services for each prior authorization period,
which spans six months.

When submitting a prior authorization request, the home
health service provider must submit a "CMS form 485" signed by
the child's treating physician, along with the treating
physician's prescription for nursing services and a "letter of
medical necessity" from the physician specifying the diagnosis,
functional limitations, and the frequency and duration of the
prescribed treatments.  Collectively, this documentation is
referred to as the "Home Health Certification and Plan of Care"
("Plan of Care").

The Plan of Care, along with a prescription and letter of
medical necessity from the treating physician, is submitted to
LDHH's prior authorization unit for review.  This request is
forwarded to LDHH's Medicaid claims consultant, Molina Health
Solutions ("Molina"), which reviews the medical documentation and
makes a determination whether the services requested are
medically necessary.  This determination is then forwarded to
LDHH, which then communicates the decision to the recipient,
provided that it agrees with Molina's determination.  As noted
above, the first portion of Plaintiffs' motion relates to the

substantive criteria and considerations LDHH's medical consultant uses in reviewing these prior authorization requests.

Generally speaking, the Stipulations and Orders governing this case are designed to ensure that class members' identified medical needs are met through services or treatments coverable under the EPSDT program. In order to make these services more accessible, however, the Stipulations and Orders additionally seek to eliminate unnecessary bureaucratic barriers in order to ensure that LDHH reviews requests for services solely on whether services requested are medically necessary. Thus, Part III of the Third Stipulation and Order ("Third Order") requires LDHH to provide a liaison within the prior authorization unit that will assist with any problems on prior authorization requests "so that a decision is rendered as to medical necessity," unless one of three things is true: (1) the service being requested is not covered by Medicaid; (2) there is a need for more documentation to support the request, and the recipient, after being notified according to provisions of the Order, has not taken the steps that are needed (including seeing a doctor, if necessary) to get specified documentation; or (3) a reported appointment with the physician (regarding the need for more documentation to support the request) was scheduled and not kept.[3]

---

[3] <u>See</u> Rec. Doc. 275-2, p. 14, ¶ 20(d) ("Prior Authorization Liaison: DHH agrees to provide a liaison ('PAL') within the prior authorization unit. The PAL shall for each class member . . .

In their motion, Plaintiffs allege that LDHH is failing to
uphold its duty to review class members' prior authorization
requests with regards to whether the requested services are
"medically necessary," as required under the Third Order.  They
report that the Department prescribes no written guidelines,
protocols, or documented clinical review criteria to be used when
its medical consultants make medical necessity determinations.
Each decision is reportedly made on a case-by-case basis after
consideration of the information accompanying a prior
authorization request, including the Plan of Care, letter of
medical necessity, and the treating physician's prescription.
Plaintiffs submit that this information is incomplete, in that it
does not include critical information regarding the child's past
medical history, recent hospitalizations or other health
problems, and whether a caregiver is available to care for the
child during periods where no nursing services are otherwise
approved.  They also point out that, although such information is
available, LDHH's physicians "very rarely" review or consider

_____

assist with problems on each prior authorization request so that
a decision is rendered as to medical necessity, unless the
determination is that:  (i) the particular service requested is
not a covered service; or (ii) the prior authorization unit
failed to receive notice within 30 days after the Department
issued the notice specified in ¶ 20(e)(ii) [regarding need for
additional documentation] that the recipient had scheduled an
appointment needed to determine medical necessity; or (iii) the
reported appointment was not kept.").

documentation accompanying the prior authorization request for the immediately preceding prior authorization period.

Plaintiffs allege that, utilizing this procedure, LDHH has consistently approved fewer hours of nursing care than was recommended by class members' treating physicians, despite expressing no valid basis for disagreeing with the physician's assessment as to the medical necessity of the services. Plaintiffs also report that LDHH's physician consultants often contact treating physicians regarding their requests for nursing services and advise them that an alternative service, personal care service ("PCS"), is available to meet recipients' documented needs.[4] However, Plaintiffs point out that LDHH fails to consider or ever advise the treating physicians of the critical limitations of PCS services. Accordingly, for all these reasons, Plaintiffs submit that the Department is actively violating the provisions of the Third Order which require it to make determinations based upon medical necessity. They request that the Department be enjoined from denying prior authorization

_____

[4] Personal care service, or PCS, is an EPSDT service designed to provide assistance with normal activities of daily living, such as "eating, bathing, dressing, personal hygiene, [and] bladder or bowel requirements." See LA. ADMIN. CODE tit. 50, § LXXIII.7301(A). One goal of PCS is to prevent institutionalization by allowing recipients to be treated on an outpatient, rather than an inpatient basis. Id. This also provides greater comfort to recipients and allows needs to be met in a more cost-effective manner. Id.

requests for services prescribed by their treating physicians, unless the decision is based on medical necessity as evidenced by (1) documented clinical review criteria; (2) a review of all appropriate medical information, including medical history, information on recent health problems, and hospitalizations; and (3) evaluation of the availability and ability of other caretakers to meet nursing needs when extended home nursing staff is not available.

The Department disputes Plaintiffs' allegations. It argues that the evidence shows that in most of the cases, the treating physicians' recommendations were based on a misunderstanding of the nature and purpose of home nursing services. According to LDHH, these treating physicians requested more hours than were actually medically necessary in order to help a parent working outside the home, or because the physician thought a nurse was required to assist the child with activities of daily living ("ADLs"). Because state Medicaid regulations prohibit it from considering "inconvenience to the . . . recipient's family"[5] in determining whether to approve a request for home nursing services, and because no provision of the various stipulations and orders require otherwise, LDHH contends that neither this nor the need for assistance with ADLs can be considered when determining how many hours of nursing services are medically

---

[5] See LA. ADMIN. CODE tit. 50, § XIX.301.

necessary.  As such, it contends that it has not violated any provision of the consent decrees governing this case and that Plaintiffs' motion should be denied.

Having examined the evidence, the parties' arguments, and the applicable law, the Court finds that the relief requested in the first part of Plaintiffs' motion is beyond the scope of the terms by which LDHH agreed to comply.  Although each of the various stipulations and orders are clearly designed to ensure the Department's prior authorization decisions are made on the basis of whether a requested service is "medically necessary," nothing within the four corners of any of these decrees dictates the substantive criteria by which such determinations must be made.  It is well-established that "the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it." United States v. Armour & Co., 402 U.S. 673, 681-82 (1971); see also United States v. Int'l Brotherhood of Teamsters, 998 F.2d 1101, 1107 (2d Cir. 1993) ("A court may not replace the terms of a consent decree with its own, no matter how much of an improvement it would make in effectuating the decree's goals."); Harris v. City of Philadelphia, 137 F.3d 209, 212 (3d Cir. 1998) (noting that a court "must not strain the decree's precise terms or impose other terms in an attempt to reconcile the decree with our own conception of its purpose.").  As the Supreme Court has

11

recognized, consent decrees are "entered into by parties to a case after careful negotiation has produced agreement on their precise terms." Armour, 402 U.S. at 681. Courts charged with enforcing a consent decree should preserve these bargained-for positions, rather than rewriting them. See Williams v. Vukovich, 720 F.2d 909, 920 (6th Cir. 1983) (citing ITT Cont'l Baking Co., 420 U.S. at 238).[6]

The Court is additionally wary of unnecessarily interfering with the substantive criteria by which the Department makes medical necessity determinations in light of the discretion afforded to participating states regarding the criteria under which such determinations are made. The Supreme Court has noted that states such as Louisiana enjoy "broad discretion" to adopt standards for determining the medical necessity of services covered under the EPSDT program. See Beal, 432 U.S. at 444; see also Frew, 540 U.S. at 439 (noting the "various ways that a State could implement the Medicaid Act" to comply with the

---

[6] The Court also notes that the consent decrees provide a procedural method to modify the parties' obligations thereunder in certain circumstances. See, e.g., Rec. Doc. 275-2, p. 19, ¶ 37 ("The Court shall retain jurisdiction of this action for the purpose of enforcing this agreement, which is subject to modification on motion of counsel for the plaintiffs or the defendant . . . should changes in the governing federal Medicaid statutes or federal regulations necessitate such changes."). Here, however, Plaintiffs' motion does not seek to modify the terms of the decrees and instead seeks to enforce the terms as they are written.

"general EPSDT statute"); <u>Rush v. Parham</u>, 625 F.2d 1150, 1155
(5th Cir. 1980) (holding that states may adopt standards
regarding medical necessity that place reasonable limits on
treating physicians' discretion); <u>Katie A., ex rel. Ludin v. Los
Angeles Cnty.</u>, 481 F.3d at 1150, 1159 (9th Cir. 2007) ("While the
states must live up to their obligations to provide all EPSDT
services, the statute and regulations afford them discretion as
to how to do so."); <u>Moore ex rel. Moore v. Reese</u>, 637 F.3d 1220
(11th Cir. 2011) (While the EPSDT mandate requires Georgia's
[state Medicaid agency] to provide children, who meet the
eligibility requirements, with medically necessary private duty
nursing services to correct or ameliorate their conditions, . . .
the Medicaid Act does not set forth a uniform manner in which
states must implement that EPSDT mandate."); <u>Fla. Ass'n of Rehab.
Facilities, Inc. v. Fla. Dep't of Health & Rehabilitative Servs.</u>,
225 F.3d 1208, 1211 (11th Cir. 2000) (commenting that
participating states are "granted broad latitude in defining the
scope of covered services as well as many other key
characteristics of their [Medicaid] programs").  This Court will
not  interfere with the standards Louisiana has chosen to adopt,
at least in the absence of some indication that the provisions of
the consent decrees require otherwise.  To the extent Plaintiffs
seek to alter the substantive considerations, standards, or
criteria by which the Department's medical necessity

determinations are made, their motion will be denied.[7]

## B. Part Two: Procedural Requirements

Having considered the first general set of allegations raised in Plaintiffs' motion, the Court now turns to the second. As previously noted, the second set of provisions that Plaintiffs seek to enforce concerns the procedures and protocols that must be followed when LDHH denies a class member's prior authorization request. In particular, Plaintiffs' motion seeks to compel LDHH's compliance with the provisions of the Third Order governing "chronic needs" recipients, as well as other provisions regarding denial notices that are sent to class members after a prior authorization request is denied.

### i. "Chronic Needs" Recipients

The Third Order provides a procedure designed to reduce the need to repeatedly submit large amounts of documentation for recipients who are determined to have "chronic needs" for services. Paragraph 19 of the Third Order provides, in pertinent part:

> **The Department or its agents shall determine in each case if a prior authorized service can reasonably be expected to be required at the same level in future**

---

[7] Of course, Plaintiffs are not wholly without recourse. In the Court's estimation, there is nothing to prohibit them from filing another lawsuit challenging the substantive criteria by which the Department's determinations are made or from bargaining with LDHH over whether certain factors or criteria should be considered as part of the prior authorization process.

**time periods; and if so services for successive prior authorization periods requests shall be authorized upon receipt of the physician's prescription only. Recipients and their case manager, if any, shall be required to report to DHH any changes in the recipients' condition that reduces the level of services needed.**[8]

Accordingly, once a "chronic needs" class member has received a prior authorization for a medically necessary service, all that is required to obtain a subsequent prior authorization for the service is for the request to be accompanied by a statement from the treating physician that the recipient's condition has not improved.

Plaintiffs argue that LDHH has violated Paragraph 19 of the Third Order by failing to identify these "chronic needs" recipients and then reducing their previously approved services without any evidence that their medical conditions have improved. Plaintiffs' request that LDHH be enjoined from denying prior authorization to class members for services prescribed by their treating physicians, if the same service was approved for the recipient for the period immediately preceding the request, unless there is evidence that the recipient's condition has actually improved, or that less care is now necessary under the circumstances.

LDHH contends that Plaintiffs' reliance on the "chronic

---

[8] See Rec. Doc. 275-2, p. 14, ¶ 19.

needs" provisions of the Third Order is misplaced, in that only one of the 13 class members described in Plaintiffs' motion has been designated as a chronic needs recipient.  It explains that a chronic needs designation is made with respect to *each* specific service, and that it is much more common for a child to receive a chronic needs designation for PCS services, rather than home nursing services.  LDHH explains that when a child's condition requires PCS, he or she will often require the exact same amount and type of PCS throughout their lives.  However, the same child's needs for nursing services can vary significantly from one prior authorization period to another, which would prevent a chronic needs designation.  It therefore contends that it is irrelevant that many of these class members had been previously approved for some of the services which it subsequently denied.

Having considered the record, however, the Court finds that the evidence supports a finding that at least some of the individuals identified in Plaintiffs' motion require services that "can reasonably be expected to be required at the same level in future time periods."[9]  As such, the Department violated the Third Order by failing to certify them as chronic needs recipients with respect to nursing services.

One such class member is a four-year-old boy referred to as

---

[9] <u>See</u> Rec. Doc. 275-2, p. 14, ¶ 19.

"L.C." in Plaintiffs' motion.[10] L.C. suffers from "shaken baby syndrome" as a result of being shaken at five weeks of age, causing a massive stroke. He is blind in both eyes, is unable to swallow or keep his airways clear of secretions, and is unable to eat or take fluids by mouth. He is prone to seizures and bone fractures, is hypertensive, and has severely contracted muscles in each of his limbs. He has a PEG tube placed in his stomach to provide him with nutrition, fluids, and medication. He has reportedly been receiving 84 hours of home nursing service per week since at least July 2010.

L.C.'s treating pediatrician, Dr. Erica Menina, has treated him since his birth. She states in her declaration that he needs 84 hours a week of home nursing to perform various tasks to prevent his condition from further deteriorating, including: monitoring his breathing; suctioning his tracheal tube and changing it in the event of a blockage; administering nebulizer treatments, administering oxygen and otherwise maintaining his respiratory equipment; monitoring and administering feeding and medication through his percutaneous endoscopic gastrostomy ("PEG") tube; monitoring seizure activity; monitoring skin breakdown; administering splints on his hands; assisting in moving and re-positioning him; monitoring his blood pressure;

---

[10] See Rec. Doc. 275, Exh. 3, L.C. Prior Approval Documents.

administering eye medication; and assisting him with adaptive equipment.  The evidence shows that L.C.'s condition is chronic and has remained unchanged since birth.  As such, Dr. Menina recommended that his nursing services be continued at the previously approved level of 84 hours per week.  Although the Department did not and still does not cite any evidence showing any change in L.C.'s condition or medical needs, it refused to approve 44 of the 84 weekly nursing hours that were requested.

In another case,  LDHH denied a prior authorization request for home nursing services for a seven-year-old boy identified as "A.S."[11]  A.S. has been severely disabled since he was born.  He has been diagnosed with hyperthryroidism, cortical dysplasia, bilateral optic nerve dysplasia, seizures, hypernatremia (an electrolyte imbalance due to elevated sodium levels in the blood), panhypopituitarism, and diabetes insipidus.  He is blind, cannot stand or walk, and has a ventricular-peritoneal shunt to drain fluid from his brain.  His treating physician, Anatole Karpovs, M.D., found that A.S. should receive 30 hours per week of home nursing services, which was the same number of hours for which he had been approved since March 15, 2010.  Included in the prior authorization request was a letter from Dr. Karpovs stating that, in his opinion, A.S. required 30 hours of skilled home

---

[11]  See Rec. Doc. 275, Exh. 4, A.S. Prior Approval Documents.

18

nursing care each week in order to monitor his fragile health (including his blood pressure, his lung functions, and fluid and electrolyte levels), to provide respiratory care, to administer the ten medications he takes daily, to provide skin care, to provide continuous repositioning of his body due to chronic sinusitis, and to help him use his wheelchair. Although A.S. had been previously approved for nursing services, LDHH denied his request in full, stating in its denial notice that "the recipient does not meet the criteria for the equipment, supplies, and/or services that are being requested."[12]

Finally, in yet another case, the Department denied a treating physician's request to continue the 56 hours per week of home nursing services that a recipient was receiving.[13] The recipient, "A.B.," is a 17-year-old boy with Batten's disease, which is a rare, fatal, progressive neuromuscular disorder. He has cerebral palsy and a surgically irreparable dislocated hip and cannot walk or speak, spending his days entirely confined to bed. He receives all of his nutrition and medications through a PEG tube. He has a surgically-implanted IV port, through which he must have blood drawn and receive medications to control seizures caused by his condition. According to the Department's internal

---

[12] See Rec. Doc. 275, Exh. 4, A.S. Prior Approval Documents, p. 9.

[13] See Rec. Doc. 275, Exh. 5, A.B. Prior Approval Documents.

records, A.B. had been approved to receive 56 hours per week of home nursing services since at least February 2009. His physician, Amanda Lacomb, M.D., requested that he continue to receive the same number of hours that the Department had previously approved as medically necessary. On April 19, 2011, the Department denied all but 30 hours of the 56 weekly hours of home nursing that was requested for A.B., despite the fact that the Department had found this level of nursing services to be medically necessary for each period over the previous two years, and that none of the medical documentation that the Department received gave any indication that his condition had improved or that his needs had changed.

It is troubling that none of these children were certified as chronic needs recipients. The evidence submitted shows that these children's conditions are chronic in nature, that their need for home nursing services has remained consistent over periods of years, and that this need is not expected to change in the future. As previously noted, LDHH and its agents are under an affirmative obligation to "determine in each case if a prior authorized service can reasonably be expected to be required at the same level in future time periods."[14] LDHH's failure to fulfill this obligation has unnecessarily required recipients and

---

[14] See Rec. Doc. 275-2, p. 14, ¶ 19.

their caregivers to repeatedly submit large amounts of medical documentation for each individual prior authorization period, which is precisely the result that the Third Order's chronic needs provisions are designed to prevent.

Furthermore, even if these class members' requests were properly reviewed under the "medical necessity" framework instead of the "chronic needs" framework, as LDHH suggests, the Department offers no reasoned explanation based on medical necessity that would support such precipitous reductions in the number hours it previously approved as medically necessary. In each of the cases cited above, the Department had previously determined that the services requested were medically justified at the level of hours indicated, and each class member's treating physician indicated that the child's medical condition and need for home nursing services remained unchanged from previous periods. Despite the lack of evidence contradicting these doctors' conclusions, however, LDHH reduced L.C.'s and A.B.'s previously approved nursing hours by approximately 50% and denied A.S.'s request altogether.

In light of the foregoing, Plaintiffs' request for relief will be granted. Once LDHH has previously determined that nursing services are medically necessary to treat or ameliorate a recipient's condition, it will be required to at least consider its own previous determination when considering whether to

approve a subsequent request to continue the same service, as well as any evidence suggesting that the recipient's condition or needs have changed. Where such evidence is present, the necessity of the services may properly be re-evaluated. If a class member's condition is chronic and the resulting medical need for services remain unchanged, however, LDHH will not be permitted to arbitrarily reduce previously approved hours.[15]

---

[15] The Court recognizes that this relief may appear somewhat at odds with its earlier discussion regarding the absence of provisions in the consent decrees establishing standards or criteria by which LDHH's determinations of medical necessity must be made. In the previous context, Plaintiffs alleged that the Department's medical necessity criteria, or lack thereof, violated the terms of the consent decrees. Here, in contrast, Plaintiffs do not appear to contend that the failure to consider the level of previously approved services constitute a violation of the consent decrees. Rather, they request that the Department be enjoined to consider certain criteria as an equitable remedy based on its failure to adequately certify class members as "chronic needs" recipients.

This contextual distinction is significant, because while a district court generally lacks authority to rewrite the terms of a consent decree, it has broad discretion to fashion equitable remedies to enforce a consent decree in response to a party's noncompliance. See EEOC v. Local 580, Int'l Assoc. of Bridge, Structural & Ornamental Ironworkers, 925 F.2d 588, 593 (2d Cir. 1991) ("[T]hough a court cannot randomly expand or contract the terms agreed upon in a consent decree, judicial discretion in flexing its supervisory and enforcement muscles is broad."). These remedies "need not match those requested by a party or originally provided by the court's earlier judgment." Alcoa, 533 F.3d at 288 (citations omitted); see also Cook v. City of Chicago, 192 F.3d 693, 695 (7th Cir. 1999) (Posner, J.) (noting that where a "[consent] decree does not specify the consequences of a breach," the question of remedy is "[i]mplicitly . . . referred to the district court's equitable discretion" ). Because the Court finds that the relief Plaintiffs seek will serve to remedy the effects of the Department's noncompliance, their request will be granted.

## ii. The Third Order's "Meaningful Notice" Provisions

The Third Order also contains a series of provisions, the
general thrust of which requires LDHH to provide class members
whose prior authorization requests are denied with meaningful
notice of the reasons underlying the Department's decision.  Some
of the Third Order's requirements for denial notices are somewhat
basic, including, for example, that "all reasons for the denial
must be given at the same time,"[16] and that denial notices for
requests involving services approved in hourly units must
"clearly indicate how many hours per day or week were requested,
and how many were approved."[17]  Other requirements are more
substantively driven.  For instance, Paragraph 14 of the Third
Order requires denial notices to provide sufficiently detailed
notice of each reason that a request is denied in order to enable
a treating physician, case manager, or recipient to understand
what additional information could be submitted in order to
support the request:

> **Whatever the reason for the denial, the notices shall
> state specifically each reason for denial, in
> sufficient detail to inform the provider, case manager,
> and recipient of any further information needed to
> support the request.  In cases where the prior
> authorization unit disagrees with the treating
> physician's determination of medical necessity, notices
> shall spell out specific reasons for the disagreement,**

---

[16]  See Rec. Doc. 275-2, p. 13, ¶ 13.

[17]  See Rec. Doc. 275-2, p. 14, ¶ 17.

**in enough detail to allow the physician or other provider to provide further information or explanation in support of the request, if such is available.**[18]

It also goes on explicitly state that generalized, conclusory assertions are insufficient to satisfy the notice requirement:

**A statement that "the service is not considered medically justified based on the documentation submitted," without giving a reason why the conclusion was reached, is not sufficient.**[19]

Plaintiffs' motion identifies and includes several denial notices which they claim fail to comply with the aforementioned requirements. These notices take essentially one of two forms, as explained below.

## ii. *Denial Notices Referencing the Class Member's Failure to Provide Additional Information Demonstrating Medical Necessity*

The first form of notice states that a recipient's prior authorization request was denied for failing to provide additional information sufficient to demonstrate that the requested service is medically necessary. The evidence shows that at least six class members received notices falling in this

---

[18] <u>See</u> Rec. Doc. 275-2, p. 14, ¶ 14.

[19] <u>See</u> Rec. Doc. 275-2, p. 14, ¶ 14.

category.  The class members identified as "C.D.,"[20] "E.F.,"[21] and

"S.T."[22] each received denial notices that stated:

> **On [date] the prior authorization unit received this request back from the prior authorization liaison with a memo to deny the additional hours of home health nursing. The provider, recipient, and/or case manager failed to respond to the notice of insufficient medical documentation.  The requested information on the 10 day notice, sent on [date], was as follows:**
>
> **Additional medical information to justify the necessity of hours not approved.**
>
> **This request is approved for [number of] hours per week for 26 weeks of home health nursing services as requested.**

The notices that "M.N."[23] and "O.P."[24] received vary slightly

from the notices described above, but the substance of the

notices is substantially the same.  The only difference is that

the "10 day notice" referred to in the first paragraph requested

the following information:

> **1.   Submit additional medical information as to why more time is needed for home health nursing services from**

---

[20]   See Rec. Doc. 275, Exh. 6, C.D. Prior Approval Documents, p. 2.

[21]   See Rec. Doc. 275, Exh. 7, E.F. Prior Authorization Documents, p. 2.

[22]   See Rec. Doc. 275, Exh. 15, S.T. Prior Authorization Documents, pp. 2-3.

[23]   See Rec. Doc. 275, Exh. 12, M.N. Prior Authorization Documents, pp. 2-3.

[24]   See Rec. Doc. 275, Exh. 13, O.P. Prior Authorization Documents, pp. 2-3.

> the physician

**2.     The provider is requesting [number of] hours a week, and the request is approved for [number of] hours a week**

**3.     The recipient receives [number] hours a day of personal care services in addition to the skilled home health nursing services.**

Finally, the notice that "Q.R." received states, in pertinent part:

> **We re-reviewed this request with new medical records. This information does not support additional hours than what we have already approved.  We reviewed the submitted information which does not justify 84 hours a week of home health services.  This child has been receiving 70 hours a week and we will continue with 70 hours a week of home health services.**[25]

The Court finds that these denial notices fail to comply with the Third Order's notice provisions.  Where the basis of denial is a disagreement as to the treating physician's assessment regarding the medical necessity of the requested service, the second sentence of Paragraph 14 requires LDHH to "spell out specific reasons for the disagreement, in enough detail to allow the physician . . . to provide further information or explanation in support of the request, if such is available."[26]  Furthermore, regardless of the reasons for denying the request, the first sentence of Paragraph 14 requires LDHH's

_____

[25]   Rec. Doc. 275, Exh. 14, Q.R. Prior Authorization Documents, p. 2.

[26]   See Rec. Doc. 275-2, p. 14, ¶ 14 (emphasis added).

notices to "state specifically *each* reason for the denial, in sufficient detail to inform the provider, case manager, and recipient of any further information needed to support the request."[27]

It is readily evident that neither these notices nor any of the "notices of insufficient documentation" to which they refer spell out the reasons why the Department disagreed with these recipients' treating physicians' recommendations concerning nursing services. None of the notices provide even a hint at what type of information could be submitted to further support or explain a prior authorization request, or to contest the Department's disagreement with the treating physicians' determination of medical necessity. Instead, they merely state the Department's conclusion that "the information submitted does not show medical necessity" and instruct the physician to "submit additional information to justify the medical necessity of hours not approved." In substance, these notices differ little, if at all, from the uninformative and conclusory language which is explicitly proscribed by Paragraph 14 of the Third Order. <u>See</u> Rec. Doc. 275-2, p. 14, ¶ 14 ("A statement that 'the service is not considered medically justified based on the documentation submitted,' without giving a reason why the conclusion was reached, is not sufficient.").

---

[27] <u>See</u> Rec. Doc. 275-2, p. 14, ¶ 14.

The Department contends that it "cannot be more specific" in its denial notices "because there is no set of guidelines suggesting when more time would be authorized" and because "[e]ach recipient is different and has different needs."[28]  This argument rings hollow, however, in light of Dr. Barai's detailed declaration, in which he offers several specific reasons why he disagreed with the treating physicians' assessments in the aforementioned cases.  With respect to E.F., for example, Dr. Barai explained that, in his opinion, nursing services were only medically necessary for two needs identified in the treating physician's request, because the child has a mechanical device which clears mucus from his lungs and prevents pneumonia which can be used twice daily; because the family is expected to be trained in using this device; because a seizure could occur at any time, including the other 112 hours of the week that a nurse would not be present, even if the request was approved in full; and because the family could apply for PCS services to help with other needs involving ADLs.[29]

None of these reasons were disclosed in the denial notice. Instead the denial notice E.F. received, along with several other denial notices the Department has issued, simply states that the "provider, recipient and/or case manager failed to respond to the

---

[28]  See Rec. Doc. 282, p. 11.

[29]  See Rec. Doc. 282-4, Affidavit of Dr. Lalit Barai, p. 5.

notice of insufficient medical documentation," which in turn, merely requested "additional medical information to justify the necessity of hours not approved."[30]  If the Department's physician can articulate such reasons in order to defend itself in Plaintiffs' enforcement action, surely it can be expected to provide such reasons in its denial notices, as well. Furthermore, the Third Order does not require the Department to somehow anticipate exactly what additional information a treating physician may actually *possess*, as LDHH's sur-reply memorandum seems to suggest.[31]  It merely requires LDHH to spell out the specific reasons *for its disagreement* with the physician's assessment of the medical necessity of a requested service "in enough detail to allow the physician . . . to provide further information or explanation in support of the request, if such is available."[32]

>    ### iii.  *Denial Notices Citing Agreement with the Class Member's Treating Physician that Hours Requested Are Not Medically Necessary*

---

[30]  See Rec. Doc. 275, Exh. 6, C.D. Prior Approval Documents, p. 2.

[31]  See Rec. Doc. 344, p. 11 ("Therefore, when a notice states the number of hours that will be approved as medically necessary for the identified tasks, it's up to the provider to provide information justifying why more time is needed to perform those tasks.  The Department would not know what information a provider has that would justify more hours.").

[32]  See Rec. Doc. 275-2, p. 14, ¶ 14.

The second general form of denial at issue in Plaintiffs'
motion arises in cases where an LDHH physician consultant
contacted a recipient's treating physician concerning a prior
authorization request, and after discussing the request, the
treating physician allegedly agreed that fewer home nursing hours
than were previously requested would suffice to meet the child's
medical needs.  In these cases, the Department appears to have
adopted the practice of simply citing the fact of the treating
physician's agreement as the basis for its denial.

For instance, in a partial denial notice that was sent to
"A.B." on April 19, 2011, LDHH stated that the Department's
physician consultant had contacted the recipient's doctor and
that both had "agreed that only 30 hours a week of home health
nursing services [were] medically necessary," rather than the 56
hours that the physician had requested for the child.[33]  With
respect to another child, K.L., the Department sent a denial
notice that similarly stated "our physician consultant contacted
your prescribing physician Dr. Thomas and they both agreed that
only 40 hours [were] medically necessary" instead of the 56 hours
that was requested.[34]  The Department also cited the purported
agreement of the treating physician in partially denying requests

---

[33]  Rec. Doc. 275, Exh. 5, A.B. Prior Approval Documents, p.
2.

[34]  Rec. Doc. 275, Exh. 10, K.L. Prior Approval Documents,
p. 2.

for 84 hours per week of home nursing services for two class members identified as "L.C."[35] and "I.J."[36]

The Court finds that these denial notices fail to comport with the notice requirements of the Third Order to the extent that they merely cite the agreement with the recipients' treating physicians that previously requested hours were not medically necessary, rather than stating *why* the hours were not medically necessary. The first sentence of Paragraph 14 of the Third Order states: "Whatever the reason for the denial, the notices shall state specifically each reason for denial, in sufficient detail to inform the provider, case manager, and recipient of any further information needed to support the request."[37] In each of the cases cited above, the substantive reason that the nursing hours were not approved was that the services were not medically necessary – not that the recipient's treating physician *agreed* that the services are not medically necessary. Accordingly, LDHH's practice of only referencing a treating physician's agreement with its underlying determination as to the medical necessity of the services obscures the primary reasons that the recipient's request was denied. In most cases, a recipient will

---

[35] Rec. Doc. 275, Exh. 3, L.C. Prior Approval Documents, p. 7.

[36] Rec. Doc. 275, Exh. 9, I.J. Prior Approval Documents, pp. 2-3.

[37] See Rec. Doc. 275-2, p. 14, ¶ 14.

not be privy to the details of any conversation between his treating physician and LDHH's medical consultant. The Third Order guarantees him meaningful access to the reasons the Department has determined that his requested services are not medically necessary in sufficient detail to allow him to submit additional information that can support his request.

Moreover, the Court is somewhat skeptical of whether these recipients' physicians did, in fact, change their opinions on whether the previously requested services were medically necessary. For instance, in her sworn declaration, L.C.'s treating physician, Dr. Erica Menina, vigorously disputes that she ever agreed that anything less than 84 hours per week of home nursing services were necessary to meet L.C.'s needs.[38] She reports that LDHH's medical consultant, Dr. Barai, contacted her about her prior authorization request, but that he never inquired about L.C.'s medical needs or the clinical basis for her request for home nursing services. Instead, according to Dr. Menina, he informed her that there was "no way he could approve 84 hours of nursing care for [L.C.] because it was Medicaid's policy never to approve this many hours of care," despite the fact that L.C. had previously been approved for precisely this amount of services

---

[38] Rec. Doc. 275, Exh. 3, L.C. Prior Approval Documents, pp. 9-12.

since at least July 2010.[39]  Based on this testimony, L.C.
subsequently appealed the denial of his request for home nursing
services, and the administrative law judge found that the request
should have been approved in part because Dr. Menina had never
agreed that only 40 hours were necessary to meet L.C.'s needs.[40]

In another case, the records submitted by Plaintiffs show
that the treating physician for a child identified as "A.B.," Dr.
Amanda Lacomb, wrote three letters to LDHH between February 14,
2011 and March 31, 2011, expressly reiterating her opinion that
56 hours of home nursing services per week were medically
necessary to meet A.B.'s needs.  Yet, several weeks later, LDHH's
medical review consultant denied the request because Dr. Lacomb
had reportedly changed her position regarding the medical
necessity of the services.  The Court has reviewed the
Department's records with respect to A.B., however, and there are
no records whatsoever that document any conversation between the
Department's physician consultant and Dr. Lacomb.  Finally, in
the case of the class member identified as "K.L.," the treating
physician admits that he did, in fact, agree to a reduction in
the number of hours that were previously requested.  However,
this "agreement" was not based on the fact that he truly believed

---

[39]  Rec. Doc. 275, Exh. 3, L.C. Prior Approval Documents,
p.11.

[40]  Rec. Doc. 275, Exh. 3, L.C. Prior Approval Documents, p.
26.

that such services were not medically necessary, but was instead driven by fear that the child would be receiving none of the nursing services that were medically necessary if he further contested LDHH's determination regarding the medical necessity of the services.

In light of the foregoing evidence, the Court is dubious of the purported "agreements" cited in the Department's denial notices with respect to these recipients. Irrespective of any treating physician's agreement, however, Paragraph 14 of the Third Order requires LDHH to state the reasons why the services requested are not medically necessary to meet a recipient's needs, as explained above.[41] Because Plaintiffs have introduced evidence demonstrating that LDHH's denial notices do not comport with this requirement, Plaintiffs' request for relief will be granted.

### iv. *Notices Regarding Alternative Services*

The Department contends that, in many of the cases cited in Plaintiffs' motion, the requests for nursing services were denied based on the determination that PCS is a more appropriate service

---

[41] The Court acknowledges LDHH's concern that its denial notices should not be required to reiterate every single topic that its physician consultants and class members' treating physicians discuss but finds this concern unfounded. The Third Order only requires the Department to spell out the reason or reasons why a requested service is not medically necessary, and not the minutiae of any subsequent conversation with a recipient's treating physician.

to meet the needs identified in the prior authorization packet.

Yet, the evidence submitted shows that this reason rarely, if ever, appears in the denial notice received by the recipient. As previously discussed, Paragraph 14 of the Third Order requires *every* denial notice to "state specifically each reason for denial, in sufficient detail to inform the provider, case manager, and recipient of any further information needed to support the request."[42] To the extent that LDHH denies services because PCS are sufficient to meet a child's needs, the Third Order requires this reason to be conspicuously stated in the denial notice.

For example, in the case of one class member identified as "Q.R.," the Department's records state that the child appeared to be requesting nursing services in order to meet his needs for PCS, and that "[n]ursing staff is not supposed to be doing help in ADL."[43] Dr. Barai subsequently confirmed in his affidavit that this was at least part of the reason that Q.R.'s request for home nursing services was partially denied, stating that "the child is not receiving any PCS, which can meet the child's ADL needs."[44] However, the notice of partial denial that was sent to

[42] See Rec. Doc. 275-2, p. 14, ¶ 14.

[43] Rec. Doc. 275, Exh. 14, Q.R. Prior Approval Documents, p. 4.

[44] Rec. Doc. 282-4, Affidavit of Dr. Lalit Barai, p. 7.

35

Q.R. on August 1, 2011 never mentions the fact that the Department felt that his needs could be met through an alternative service. It states:

> **We re-reviewed this request with new medical records. This information does not support additional hours than what we have already approved. We reviewed the submitted information which does not justify 84 hours a week of home health services. This child has been receiving 70 hours a week and we will continue with 70 hours a week of home health services.**[45]

Similarly, when processing another request for home nursing services from a class member identified as "G.H.," the Department's medical reviewer notes that the child "need[s] ADL help" and "should get PCS more than LPN," which was the service his physician requested.[46] And with respect to "K.L.," the Department's medical consultant noted that "at present, [K.L.] does not meet DHH criteria for home health care nursing" and that he had encouraged the treating physician to explore the possibility of prescribing PCS instead of nursing services to meet the child's needs.[47] In neither of these cases do the denial notices refer to the availability of another service to meet the child's needs, although the evidence shows that the

---

[45]  Rec. Doc. 275-5, p. 2.

[46]  Rec. Doc. 275, Exh. 8, G.H. Prior Authorization Documents, p. 2.

[47]  Rec. Doc. 275, Exh. 10, K.L. Prior Authorization Documents, p. 10.

Department relied on this rationale at least in part in its decision to deny the requests. Because Paragraph 14 of the Third Order requires *each* reason that a prior authorization request is denied to be specified, the Court finds that Plaintiffs' allegations have merit, and the relief requested will be granted with respect to this issue.

### v. PCS as a "Less Costly, Equally Effective" Service

Drawing on the same allegations discussed above, Plaintiffs additionally contend that LDHH's practice of denying requests for home nursing services based on the availability of PCS to meet class members' needs violates a provision of the Second Stipulation and Order of Dismissal ("Second Order"), as well.

Paragraph 12 of the Second Order governs situations where LDHH elects to deny a prior authorization request based on its determination that a less costly alternative treatment or service would be equally effective to meet the recipient's needs. This provision states, in full:

> **For class members, when treatment or services are denied on the ground that an alternative treatment or service would be just as effective and less costly, the Prior Authorization Unit will identify the less costly item in its notice of denial of the more expensive item, in sufficient detail to allow the recipient and the provider to assess the utility of the item, and will inform the recipient and the provider that the less costly item will be approved, provided the recipient desires the item and so informs the provider, and a prescription for the item is obtained. The notice will further inform the recipient that he or she may accept the less costly item while maintaining an**

**appeal of the denial of the more costly item. If,
after appeal, the more costly item is approved, DHH may
request the return of the less costly item at DHH's
expense. Although recipients are not liable for any
damage, loss, or wear and tear to the less costly item,
them must not dispose of, destroy, or otherwise render
unusable (other than by ordinary wear and tear) the
less costly item, without specific permission from
DHH.**[48]

Plaintiffs maintain that, to the extent LDHH relies on the

availability of PCS to meet class members' needs in denying

requests for home nursing services, it must comply with Paragraph

12 of the Second Order by (1) identifying PCS as a less costly

item or service, (2) describing it in sufficient detail to allow

the recipient to assess whether it will meet his or her needs,

and (3) stating in the denial notice that LDHH will approve PCS

for the recipient if the recipient desires it and a prescription

for the item is obtained.

The first issue is whether this provision should be

interpreted to apply to prior authorization requests for nursing

services at all. In response, LDHH argues that this provision

should not be interpreted to apply to requests for home nursing

services in the first instance. It submits that Paragraph 12 was

primarily intended to apply to requests for durable medical

equipment ("DME") and not to requests for services. As it points

out, aside from a single reference to "services" in the first

_____

[48]   Rec. Doc. 275-2, p. 30, ¶ 12.

sentence, the majority of the paragraph references "items," rather than "services." For example, the provision states that the Department will identify and approve "the less costly item," as long as the recipient "desires the item." It also goes on to provide that the recipient can "accept the less costly item" while simultaneously appealing the denial of the "more costly item," and that recipients "are not liable for any damage, loss, or wear and tear to the less costly item."

On the one hand, it is admittedly difficult to comprehend how some of the operative language of this provision, which clearly contemplates application to requests for tangible items, could be applied to a "service." On the other hand, however, the first sentence of the Paragraph perhaps suggests that the provision is intended to apply more broadly than to requests for tangible items. By its own terms, the provision applies "when treatment *or services* are denied on the ground that an alternative treatment *or service* would be just as effective and less costly."[49] Furthermore, the allegations of Plaintiffs' original complaint suggest the provision applies more broadly than to requests for DME. Plaintiffs' complaint alleged that LDHH was violating the Medicaid Act by "failing to follow up to arrange for the provision of appropriate items or services when [LDHH] denies requested items or services on the ground that less

---

[49]    Rec. Doc. 275-2, p. 30, ¶ 12 (emphasis added).

39

expensive item or services will meet the recipient's needs."[50]
The Court finds that Paragraph 12 should be interpreted in light
of the specific claims it was intended to resolve.  <u>Rice v. Glad
Hands, Inc.</u>, 750 F.2d 434, 438 (noting that "stipulations must be
interpreted in light of the circumstances under which they are
made").  These claims involved the Department's alleged failure
to arrange for recipients to receive both items *and* services that
were less expensive, but still sufficient to meet EPSDT
recipients' medical needs, after requests for more expensive
items or services were denied.  Plaintiffs' allegations were not
limited solely to requests for tangible items.  The language
cited by LDHH, of course, is somewhat ill-suited to requests for
services and clearly intended to apply only to tangible items.
For example, a recipient cannot "dispose of, destroy, or
otherwise render unusable" a service.  However, at least the
first two sentence of Paragraph 12 can, in fact, be reasonably
applied to prior authorization requests for home nursing
services, and the Court finds that they should be.

    The parties further disagree as to how Paragraph 12 should
apply.  Plaintiffs appear to interpret the provision at face
value – that when a prior authorization request is denied because
PCS is a less costly, but equally effective alternative to home
nursing, the Department's notice denying the nursing service

---

[50]   Rec. Doc. 275-2, p. 28.

40

request should also simultaneously act as an approval for PCS services, without requiring a recipient to submit an additional prior authorization request for PCS. LDHH disputes this interpretation and argues that a recipient must submit a new prior authorization request for PCS to allow its medical consultants to review the PCS Plan of Care, which establishes whether a recipient needs assistance with ADLs and how much assistance he or she may need.

The Court finds that the Plaintiffs have the better argument on this point. First, the need for an entirely new prior authorization packet is at least partially obviated any time that Paragraph 12 should apply. In order for Paragraph 12 to apply in the first place, the Department will have *already* determined that the recipient has a need for assistance with ADLs; otherwise, at least in theory, it should not have invoked the availability of PCS to meet the recipient's documented needs as a basis for denying the request for nursing services. Accordingly, a new PCS Plan of Care is not technically necessary to establish why the recipient needs assistance with ADLs, as the Department suggests.

Next, the Court finds that the purposes of Paragraph 12 support Plaintiffs' interpretation. See United States v. Am. Cyanamid Co., 719 F.2d 558, 564 (2d Cir. 1983) (in construing a provision of a consent decree, a court may "consider the purpose of the provision in the overall context of the judgment at the

time the judgment was entered"). Here, this provision is intended to reduce the red tape involved in obtaining the Department's approval for a service to meet a previously documented need. If class members were required to assemble a completely new prior authorization packet for PCS, they would be left during the interim without access to services that the Department has already found to be medically necessary to meet their needs. LDHH's interpretation of this provision would be contrary to the overall purposes of the Stipulations and Orders, as well as the EPSDT program as a whole, which is to assure the availability of health care services that are medically necessary to treat, ameliorate, or correct a recipient's condition.

Additionally, where the Department is asserting that PCS will meet a need that has been described by a treating physician as requiring nursing services, Paragraph 12 of the Second Order requires the Department to identify the service "in sufficient detail to allow the recipient and the provider to assess the utility" thereof.[51] Plaintiffs contend, and the Court agrees, that a proper evaluation of the utility of PCS includes information regarding the limitations and restrictions on such services. For example, Louisiana Medicaid regulations strictly limit the tasks for which PCS can be used. PCS workers are not authorized to perform tasks for which medical training is

_____

[51] Rec. Doc. 275-2, p. 30, ¶ 12.

42

necessary, such as medical observation, taking vital signs, suctioning a tracheostomy, performing a tracheostomy change, administering nebulizer treatments, administering medications, monitoring PEG-tube feedings, flushing a PEG tube if it is backing up or malfunctioning, or even performing palliative skin care.[52] Another important limitation on the utility of PCS is that a parent or other caretaker must be present in the home with PCS providers if the PCS recipient is either under the age of 15, or older than 15 but not competent to direct his or her own care. See LA. ADMIN. CODE, Title 50, Part XV, § 7305(A)(4). Both of these limitations should be explained when PCS services are recommended as a suitable alternative to a request for home nursing services.

Finally, if further information is necessary to determine the precise *number* of PCS hours that are required to meet the needs, this information can be obtained without requiring a recipient to submit a completely new prior authorization request. Notably, the Department appears to require recipients and/or their treating physicians to submit additional information to justify additional non-approved hours without submitting an entirely new prior authorization request. If the need for assistance with ADLs has been previously documented in a request,

---

[52] See Rec. Doc. 275, Exh. 18, Louisiana State Medicaid Plan, Attachment 3.1A, Item 04(b) EPSDT.

but the extent of the need is not known, the Department could simply utilize the same procedure here.  Because the Court finds that LDHH's procedures and denial requests do not comport with the requirements of Paragraph 12, Plaintiffs' request for relief with respect to this point will be granted.

### vi.  *Notices Failing to Specify Both Number of Hours Requested and Number of Hours Approved*

Finally, Plaintiffs allege that several class members have received denial notices that fail to state the number of service hours requested, in violation of the Third Order's notice provisions requiring that notices "clearly indicate how many hours per day or week were requested, and how many were approved."[53]  LDHH acknowledges that the notices that these few class members received do not appear to comply with the Third Order's notice provisions.  It asserts that this was an aberration, however, not representative of the Department's general practices.  It also points out that additional notices were subsequently sent to these class members and that these notices comply with the notice provisions.  In the view of this Court, however, the fact that some class members receive multiple notices does not excuse the fact that some of the notices clearly do not comply with the Third Order.  If anything, the Department's practice of sending multiple notices creates only

---

[53]  See Rec. Doc. 275-2, p. 14, ¶ 17.

44

greater opportunities for confusion and demonstrates an even greater need for clarity in the notices that it submits. Accordingly, Plaintiffs' request for relief will be granted with respect to this provision, as well.

### CONCLUSION

Accordingly, for all the reasons expressed above, **IT IS ORDERED** that Plaintiffs' Motion to Enforce Stipulations and Orders **(Rec. Doc. 275)** is hereby **GRANTED IN PART** and **DENIED IN PART**. A separate order will be entered providing the precise relief that will be granted.

New Orleans, Louisiana this 26th day of June, 2012.

CARL J. BARBIER
UNITED STATES DISTRICT COURT