UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

MELANIE CHISHOLM, ON BEHALF                   CIVIL ACTION
OF MINORS, CC AND MC, ET AL

VERSUS                                        NO: 97-3274

KATHY KLIEBERT, INTERIM                       SECTION: "J"(5)
SECRETARY OF THE LOUISIANA
DEPARTMENT OF HEALTH AND
HOSPITALS

## ORDER AND REASONS

On May 21, 2013, following an oral argument held on May 8, 2013, the Court issued a short order granting Plaintiffs the relief requested in their Motion to Modify Contempt Remedy **(Rec. Doc. 364)**. Having considered the motion, the parties' written submissions, the oral arguments of counsel, the record, and the applicable law, the Court now issues its written reasons.

### PROCEDURAL HISTORY AND BACKGROUND FACTS

Medicaid is a jointly administered federal-state program of public assistance that Congress enacted in 1965. A state's participation in the Medicaid Program is completely voluntary. Wilder v. Virginia Hosp. Ass'n., 496 U.S. 498, 502 (1990). Although participating states are free to design their own Medicaid Programs

and determine exactly how and in what manner they provide services, Beal v. Doe, 432 U.S. 438, 444 (1977), they must comply with federal law. Mitchell v. Johnson, 701 F.2d 337, 343 (5th Cir. 1983). LDHH is the single state agency designated to administer the Medicaid program within the State of Louisiana.

In October 1997, Plaintiffs filed suit under 42 U.S.C. § 1983 against Defendant, the Louisiana Department of Health and Hospitals ("LDHH" or "the Department"),[1] alleging numerous Medicaid violations. On March 17, 1998, this Court certified this case as a class action, defining the class as:

> All current and future recipients of Medicaid in the State of Louisiana under age twenty-one who are now or will in the future be placed on the Mental Retardation/Developmental Disabilities ("MR/DD") waiver waiting list.

Thereafter, the parties entered into two partial settlements resolving some of the Plaintiffs' claims. The Court conducted fairness hearings on February 16, 2000 and December 14, 2000 and approved those partial settlements. In addition, on August 30, 2000, the Court entered partial summary judgment for Plaintiffs on some of their claims while reserving a ruling on others until the February 16, 2000 settlement had been given an opportunity to resolve them. Following the foregoing rulings, on October 7, 2000, the sole remaining issue — the extent of the State's obligation,

---

[1] The Court recognizes that the named Defendant is Kathy Kliebert, the interim Director or the Louisiana Department of Health and Hospitals. However, because the suit is against her in her official capacity, the Court hereinafter refers to the Defendant as "LDHH" or "the Department" for the sake of convenience. See Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989) (suit against a state official in his official capacity is generally suit against the State itself).

under federal Medicaid law, to provide community-based access to psychological and behavioral services to class members diagnosed with autism[2] — came on for a bench trial before the Court.[3]

**A. 2001 Findings of Fact and Conclusions of Law**

On February 21, 2001, the Court issued its Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a) on the sole question of the extent to which federal Medicaid law requires the State of Louisiana, through the LDHH, to provide community-based behavioral and psychological services, rendered by licensed psychologists, to class members diagnosed with autism.[4] (2001 Findings of Fact and Conclusions of Law, Rec. Doc. 118)

Plaintiffs argued, at that time, (a) that licensed psychologists, as opposed to psychiatrists or other practitioners,

---

[2] Autism is a subset of a set of disorders known as Pervasive Developmental Disorders, which has its onset in early childhood. This Court has previously recognized that:

> Pervasive Developmental Disorders or "PDD" are disorders characterized by severe and pervasive impairment in several areas of development: reciprocal social interaction skills, communication skills, or the presence of stereotyped behaviors, interests, and activities. The qualitative impairments that define these conditions are distinctly deviant relative to the individual's developmental level or mental age. They include Autistic Disorder, Childhood Disintegrative Disorder, Rett's Disorder, Asperger's Disorder, and Pervasive Developmental Disorder Not Otherwise Specified.

(2001 Remedial Order, Rec. Doc. 124, p. 2, ¶ 2)

[3] Prior to trial, the parties consented to try the sole remaining issue by submitting all evidence in documentary form.

[4] The Court explicitly stated that "as used throughout these Findings of Fact and Conclusions of Law, the term 'psychologist' refers to an individual so licensed in Louisiana," and further explained, that under Louisiana law at the time, as codified in La. R.S. 37:2356, to qualify as a licensed psychologist, "the individual must possess a doctoral degree with a major in psychology, have a minimum of two years of experience practicing psychology under the supervision of a psychologist, and must pass both a written and an oral examination." (2001 Findings of Fact and Conclusions of Law, Rec. Doc. 118, p. 4, n. 3)

were uniquely qualified to render the behavioral and psychological services essential to treating children with autism and (b) that federal Medicaid law mandated that the State provide class members diagnosed with autism with access to behavioral and psychological services administered by licensed psychologists. (2001 Findings of Fact and Conclusions of Law, Rec. Doc. 118, p. 5) Moreover, although Plaintiffs conceded, at that time, that behavioral and psychological services were not completely unavailable under the State's then-existing system, they argued that under the State's then-existing system, (a) access to psychological and behavioral services was more theoretical than real and (b) the options provided by the state did not provide psychological and behavioral services to the extent mandated by federal law. (2001 Findings of Fact and Conclusions of Law, Rec. Doc. 118, p. 6) LDHH, at that time, did not dispute Plaintiffs' contentions that (a) psychological and behavioral services would benefit class members with autism and (b) licensed psychologists are uniquely suited to effectively render those services. (2001 Findings of Fact and Conclusions of Law, Rec. Doc. 118, p. 6) Rather, LDHH contended that its then-existing system provided class members diagnosed with autism with sufficient access to psychological and behavioral services, pointing to various avenues through which, it asserted, class members could access psychological services. (2001 Findings of Fact and Conclusions of Law, Rec. Doc. 118, p. 6)

After reviewing the pertinent evidence and applicable law, the Court concluded that under federal law, Louisiana is required to

4

provide class members diagnosed with autism with behavioral and psychological services rendered by licensed psychologists. (2001 Findings of Fact and Conclusions of Law, Rec. Doc. 118, pp. 6-7) The Court explained that by choosing to participate in the federal Medicaid program and accepting federal funds, Louisiana obligated itself to comply with federal Medicaid law. (2001 Findings of Fact and Conclusions of Law, Rec. Doc. 118, pp. 7-8) In particular, one of Louisiana's mandatory statutory obligations under federal Medicaid law is to provide early and periodic screening, diagnosis, and treatment services ("EPSDT") to categorically needy individuals under age twenty-one. (2001 Findings of Fact and Conclusions of Law, Rec. Doc. 118, p. 8) The Court observed that, in addition to those services enumerated in the definition of EPSDT, federal law mandates that the State provide other services, not specifically mandated in the definition of EPSDT, if those services are a type of "medical assistance," as defined in Section 1396d(a), that is "necessary . . . to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services . . . ." 42 U.S.C. §§ 1396(r)(5), 1396d(a). (2001 Findings of Fact and Conclusions of Law, Rec. Doc. 118, pp. 8-9) The Court reasoned that if the behavioral and psychological services that Plaintiffs sought — namely behavioral and psychological services rendered by licensed psychologists — constituted "medical assistance" "necessary . . . to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services," they qualified as EPSDT services and the State

was obligated to provide them to class members diagnosed with autism. (2001 Findings of Fact and Conclusions of Law, Rec. Doc. 118, p. 9)

The Court found that the psychological and behavioral services Plaintiffs sought constituted "medical assistance" as defined under Section 1396d(a), because they fell within two distinct prongs of the statutory definition of "medical assistance," namely subsections 1396d(a)(6) and 1396d(a)(13). (2001 Findings of Fact and Conclusions of Law, Rec. Doc. 118, pp. 9-10) The Court reasoned that psychological and behavioral services rendered by licensed psychologists fell within subsection 1396d(a)(6) of the statutory definition of "medical assistance," because they constituted "any other type of remedial care recognized under State law, furnished by licensed practitioners within the scope of their practice as defined by State law." Id. § 1396d(a)(6). The Court reasoned that services in question also fell within subsection 1396d(a)(13) of the statutory definition of "medical assistance," because they constituted "other . . . preventative, and rehabilitative services, including any medical or remedial services . . . recommended by a physician or other licensed practitioner of the healing arts within the scope of their practice under State law, for the maximum reduction of physical or mental disability and restoration of an individual to the best possible functional level." Id. § 1396d(a)(13).

Moreover, the Court concluded, based on the unrebutted

testimony of Plaintiffs' expert, Dr. Grant Butterbaugh, Ph.D.,[5]
that psychological and behavioral services rendered by licensed
psychologists were necessary to correct or ameliorate the
debilitating effects of autism and that services provided through
psychiatrists or other practitioners could not substitute for
behavioral services rendered by licensed psychologists.[6] (2001
Findings of Fact and Conclusions of Law, Rec. Doc. 118, pp. 11-12)
Accordingly, the Court found that the State, pursuant to the
federal EPSDT mandate, was required to provide behavioral and
psychological services rendered by licensed psychologists to class
members with autism. (2001 Findings of Fact and Conclusions of Law,
Rec. Doc. 118, p. 12)

After considering the evidence offered by both parties, the
Court concluded that the State's then-existing system did not
comply with the mandates of federal Medicaid law stating:

> [T]he Court is persuaded by Plaintiffs' contention that
> the availability of behavioral and psychological
> services, to class members diagnosed with autism, is more
> theoretical than actual under the current system. Under

---

[5] Dr. Butterbaugh was a licensed clinical psychologist and
neuropsychologist and also served as an associate clinical professor in the
psychiatry department of the Louisiana State University School of Medicine in
New Orleans.

[6] Dr. Butterbaugh testified: (1) that psychological or behavioral
interventions have been shown to be effective in improving functioning in
children with autism, (2) that the use of behavioral interventions is
essential for teaching most children with autism daily functional skills and
modifying their misbehaviors, and (3) that the effects of autism can at least
be mitigated by psychological services, and that for many individuals with
autism, psychological services are a necessary service, for which other
services cannot substitute. (2001 Findings of Fact and Conclusions of Law,
Rec. Doc. 118, p. 11) Dr. Butterbaugh also testified that psychiatrists
generally are not trained in, and do not provide, the types of intensive
behavioral treatment methodologies that have been shown to be effective in
treating children with autism. (2001 Findings of Fact and Conclusions of Law,
Rec. Doc. 118, pp. 11-12)

the structure of the current system system, it would seem
to be more the exception than the rule that class members
with autism would have access to psychological services.
Given that Plaintiffs are entitled to these mandatory
services, the current system falls woefully short of
complying with federal law. [LDHH's] failure to make
behavioral and psychological services available to all
EPSDT recipients who need them violates the requirement
of 42 U.S.C. § 1396d(r)(5) that the defendant provide all
services within the scope of 42 U.S.C. § 1396(a)
necessary to correct or ameliorate health conditions of
EPSDT recipients.

(2001 Findings of Fact and Conclusions of Law, Rec. Doc. 118, pp.
21-22)

After finding that LDHH's then-existing system failed to
provide psychological and behavioral services rendered by licensed
psychologists to class members diagnosed with autism, as mandated
by federal law, the Court considered the appropriate remedy.
Plaintiffs proposed that LDHH be required to allow psychologists to
enroll directly in the Medicaid program as providers of services to
class members. (2001 Findings of Fact and Conclusions of Law, Rec.
Doc. 118, p. 22) LDHH argued that such a remedy would have sweeping
effects on Louisiana's Medicaid program and was much broader than
necessary to remedy the complained-of systemic shortcomings. (2001
Findings of Fact and Conclusions of Law, Rec. Doc. 118, p. 22)
After observing that there seemed to be a possibility that the
parties could agree on a remedy short of direct enrollment that
would put the state in compliance with its obligations under
federal law, the Court pretermitted fashioning a remedy at that
time, and ordered the parties to confer and jointly submit a
proposed remedy for the identified violation of federal law. (2001

Findings of Fact and Conclusions of Law, Rec. Doc. 118, p. 23)

**B. The 2001 Remedial Order**

On June 28, 2001, after the parties conferred and jointly submitted a proposed remedy for the Court's consideration, the Court entered a remedial order ("2001 Remedial Order"). In the 2001 Remedial Order, the Court ordered LDHH to make available to class members with Pervasive Developmental Disorders ("PDD"), including class members with autism, all necessary psychological and behavioral services to correct or ameliorate their conditions. (2001 Remedial Order, Rec. Doc. 124, pp. 1-2, ¶ 1) The Court ordered that "[s]ufficient qualified providers will be available to insure that the necessary services may be provided to all class members with reasonable promptness." (2001 Remedial Order, Rec. Doc. 124, p. 2, ¶ 3) With respect to the services that LDHH was obligated to provide to class members, the Court specified that:

> [s]ervices provided will include the necessary evaluations; family education and training; clinical interventions; periodic follow-up; linkages to emergency mental health services in crisis situations; as well as those services routinely performed by psychologists in the practice of psychology. The psychologist will assist multidisciplinary service providers, such as providers of educational services, speech therapy, occupational therapy, physical therapy, psychiatric services, personal care services, or primary medical care, in the design of appropriate, effective learning-based formats for behavioral support in the delivery of multidisciplinary services.

(2001 Remedial Order, Rec. Doc. 124, p. 2, ¶ 4).

With respect to the permissible justifications for LDHH imposing limitations upon these services to class members, the

Court ordered that

> [a]ny limitations imposed upon these services to class
> members will be justified by the fact that services
> beyond those limits are not necessary to correct or
> ameliorate their condition, or are not within the
> services listed in 42 U.S.C. § 1396d(a) . . . This Order
> does not establish by implication or otherwise, that any
> service not currently covered by Louisiana Medicaid is,
> or should be, included in 42 U.S.C. § 1396d(a), other
> than those services described in paragraph 4 of this
> Order. Defendant is not subject to an action for contempt
> of this Order for denying the inclusion of any services
> (other than those services described in paragraph 4 of
> this Order) currently not covered by Louisiana Medicaid.

(2001 Remedial Order, Rec. Doc. 124, p. 3, ¶ 5)

Attachment A to the 2001 Remedial Order outlined the manner in which LDHH would make the behavioral and psychological services available to classmembers diagnosed with autism or PDD. (2001 Remedial Order, Rec. Doc. 124, p. 3, ¶ 6) The remedy outlined consisted of two components, the State Plan Program and the Center for Excellence. Under the State Plan Program, LDHH would establish fifteen teams throughout Louisiana, according to population distribution, consisting of a least: (1) one psychologist who would act as team leader, (2) one person with at least a master's degree in psychology to work with the team leader, (3) one licensed clinical social worker, and (4) three behavior intervention specialists. (2001 Remedial Order, Rec. Doc. 124, p. 9) In order to be qualified as a team leader, a psychologist would: (1) be licensed by the state of Louisiana, (2) possess a doctoral degree with a major in psychology, as provided in the licensing standards for Louisiana psychologists, with professional training in normal

10

and abnormal childhood development, (3) have accrued a minimum of 130 hours working with children with autism, and (4) have experience in diagnosing and treating childhood developmental and mental disorders, including conducting functional behavioral assessments and implementing positive behavior support plans. (2001 Remedial Order, Rec. Doc. 124, pp. 9-10) The team leader psychologists were to be responsible for developing and implementing family-centered treatment plans for each child requesting services who meets the eligibility requirements.[7] (2001 Remedial Order, Rec. Doc. 124, pp. 10-11, ¶¶ 2, 10)

The 2001 Remedial Order also provided detailed requirements for each family-centered treatment plan. (2001 Remedial Order, Rec. Doc. 124, pp. 11-13, ¶¶ 1-16) The plans were, among other things, to be multi-disciplinary, family-centered, culturally sensitive, and arrived at by agreement between the parents or caregivers and the provider-teams. (2001 Remedial Order, Rec. Doc. 124, p. 12, ¶¶ 4, 6) The plans were also to identify the responsibilities of both the parents or caregivers and the provider-teams in carrying out the plan. (2001 Remedial Order, Rec. Doc. 124, p. 11, ¶ 1) The

---

[7] In order to be eligible for services under the State Plan Program outlined in the 2001 Remedial Order, a child must meet the following minimum eligibility requirements: (a) the child has a diagnosis of PDD according to a clinically appropriate diagnostic screening tool or other assessment, or (b) the child has an impaired functional status that can be addressed by psychological treatment, on an instrument or other assessment of individual functioning that is appropriate for individuals with developmental disabilities, or (c) the child engages in recurrent behaviors that are so disruptive or dangerous that harm to others is likely, or (d) the child engages in recurrent behaviors that are not the result of clinically suicidal intent that have resulted in actual physical harm to the child himself or herself, such as bruising, lacerations or other tissue damage, or would result in same if the child was not physically restrained.

plans were supposed to be "designed to achieve the maximum improvement of the child's functioning, given the family systems, family readiness for change, siblings' needs, peer reactions, child's position with the family life cycle, and school curriculum" and "must provide adequate support (i.e., coaching, mentoring, and on-site assistance, if necessary) for family/caregiver implementation." (2001 Remedial Order, Rec. Doc. 124, p. 12, ¶ 5) The 2001 Remedial Order further specified that treatments proposed should be based on solid, empirical evidence and contemplated follow-up assessments and ongoing treatment for eligible class members. (2001 Remedial Order, Rec. Doc. 124, p. 13, ¶¶ c, d)

**C. The 2002 Contempt Order**

On May 16, 2002, Plaintiffs filed a Motion for Civil Contempt and Alternative Remedies ("2002 Contempt Motion") alleging that LDHH had failed to comply with the 2001 Remedial Order. (2002 Contempt Motion, Rec. Doc. 132) Plaintiffs attached to the 2002 Contempt Motion part of the Request for Proposals that LDHH had issued in connection with the "Psychological and Behavioral Services for Children Program" that LDHH planned to establish to provide the fifteen teams contemplated in the 2001 Remedial Order.[8] (2002 Contempt Motion, Rec. Doc. 132, pp. 3-7) Plaintiffs asserted in their 2002 Contempt Motion that LDHH should be held in contempt, because the schedule LDHH published in the Request for Proposals

---

[8] LDHH issued the Request for Proposals in order to seek offers from interested persons for the implementation of the fifteen provider teams contemplated in the 2001 Remedial Order. (Request for Proposals, Rec. Doc. 132, p. 7)

showed that LDHH did not intend to begin providing services to class members until August 15, 2002 when a prior Court order required LDHH to implement the 2001 Remedial Order and provide services by June 1, 2002. (2002 Contempt Motion, Rec. Doc. 132, p. 1) Plaintiffs also pointed out: (1) that in the "Overview" section of the RFP, LDHH indicated that it intended to submit a request for a 1915(b)(4) waiver of provisions to the Centers for Medicare and Medicaid Services[9] ("CMS") so that providers could be limited to those LDHH contracted with pursuant to the RFP and (2) that "the entire program is contingent on CMS's approval of the [freedom of choice] waiver." (2002 Contempt Motion, Rec. Doc. 132, pp. 1, 7) Plaintiffs noted that LDHH only requested the waiver in March of 2002, had not received approval of the waiver as of the time of the filing of the 2002 Contempt Motion in May of 2002, and that CMS had ninety days within which to rule on the requested waiver, which extended beyond the June 1, 2002 deadline for LDHH to implement services. Asserting that it was apparent that LDHH would not implement services by June 1, 2002, as ordered by the Court, and that it not even guaranteed that LDHH would implement services by August 15, 2002, Plaintiffs requested that the Court:

> (1) order LDHH to make psychological and behavioral services available to class members by allowing private psychologists to enroll in the Louisiana Medicaid program and provide services to recipients under age 21 without delay and to continue to provide services in this way unless and until services under the Request for Proposal

---

[9] The Center for Medicare and Medicaid Services partially regulates state Medicaid programs.

are available statewide;[10]

(2) order that LDHH make the availability of these services known to psychologists in the state and to class members with autism and other pervasive developmental disorders;

(3) order that LDHH provide payment and coverage for the psychologists' services under the same terms as it provides payment and coverage for visits to physicians' offices, without designing and implementing any "prior approval" standards and procedures, unless and until further order of the Court;[11] and

(4) order appropriate reporting as to the provision of such services and payments made for such services.

(2002 Contempt Motion, Rec. Doc. 132, p. 2)

Plaintiffs also specifically requested that the Court order that "[LDHH's] conformance with this temporary civil contempt remedy would not excuse it from its obligation to continue implementing the previously agreed and ordered remedy." (Rec. Doc. 132, p. 10) Plaintiffs contemplated that the temporary remedy "would be ended, by subsequent court order, once [LDHH] makes a showing that the previously ordered services are actually available as required by this court's previous orders." (2002 Contempt Motion, Rec. Doc. 132, p. 11)

---

[10] Plaintiffs requested this relief "until and unless [LDHH] completes its venture to make services available through 15 teams statewide." (2002 Contempt Motion, Rec. Doc. 132, p. 9)

[11] (2002 Contempt Motion, Rec. Doc. 132, pp. 1, 9) Plaintiffs argued that LDHH had delayed for over a year while it attempted to implement a program with the freedom-of-choice cost containment elements it desired, and that the time had come for the needs of the class members, whose needs had been illegally unmet since before the suit's inception, to be given priority. Plaintiffs further argued that coverage should be made available for services of psychologists *and their staffs* on the same terms as coverage for visits to physicians offices, without any "prior approval" standards and procedures, because any potential losses were more than outweighed by LDHH having saved millions of dollars by giving no required services during the preceding years. (Rec. Doc. 132, pp. 8-9)

The Court held oral argument on the 2002 Contempt Motion on
June 7, 2002. (Rec. Doc. 138) On June 17, 2002, the Court entered
a Judgment finding by clear and convincing evidence that LDHH was
in contempt of the 2001 Remedial Order, and the January 23, 2002
order amending the implementation date in the 2001 Remedial Order
from January 1, 2002 until June 1, 2002. (2002 Contempt Order, Rec.
Doc. 140, pp. 1, 2) In the 2002 Contempt Order, the Court further
ordered that, "[e]ffective immediately, LDHH shall implement
coverage for services provided by licensed psychologists for all
class members who qualify for them under the terms of [the 2001
Remedial Order]," and that LDHH "shall issue individual notice of
the availability of these services to class members by June 21,
2002."[12] In addition, the Court ordered LDHH to issue individual
notices seeking enrollment of psychologists to all psychologists in
the state by June 21, 2002.[13] (2002 Contempt Order, Rec. Doc. 140,
p. 3, ¶ 5) The Court also ordered that, until further order of the
Court, LDHH could limit enrollment to psychologists who: (1) have
a Ph.D., (2) are licensed as psychologists in Louisiana, and (3)
are professionally qualified to treat children and/or adults with

---

[12] The Court also ordered LDHH to update its list of class members to
the extent practical before issuing the notice, to attempt to ensure both its
currency and completeness as to class members no longer on the MR/DD waiver
waiting list. (2002 Contempt Order, Rec. Doc. 140, p. 2, ¶ 4) The Court
further ordered that if the updates to the list could not be completed before
the date for issuing notices, LDHH should nonetheless send notices to those
added to the list thereafter. (2002 Contempt Order, Rec. Doc. 140, p. 2, ¶ 4)

[13] The Court further ordered LDHH to attempt to obtain consent of
Plaintiffs' counsel as to the form of such notices. (2002 Contempt Order, Rec.
Doc. 140, p. 3, ¶ 5)

PDD, including autism and/or developmental disabilities.[14] (2002
Contempt Order, Rec. Doc. 140, p. 3, ¶ 6) The Court ordered LDHH's
counsel to provide weekly updates, in writing, to the Court and
Plaintiffs' counsel on implementation of the contempt remedy,
covering, to the extent practical, the following elements from the
Court's 2001 Remedial Order: (a) the number of providers enrolled,
(b) the locations from which the providers offer services, (c) the
total number of class members, and (d) to the extent available, the
total number of class members with a diagnosis of PDD, and their
parishes of residence. (2002 Contempt Order, Rec. Doc. 140, p. 3,
¶ 7) With regard to the initial implementation of the remedy, the
Court denied the Plaintiffs' request that the LDHH provide services
to persons who are not class members and LDHH's request to impose
prior authorization procedures. (2002 Contempt Remedy, Rec. Doc.
140, p. 3, ¶¶ 8-9) The 2002 Contempt Order provided that:

> [b]ecause this remedy is intended to correct compliance
> by [LDHH], and compensate class members for the failure
> to comply, [LDHH] may purge itself of contempt by a
> showing to the Court that it has fully implemented the
> Court's previous orders, and the remedies ordered herein
> shall cease on such a finding by the Court. The remedy
> may also be ended by agreement of the parties, approved
> by the Court, or by further order of the Court.

(2002 Contempt Order, Rec. Doc. 140, pp. 3-4, ¶ 10)

The 2002 Contempt Order also provided that "[e]ither party may
by motion seek modification of the alternative remedy ordered

---

[14] The 2002 Contempt Order specified that the parties agreed as to the
initial means for determining these qualifications, which could be changed by
their agreement or by order of the Court. (2002 Contempt Order, Rec. Doc. 140,
p. 3, ¶ 6)

herein." (2002 Contempt Order, Rec. Doc. 140, p. 4, ¶ 11) On February 21, 2013, nearly a decade after the Court issued the 2002 Contempt Order, Plaintiffs filed the instant motion seeking to modify the contempt remedy in the 2002 Contempt Order and set the motion for hearing, without oral argument, on April 24, 2013. (Rec. Doc. 364) On April 4, 2013, LDHH filed a motion to continue the submission date on Plaintiffs' motion (Rec. Doc. 366), which Plaintiffs opposed. The Court denied LDHH's motion to continue on April 10, 2013. (Rec. Doc. 370) On April 16, 2013, LDHH filed its opposition to Plaintiff's Motion for Modification of Contempt Remedy. (Rec. Doc. 367) On April 17, 2013, Plaintiffs filed a request for oral argument. On April 22, 2013, the Court issued an order continuing the hearing and oral argument on Plaintiff's Motion for Modification of Contempt remedy until Wednesday, May 8, 2013. On May 3, 2013, Plaintiffs filed a motion for leave to reply to LDHH's opposition, which the Court granted on May 8, 2013. (Rec. Doc. 379) On Wednesday, May 8, 2013, the Court heard oral argument on Plaintiffs' motion and took the matter under advisement. On May 21, 2013, the Court issued a short order in which it granted Plaintiffs' Motion for Modification of Contempt Remedy and indicated that it would issue written reasons at a later date. (Rec. Doc. 380)

PARTIES' ARGUMENTS

**A. Plaintiffs' Arguments**

**1. Requested Modification of the Remedy in the 2002 Contempt Order**

The instant motion concerns a subset of the class consisting of class members who have been diagnosed with autism or other Pervasive Development Disorders ("PDD").[15] Plaintiffs assert that LDHH continues to fail to comply with the remedy in the 2001 Remedial Order pertaining to services to ameliorate autism. Plaintiffs seek an order modifying the 2002 Contempt Order to require LDHH to assist class members diagnosed with autism or PDD in locating and obtaining Applied Behavioral Analysis therapy ("ABA"), an evidence-based treatment that both parties acknowledge has proven to be and is widely recognized by experts as one of the most, if not the most, effective method(s) of treating autism and other PDDs. In addition, Plaintiffs seek an order requiring LDHH to allow additional qualified practitioners of ABA, including Board Certified Behavior Analysts and the McNeese Autism Program, to enroll as Medicaid providers and provide services for class members. In particular, Plaintiffs request that the Court order LDHH:

> (1) to make provisions for the numerous Board Certified Behavior Analysts who specialize in ABA therapy to enroll as independent Medicaid providers, to submit claims for their services, and to be listed as a resource for class members in all resources informing EPSDT recipients of

---

[15] See supra n. 2.

services governed by orders in this case;[16]

(2)  to make provisions for Board Certified Behavior Analysts, the McNeese Autism Program, and other programs and agencies employing Board Certified Behavior Analysts to be reimbursed by Medicaid for intensive behavior interventions designed and supervised by Board Certified Behavior Analysts;

(3) to identify any other providers who are enrolled in Medicaid who have documented evidence of equivalent education, professional training, and supervised experience in ABA;

(4) to provide reimbursement rates such that sufficient qualified providers are available and that necessary services are provided to class members with reasonable promptness;

(5) to develop and maintain outreach and referral systems to direct class members to providers who possess this certification or evidence of equivalent qualifications, for evaluation and treatment;

(6) to arrange for intensive ABA therapy for class representatives, F.F. and A.B.;

(7) to report to the Court within forty-five days of entry of its Order as to LDHH's implementation of the relief;

(8) to provide monthly reports to class counsel, as to the following, in order to insure that the modified remedy is working:

> a) the number of Board Certified Behavior Analysts or equivalently - qualified providers of ABA therapy enrolled in Medicaid and their locations;
>
> b) the number of class members diagnosed with PDD and their locations;
>
> c) the number of class members with PDD receiving intensive ABA therapy;
>
> d) the number of class members with PDD receiving other psychological or behavioral services, and the type of practitioners from whom they are receiving services; and

---

[16] First Stipulation and Order, Rec. Docs. 43, 17, 31, 37-51.

e) the amount of Medicaid expenditures on each of these types of services for class members with PDD.

## 2. Background Information

Plaintiffs provide a significant amount of background information, supporting evidence, and statistics relating to: (a) 2012 changes to LDHH's Medicaid and behavioral health services system, (b) the class representatives, (c) Applied Behavioral Analysis, (d) Board Certified Behavior Analysts, (e) the McNeese Autism Program, and (f) recent changes in Louisiana law relative to private insurance coverage of ABA therapy, which is summarized below.

### a. 2012 Changes to LDHH's Medicaid and Behavioral Health Services

In March of 2012, LDHH made changes to its behavioral health service system, contracting with a managed care organization, Magellan of Louisiana, Inc., ("Magellan") to provide most of its behavioral health services, including the psychological services offered to class members. (Abadie Decl., Rec. Doc. 364-7, p. 2, ¶ 8) According to Plaintiffs, providers of behavioral health services must now enroll through Magellan and services must be prior authorized. Plaintiffs assert that the reimbursement rates for psychologists have been reduced, and that fewer psychologists are treating class members. In addition, Plaintiffs assert that as part of the changes LDHH made in 2012, it expanded the types of providers that are allowed to enroll in Medicaid and now permits the enrollment of licensed clinical social workers, licensed

professional counselors, licensed marriage and family therapists, and unlicensed providers who meet certain criteria.

### b. Class Representatives

The class representatives in this case are F.F. and A.B., five and six year old boys who have been diagnosed with autism.[17] Both class representatives' pediatricians have recommended that they receive Applied Behavioral Analysis therapy to treat their autism.[18] (Owens Decl., Rec. Doc. 364-2; Schneider Decl., Rec. Doc. 364-4) In addition, Dr. James Mulick, Ph.D.,[19] an expert on the effective treatment of autism, reviewed F.F. and A.B.'s medical records, and concluded based on his review that (a) both class representatives were properly diagnosed with autism, and (b) both class representatives need and would benefit from additional intensive ABA therapy (thirty to forty hours per week) to correct and

---

[17] Plaintiffs have supported these facts regarding F.F. with declarations under penalty of perjury from Kimberlee Owens, F.F.'s mother, (Owens Decl., Rec. Doc. 364-2) and Christine Tilley, a Board Certified Behavior Analyst who provides ABA therapy to children in the New Orleans area and who began providing ABA therapy to F.F. in September of 2009. (Tilley Decl., Rec. Doc. 362-3)

[18] F.F.'s developmental pediatrician recommended that he receive ABA therapy. (Owens Decl., Rec. Doc. 364-2, p. 2, ¶ 7) A.B.'s pediatrician stated: (1) a program of ABA therapy is medically necessary for A.B.; (2) ABA therapy is the only evidence-based therapeutic intervention for autism; and (3) ABA therapy is accepted standard practice for treatment of autism. (Schneider Decl., Rec. Doc. 364-4, p. 3, ¶¶ 6-7)

[19] Dr. Mulick is a psychologist who is currently employed at the Child Development Center at the Nationwide Children's Hospital in Columbus, Ohio and at the Ohio State University College of Medicine. He is a full professor at Ohio State University both in the Department of Psychology, Division of Intellectual & Developmental Disabilities, and in the Department of Pediatrics, Division of Behavioral and Developmental Pediatrics. Dr. Mulick has practiced as a psychologist for 38 years, published numerous articles, trained numerous professionals about autism and effective autism treatments, and diagnosed and treated more than 3,000 individuals with autism and other developmental disabilities. (Mulick Decl., Rec. Doc. 364-6, p. 2, ¶¶ 1-4)

ameliorate the effects of their autism on their learning, behavior, and/or socialization. (Mulick Decl., Ex. 5 to Pl.'s Mot., Rec. Doc. 364-6, p. 18, ¶¶ 44-49)  Both class representatives assert that because Medicaid does not cover ABA therapy, they are unable to obtain as much ABA therapy as needed due to their families' financial constraints. (Owens' Decl., Rec. Doc. 364-2, pp. 3-4, ¶¶ 14, 16; Teekel Decl., Rec. Doc. 364-2, pp. 2-3, ¶¶ 8, 13)

### c. Applied Behavioral Analysis

Since the Court issued the 2002 Contempt Order, there has been an expansion of the availability of evidence-based treatments for children with autism through Board Certified Behavior Analysts ("BCBAs") who provide ABA therapy. ABA therapy is a type of behavioral health service that relies on reinforced practice of various systematically taught skills and is highly effective in treating autism in a high percentage of cases.[20] ABA interventions are based on scientific research and aim to help people develop new behavior, increase or decrease existing behavior, and emit behavior under specific environmental conditions. More than forty years of peer-reviewed research validates early interventions for autism that are conceptually grounded in ABA.[21] In 1998, the United States

---

[20]  This information in this section regarding ABA therapy is based on Dr. Mulick's declaration, which was submitted by Plaintiffs. See supra n. 19. Defendants do not dispute this contention. (Def.'s Opp., Rec. Doc. 371, pp. 1-2).

[21]  According to Dr. Mulick, in 1987, Professor Lovaas wrote a landmark paper that was published as the lead article in the most prestigious clinical psychology journal published by the American Psychological Association. In that article, Lovass announced the results of his Young Autism Project, outlined the "UCLA model" of  early intensive behavioral treatment, and demonstrated that young children with autism given intensive behavior therapy

Surgeon General concluded that "[t]hirty years of research demonstrate[s] the efficacy of applied behavioral methods in reducing inappropriate behavior and increasing communication, learning, and appropriate social behavior."

### d. Board Certified Behavior Analysts

Board Certified Behavior Analysts ("BCBAs") are professionals who have (a) completed either a Master's Degree or a Doctorate from an accredited university with rigorous coursework, training, and supervised experience in ABA therapy and (b) passed the national credentialing exam administered by the Behavior Analyst Certification Board. (Mulick Decl., Rec. Doc. 364-4, p. 15-16, ¶ 39) The Behavior Analyst Certification Board is a credentialing organization that has established uniform content, standards, and criteria for professionals to meet and establish their competence and experience in ABA therapy.[22] BCBAs are independent practitioners who may work as employees or independent contractors for an organization. (Mulick Decl., Rec. Doc. 364-4, p. 16, ¶ 39) BCBAs

during preschool could achieve normal levels of intellectual functioning. Dr. Mulick explains that the UCLA model had several important components. First, the treatment is usually required to be carried out for approximately three years and it is intensive, in that it is delivered five to six hours per day during one-on-one sessions with a trained therapist implementing the treatment. Second, the treatment program is administered by four to five therapists who work part-time with the individual child. Third, therapists are closely supervised by senior therapists and other professionals who assure treatment fidelity. Fourth, parents are encouraged to observe treatment sessions so that they can be able to expect the child to perform what they learned outside of therapy. Fifth, therapists convey to the parents how to use the behavior analytic teaching procedures with their children. The use of several therapists and the involvement of parents promotes generalization of skills learned during therapy sessions and provides additional practice.

[22] See http://www.bacb.com/index.php?page=1.; (Green Decl. Rec. Doc. 79-1, p. 4, ¶ 10)

design behavior analytic interventions and supervise Assistant Behavior Analysts and others who actually implement behavior analytic interventions. (Mulick Decl., Rec. Doc. 364-4, p. 16, ¶ 39) According to the Behavior Analyst Certification Board, there were 65 BCBAs in Louisiana on February 1, 2013, none of whom were certified prior to 2003.[23] (Abadie Decl., Rec. Doc. 364-7, p. 2, ¶¶ 12, 16) None of these 65 BCBAs is included on the list of providers that LDHH submitted to Plaintiffs or the Magellan website, and although one BCBA provider was on the 2011 list of Medicaid-enrolled psychologists, it is no longer on the list. (Abadie Decl., Rec. Doc. 364-7, pp. 3-4, ¶¶ 11-16) At present, LDHH does not permit BCBAs to enroll and be reimbursed as Medicaid providers solely by virtue of their certification, and does not maintain records of Medicaid-enrolled providers who are certified to provide ABA therapy.[24]

_____

[23] This information was based on a declaration under penalty of perjury from Jeanne Abadie ("Ms. Abadie"), the Compliance Specialist in the Advocacy Center's New Orleans office, whose responsibilities at the Advocacy Center include monitoring compliance with settlement agreements and consent decrees, including the orders in this case. (Abadie Decl., Rec. Doc. 364-7, p. 2, ¶ 1) Ms. Abadie stated that she gathered this information by reviewing the Behavior Analyst Certification Board's website, which provides the original certification date of each BCBA, and found that the earliest date that any of the current BCBAs in Louisiana was certified was in 2003, after the Court issued the 2002 Contempt Order. (Abadie Decl., Rec. Doc. 364-7, p. 2, ¶¶ 11-16)

[24] In support of this assertion, Plaintiffs rely on LDHH's response to interrogatories 5 and 6, in which LDHH stated:

"[LDHH] does not distinguish psychologists who provide ABA from those who provide other psychological services. They are simply enrolled as licensed psychologists. In addition to the psychologists enrolled in Medicaid, there are licensed psychologists who contract with Magellan through the Louisiana Behavioral Health Partnership. Magellan also contracts with licensed clinical social workers, licensed professional counselors, and licensed marriage and family therapists, as well as unlicensed providers who meet certain criteria. Any of these providers could be providing ABA therapy

## e. The McNeese Autism Program

The McNeese Autism Program is housed in the Kay Dore Counseling Clinic of McNeese State University and provides a full range of ABA-based services for children with autism.[25] The McNeese Autism Program is part of the Department of Psychology and serves as the training site for master's level students in the ABA concentration. The McNeese Autism Program has a Director — a masters' level BCBA — who provides clinical direction, and also employs two other BCBAs, one of whom has earned a Ph.D. In addition to providing clinical service, each of the BCBAs serve as supervisors, trainers, and teachers for master's level interns assigned to the McNeese Autism Program. In the typical McNeese Autism Program service, the BCBAs develop a recommended

---

because ABA therapy consists of an assessment and treatment. Treatment could be cognitive behavior therapy, individual psychotherapy or behavior therapy, but any of these therapies could be billed under the same code.

(LDHH Resp. to Interrogatory No. 5, Rec. Doc. 364-13, p. 4)

When asked to list the Medicaid-enrolled providers who are certified as behavior analysts by the Behavior Analyst Certification Board or who have documented evidence of equivalent education in ABA, the locations from which they provide services, and the last date of services to a class member for which that provider submitted a request for Medicaid reimbursement, LDHH responded that:

The Department does not capture this information when licensed psychologists enroll in the Medicaid program. Likewise, Magellan does not capture this information when providers contract with them.

(LDHH Resp. to Interrogatory No. 6, Rec. Doc. 364-13, p. 4)

[25] These facts about the McNeese Autism Program are based on the declaration under penalty of perjury of Cameron Melville, Ph.D. (Melville Decl., Rec. Doc. 364-8). Dr. Melville is a psychology professor at McNeese and the Director of Graduate Training for the Department of Psychology. (Melville Decl., Rec. Doc. 364-8, p. 2, ¶¶ 1, 2) He has a Ph.D in psychology with a specialization in behavior analysis and extensive experience behavior analysis and psychology. (Melville Decl., Rec. Doc. 364-8, p. 2, ¶¶ 1, 2)

Intervention Plan[26] based on a functional assessment of many of the child's behavior domains, and the one-on-one treatment sessions[27] are conducted by master's level interns with close supervision by the BCBAs. Allison Bennett, Ph.D., a licensed psychologist, oversees every aspect of the intervention but does not directly deliver the intervention. (Melville Decl., Rec. Doc. 364-8, p. 4, ¶ 6)

The Intervention Plan is reviewed with the child's family, which also receives training and practice in the basic ABA-based procedures to be used with the child, along with data collection procedures for the targeted behavior. Once per week, formal treatment team meetings are conducted to review progress and update Intervention Plans, and at least once per month, follow up meetings between the treatment team and the family are conducted. Functional re-assessments are conducted every six months and the child's Intervention Plan is updated based on the results of the re-assessment. Treatment outcomes of the McNeese Autism Program have been consistent with the studies that have demonstrated the effectiveness of ABA methods.

The McNeese Autism Program is funded through fees charged for

---

[26] The Intervention Plans include behaviors targeted for change, sequence, ABA procedures to be implemented, data to be tracked, and the recommended intensity of intervention, or hours per week, required to achieve goals, based on a functional assessment of many of the child's behavior domains.

[27] Each one on one session follows precise ABA-based procedures focused on the skills identified in the Intervention Plan and involves within-session recording of targeted behavior that is used to monitor the child's ongoing behavioral changes and evaluate and adjust the intervention.

service paid by the families receiving the service or a third party insurance carrier. The service rates are set at $50 per hour for one-on-one treatment, $95 dollars per hour for BCBA services, and $45 per hour for family training. Although the McNeese Autism Program is enrolled as a Medicaid provider, LDHH does not permit it to bill for services because of its service delivery model. Louisiana Medicaid staff has informed McNeese Autism Program staff that Medicaid rules require that the licensed psychologist deliver the services directly to the client and that Medicaid will not reimburse for ABA services provided by others – such as the graduate interns – under the supervision of the licensed psychologist. (Melville Decl., Rec. Doc. 364-8, pp. 6-7, ¶ 10)

### f. Changes in Louisiana Law Relative to Private Insurance Coverage of ABA therapy

Plaintiffs point out that in 2008, the Louisiana Legislature passed a law, Act 648 of 2008, codified at La. R.S. 22:1050, requiring private insurance companies to cover ABA therapy when provided by a BCBA. The statute provides that all health coverage plans issued in the state after January 1, 2009 are required to provide coverage for the diagnosis and treatment of autism spectrum disorders in individuals under 17 years of age. Treatment services include "applied behavioral analysis," a service that is specifically defined, when provided by a BCBA or a person who has provided documented evidence of equivalent education, professional training, and supervised experience in ABA. La. R.S. 1050(G)(2).

27

### 3. Plaintiffs' Arguments

Plaintiffs argue that the 2002 Contempt Order provides for its modification and should be modified to enlist additional providers, because the civil contempt sanction in the 2002 Contempt Order (a) has not resulted in LDHH's compliance with the 2001 Remedial Order and (b) has not compensated Plaintiffs by providing services as extensive as those the parties agreed to in the 2001 Remedial Order. Plaintiffs contend that LDHH has not complied with the requirement in paragraphs 1 and 3 of the 2001 Remedial Order that it "make available to class members with Pervasive Developmental Disorder or "PDD," all necessary psychological and behavioral services, including diagnostic services and treatment, to correct or ameliorate their conditions," and that "[s]ufficient qualified providers will be available to insure that the necessary services may be provided to all class members with reasonable promptness." Plaintiffs also assert LDHH has failed to comply with the provision of the 2001 Remedial Order requiring LDHH to establish fifteen multi-disciplinary teams throughout Louisiana consisting of psychologists, masters level psychologists, licensed clinical social workers, and behavior intervention specialists. Plaintiffs emphasize that although the Plaintiffs' case had centered on the need for the services of licensed psychologists in ameliorating autism,[28] the agreed-upon remedy established in the 2001 Remedial

---

[28] The Court's 2001 Findings of Fact and Conclusions of law focused on the narrow issue of whether the State was obligated to provide class members with access to *licensed psychologists*, although the 2001 Remedial Order, which both parties agreed to, contemplated the formation of 15 teams, dispersed

Order did not rely on psychologists alone to meet class members'
needs, instead supplementing the psychologists with teams of other
persons without doctorates whose services could be accessed more
frequently than those of licensed psychologists, thereby allowing
the implementation of the intense behavioral interventions
necessary to reverse autism. Plaintiffs assert that this is the
essence of ABA therapy.[29] (Pl.'s Mem. In Supp. of Mot., Rec. Doc.
364-1, p. 3). In addition, Plaintiffs assert that LDHH has not
provided reports to Plaintiffs' counsel on the numbers and
locations of enrolled psychologists and the number and parishes of
residents of class members diagnosed with PDD, as it is required to
do under the 2001 Remedial Order and the 2002 Contempt Order,[30] for

---

throughout the State of Louisiana according to population, which would consist
of one licensed psychologist who would serve as team leader and oversee
several non-psychologist individuals, including 3 "behavior intervention
specialists" per team. (2001 Remedial Order, Rec. Doc. 124, pp. 9-10, ¶
3(A)(a)).

[29] The 2001 Remedial Order provided in pertinent part: "DHH will
establish 15 teams throughout the state consisting of at least the following:
1 psychologist who will act as the team leader; 1 person with at least a
master's level in psychology, to work under the team leader; 1 Licensed
Clinical Social Worker; *3 behavior intervention specialists*." (2001 Remedial
Order, Rec. Doc. 124, p. 9, ¶ 3(A)(a)) (emphasis added).

[30] The 2001 Remedial Order provides in pertinent part that "[LDHH] will
report to Plaintiffs' counsel bi-monthly on the following: the number of
providers enrolled and the locations from which the providers offer services;
the total number of class members, and, if available, the total number of
children, with a diagnosis of PDD (whether or not they have been evaluated by
a provider) . . . " (2001 Remedial Order, Rec. Doc. 124, p. 4, ¶ 7) The 2002
Contempt Order provided, with respect to reporting, that:

> LDHH's counsel shall provide weekly updates to the Court and
> plaintiffs' counsel in writing on the implementation of the remedy,
> until further order of the Court. These reports shall also, to the
> extent practicable, cover the following elements from the Court's
> previous order:
>
>> a. The number of providers enrolled;
>> b. The locations from which the providers offer services;
>> c. The total number of class members;
>> d. To the extent available, the total number of class members

several years.[31]

Plaintiffs argue that the 2002 contempt remedy has not adequately compensated Plaintiffs for LDHH's contempt of the 2001 Remedial Order. Plaintiffs contend that the actual provision of psychological services to class members diagnosed with autism is minimal. Plaintiffs contend that they propounded discovery on LDHH in October of 2012 and that LDHH responses regarding (a) the amount of its expenditures on psychological services for class members diagnosed with autism or PDD between 2010 and 2013, and (b) the number of class members who received Medicaid services from a licensed psychologist between 2010 and 2013 demonstrate that the contempt remedy in the 2002 Contempt Order is inadequate. Plaintiffs assert that there are at least 1,027 class members that have diagnoses of autism or PDD, and that a 2008 report from the federal Centers for Disease Control indicates that the prevalence of autism spectrum disorders in the population has increased

---

with a diagnosis of PDD, and their parishes of residence. (2002 Contempt Order, Rec. Doc. 140, p. 3, ¶ 7)

[31] In support of this proposition, Plaintiffs cite the declaration of Jeanne Abadie, an Advocacy Center employee whose job responsibilities include monitoring compliance with court orders and consent decrees. Ms. Abadie's affidavit reflects that there was period between September of 2010 and October of 2012, during which time LDHH did not send Plaintiffs' counsel any reports regarding the number of providers enrolled pursuant to the contempt remedy embodied in the 2002 Contempt Order. (Abadie Decl., Rec. Doc. 364-7, p. 2, ¶¶ 1-3)  In October of 2012, Plaintiffs' counsel propounded interrogatories on LDHH seeking information about the number of licensed psychologists enrolled as Medicaid providers, the locations from which the psychologists provide services, and the last dates that these licensed psychologists provided services to class members for which they submitted a claim for Medicaid reimbursement. Id. ¶ 4.

substantially over the last decade.[32] The Plaintiffs provide the following table showing the amount of LDHH's expenditures on psychologists's services for class members between 2010 and 2013.[33]

| State Fiscal Year | Psychologists' services | Evaluations, Testing, or Assessments | Non-evaluation Services |
|---|---|---|---|
| 2010 | $28,122 | $11,315 | $16,807 |
| 2011 | $36,828 | $13,542 | $23,286 |
| 2012 | $34,888 | $9,759 | $25,129 |
| 2013 (part) | $11,439 | $2,192 | $9,247 |

Plaintiffs have offered another table, also derived from LDHH's recent discovery responses, designed to show how many of the approximately 1027 class members diagnosed with autism or PDD received Medicaid services from a licensed psychologist between 2010 and 2013.[34]

---

[32] Autism and Developmental Disabilities Monitoring Network Surveillance Year 2008 Principal Investigators, "Prevalence of Autism Spectrum Disorders—Autism and Developmental Disabilities Monitoring Network, 14 Sites, United States, 2008," Morbidity and Mortality Weekly Report 61:3 (March 30, 2012), U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, online at http://www.cnn.com/2012/03/29/health/autism/index.html (last visited July 17, 2013).

[33] This table was created by Jeanne Abadie, the Advocacy Center's Compliance Specialist in the New Orleans office based on documents that LDHH produced in response to Plaintiffs' recent discovery requests, in particular LDHH's First Supplemental Answer to Interrogatories 2 and 3 (Rec. Doc. 364-10, pp. 7-8) and LDHH's Third Supplemental Answers to Interrogatories 2, 3, and 4 (Rec. Doc. 364-11, pp. 24-26) In her affidavit, Ms. Abadie explains how she derived the numbers in the table. (Abadie Decl., Rec. Doc. 364-7, pp. 5-7, ¶¶ 17-21)

[34] This table was also created by Jeanne Abadie, see supra n. 33, based on LDHH's First Supplemental Response to Interrogatories 2 and 3 (Rec. Doc. 364-10), and LDHH's Fourth Supplemental Answer to Interrogatory 1. (Rec. Doc. 364-12) In her declaration, Ms. Abadie explains how she derived the figures. (Abadie Decl., Rec. Doc. 364-7, pp. 22-23, p. 6, ¶¶ 22-23)

| State Fiscal Year | Psychologists' services | Evaluations, Testing, or Assessments | Non-evaluation Services |
|---|---|---|---|
| 2010 | 47 | 24 | 23 |
| 2011 | 68 | 27 | 41 |
| 2012 | 66 | 18 | 48 |
| 2013 (part) | 45 | - | - |

Plaintiffs contend that these tables demonstrates that the 2002 contempt remedy (a) has failed to adequately compensate class members for LDHH's failure to implement the 2001 Remedial Order and (b) that the 2002 contempt remedy has been insufficient to coerce LDHH's compliance. Plaintiffs assert that these tables show that the services LDHH has been providing to class members under the 2002 Contempt Order fall far short of those promised in the 2001 Remedial Order by fifteen multi-person teams, which would have been supplemented if necessary.[35] For example, Plaintiffs point out that Louisiana Medicaid's expenditure of $34,888.00 on services of licensed psychologists to class members diagnosed with PDD amounts to less than $35.00 in services per class member with autism for state fiscal year 2012. Plaintiffs also assert that the fact that nearly $10,000.00 of that amount went to evaluations, testing, or

---

[35] The 2001 Remedial Order provided in relevant part:

[LDHH] anticipates that 15 teams will be a sufficient number to meet the needs of the relevant population, and that this number of providers will be willing and able to provide the services. *In the event that this proves to be an insufficient number to meet the need and that further providers are not immediately obtained, or in the event that an insufficient number of providers is willing and able to provide the services, Defendant will notify the Court and Plaintiffs' counsel immediately so that further relief may be considered.*

(2001 Remedial Order, Rec. Doc. 124, p. 4, ¶ 6( c)) (emphasis added).

assessments, rather than therapeutic services for class members with PDD, makes the figures worse. Plaintiffs also point out that during state fiscal year 2012, only 48 of the approximately 1,027 individual class members diagnosed with PDD received non-evaluation services, and the total amount spent on those non-evaluation services was $25,129.00, resulting in an average expenditure of $523.52 per participating recipient per year. Plaintiffs also observe that in state fiscal year 2011, only 41 of the approximately 1,027 individual class members with PDD received non-evaluation services, and the total amount LDHH spent on psychological or behavioral services was only $23,286.00, resulting in an average of $567.95 per participating recipient per year. Plaintiffs also point out that under Magellan, the managed care organization which assumed control of behavioral health services in March 2012, only 45 class members have received services from a licensed psychologist.

Plaintiffs contend that given the failure of the remedy in the 2002 Contempt Order, class members should be permitted to access the pool of ABA providers in the state in order to meet their unmet needs. Plaintiffs argue that ABA providers are: (1) available, (2) effective, (3) within the scope of "medical assistance" that LDHH is required to provide pursuant to the federal EPSDT mandate, and (4) can help fulfill the requirements of the 2001 Remedial Order that LDHH provide all necessary psychological and behavioral service to class members with reasonable promptness. Plaintiffs

argue that the Medicaid statute requires LDHH, as part of its EPSDT obligations, to provide:

> Such . . . necessary health care, diagnostic services, treatment, and other measures described in [42 U.S.C. § 1396d(a)] to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services, whether or not such services are covered under the State plan.

42 U.S.C. § 1396d(r)(5).

Plaintiffs assert, relying on <u>S.D. ex rel. Dickson v. Hood</u>, 391 F.3d 581, 590 (5th Cir. 2004), that the Fifth Circuit has held that "[s]tates must cover every type of health care service necessary for EPSDT corrective or ameliorative purposes that is allowable under 1396d(a)." Plaintiffs point out that the Court has already found, in its 2001 Findings of Fact and Conclusions of Law, that psychological and behavioral health services "undeniably constitute 'medical assistance' as defined in 42 U.S.C. § 1396d(a)," in part because these services fall within 42 U.S.C. § 1396d(a)(13), which includes "other . . . preventive, and rehabilitative services, including any medical or remedial services . . . recommended by a physician or other licensed practitioner of the healing arts within the scope of their practice under State law, for the maximum reduction of physical or mental disability and restoration of an individual to the best possible functional level." They argue that ABA therapy, like psychological and behavioral health services, also constitute "medical assistance" under this same provision 42 U.S.C. § 1396d(a)(13) when (a)

provided by qualified practitioners such as BCBAs and (b) recommended by a physician or other licensed practitioner.

Finally, Plaintiffs assert that despite LDHH's implementation of the 2002 contempt remedy, class members like F.F. and A.B. have not been able to obtain the therapy they need to correct or ameliorate their conditions — ABA therapy. Plaintiffs assert that a modification of the remedy in the 2002 Contempt Order is necessary to enable class members to readily locate and access ABA therapy, pointing out A.B. and F.F. have only been able to locate and access ABA therapy except through BCBAs, all of whom were certified since the entry of the 2002 Contempt order and none of whom are enrolled in Medicaid. Plaintiffs contend that if LDHH had implemented the remedy in the 2001 Remedial Order, this subset of the class would have a ready means of locating and obtaining treatment specifically focused on their autism or PDD, which they presently lack.

### 4. LDHH's Arguments

In its opposition, LDHH concedes that ABA has proven to be an effective treatment, and concedes that a modification to the remedy in the 2002 Contempt Order is warranted, given (a) the evolution of autism treatment and (b) LDHH's creation of an entirely new way of providing behavioral health services. Nevertheless, LDHH asserts that the remedy should not be modified to the extent or in the way that Plaintiffs request. Specifically, LDHH argues that instead of requiring it to enroll BCBAs in the Medicaid program as independent

providers of ABA to class members with autism, the Court should (a) modify the 2002 Contempt Order to allow LDHH to authorize ABA services through its Children's Choice Waiver and (b) modify the 2002 Contempt Order to reflect the availability of other services, such as the services of licensed clinical social workers and licensed professional counselors, that LDHH can now offer through Magellan to address the needs of children with autism.

LDHH asserts that it is willing to request approval from CMS to amend its Children's Choice Waiver so that class members diagnosed with autism could receive ABA services through priority placement instead of remaining on the registry until they advance to the top of the list, which can sometimes take five or more years. LDHH explains that (a) every waiver program has a registry or list of children and the date when waiver services were requested, and (b) ordinarily, when a slot opens, the child with the oldest date is eligible for that opening. LDHH asserts that its proposed amendment to its Children's Choice Waiver would allow class members with autism to be considered regardless of when their names were placed on the registry. LDHH notes that Children's Choice Waiver services have an annual cap of $16,410 per child, but that a family can avail itself of the "Crisis Provisions" in the draft Children's Choice Waiver rule and can exceed the cap if the circumstances warrant a "crisis designation." LDHH asserts that the Children's Choice Waiver could accomodate class members with autism within the time it would take for CMS to approve the amendment as to priority placement, which LDHH asserts would probably be six

months. LDHH also asserts that the State Plan Amendment which would be required by Plaintiffs' request could take considerably longer, probably years.

Second, LDHH argues that state legislation is needed to authorize BCBAs to provide ABA therapy independent of licensed psychologists. LDHH asserts that ABA constitutes the practice of psychology under the Louisiana Psychology Practice Act, La. R.S. 37:2351 et seq. and that a BCBA who is not also a licensed psychologist is only authorized to provide ABA under the supervision of a licensed psychologist. LDHH further argues that because BCBAs are not licensed under Louisiana law, they cannot enroll as independent Medicaid providers and bill independently for providing ABA therapy to this subset of class members. LDHH acknowledges that in an effort to address the licensing issue, the Louisiana Legislature recently introduced Senate Bill 134.[36] LDDH contends that Senate Bill 134 would (a) require the creation of a state board which would establish regulations governing (1) the licensure of behavior analysts and (2) the state certification of assistant behavior analysts, and (b) allow licensed BCBAs to practice in Louisiana without the supervision of a licensed psychologist. LDHH asserts that the existence of pending legislation to authorize licensed behavior analysts to practice independently indicates that BCBAs are not authorized to practice

---

[36] When LDHH filed its opposition on April 16, 2013, Senate Bill 134 had recently been introduced. It has now been passed as Act No. 351 with an effective date of August 1, 2013.

independently under current Louisiana law.[37] LDHH argues that it is premature for the Court to order LDHH to permit BCBAs to enroll as independent Medicaid providers until BCBAs are authorized to practice independently in Louisiana.

Third, in response to Plaintiffs' observation that private insurers are required to cover ABA services, LDHH contends that, La. R.S. 22:1050 places restrictions on BCBAs. In particular, LDHH argues that under La. R.S. 2:1050(G)(5), "applied behavior analysis" is considered "habilitative or rehabilitative care," which is listed among those treatments that must, pursuant to La. R.S. 22:1050(G)(11), be prescribed by a licensed physician or licensed psychologist who must also supervise the provision of such care.

Fourth, LDHH asserts that the Children's Choice Waiver, as currently written, is consistent with the Louisiana Psychology Practice Act in that it would require that ABA therapy only be provided only by a licensed psychologist or an unlicensed assistant with a Master's degree working under the direction of a licensed psychologist.

Fifth, LDHH asserts that in light of the evolution of autism

---

[37] LDHH notes that other states have recognized the need to regulate the practice of ABA and behavior analysts and have enacted legislation creating state licensing boards or placing behavior analysts under the oversight of an existing board LDHH points out that Nevada requires the Board of Psychological Examiners to regulate the licensing of behavior analysts; North Carolina requires behavior analysts to obtain a license from the North Carolina Psychology Board; Virginia has authorized its Board of Medicine to enact regulations governing the practice of behavior analysts; North Dakota requires behavior analysts to be licensed by its Board of Psychologist Examiners; Kentucky has established a separate licensing board for behavior analysts; and Massachusetts enacted legislation in January recognizing the practice of ABA as an independent profession and establishing standards for practice.

treatment over the past ten years, it determined that it needed to offer an array of services by different types of licensed professionals. LDHH asserts that in furtherance of that goal it (a) created the Louisiana Behavioral Health Partnership, through which Magellan would manage the provision of behavioral health services and (b) obtained CMS approval to amend the State Plan governing psychological and behavioral health services for EPSDT recipients to allow licensed clinical social workers and licensed professional counselors, among others, to enroll as providers. LDHH contends that Court should modify the 2002 Contempt Order to reflect the availability of these other services through Magellan to class members diagnosed with autism or PDD.

LDHH disputes Plaintiffs' allegations that LDHH's discovery responses show that class members were not receiving an adequate amount of services between 2010 and 2013. LDHH contends that Plaintiffs' table (Rec. Doc. 364-1, p. 8) summarizing LDHH's expenditures under the 2002 Contempt remedy during state fiscal years 2010, 2011, 2012, and 2013,[38] does not accurately represent Medicaid's expenditures on services for class members diagnosed with autism for two reasons. First, LDHH alleges that the table understates LDHH's expenditures during state fiscal years 2012 and 2013, because Plaintiffs omitted data compiled by Magellan for 2012 and 2013 that LDHH provided to Plaintiffs in its Third and Fourth Supplemental Responses to Interrogatories. Second, LDHH argues that

---

[38] The table only summarizes Medicaid expenditures during part of 2013.

Plaintiffs' table is not representative of Medicaid expenditures on services for class members diagnosed with autism, because it does not include Medicaid expenditures to providers other than licensed psychologists.

LDHH also asserts that Kimberlee Owens, F.F.'s mother, did not inquire what other services available through Magellan might be recommended for F.F. when she found out that ABA was not available. LDHH contends that, contrary to the testimony of A.B.'s pediatrician, Dr. Patricia Schneider, ABA therapy it is not the *only* evidence-based therapeutic intervention for autism. LDHH relies on the National Autism Center's National Standards Project for the proposition that there are eleven established treatments, including ABA, for individuals with Autism Spectrum Disorder. To summarize, LDHH argues that the Court should deny Plaintiffs' requested modification, because: (1) it is premature to order direct enrollment of BCBAs when they are not allowed to practice independently under Louisiana law unless they are licensed psychologists, (2) Plaintiffs have not inquired into what services other than ABA are currently available through Magellan, and (3) LDHH is willing to offer class members ABA services through an amendment to its Children's Choice Waiver.

### 5. Plaintiffs' Reply

In their reply brief, Plaintiffs assert that LDHH agrees that the evolution in autism treatment warrants modification of the 2002 contempt remedy, and only disputes *how* ABA therapy should be

provided to class members diagnosed with autism or PDD. Plaintiffs argue that LDHH's proposed modification of the 2002 Contempt Order — giving class members with autism priority for the Children's Choice Waiver — will not compensate the class for LDHH's failure to comply with the 2001 Remedial Order. Plaintiffs assert that the 2001 Remedial Order (a) provided that "sufficient qualified providers" would be available, (b) provided that the services were to be made available to each class member with "reasonable promptness," (c) did not set arbitrary dollar limits on services, and (d) did not result in class members receiving services experiencing a diminution in the kind or quantity of other Medicaid services that the class member might need. Plaintiffs argue that services are not likely to be delivered with reasonable promptness given that there are a limited number of spots on the Children's Choice Waiver registry and that as of January 30, 2013 (the most recent date for which information is posted), the registry date being served on the Children's Choice Waiver is March 5, 2005.[39] Plaintiffs also point out that LDHH has not apprised the Court or counsel for Plaintiffs how many class members, if any, could immediately receive a waiver slot if class members with autism were immediately given priority for the next available slots, or whether current and future class members would have to remain on the waiting list before they could receive services. Plaintiffs

---

[39] Louisiana Department of Health & Hospitals Website, http://new.dhh.louisiana.gov/ index.cfm/page/155 (last visited July 17, 2013).

emphasize that delay in provision of ABA therapy can be harmful, as experts stress the importance of receiving sufficient intensive ABA therapy at an early age in order to achieve maximum benefit.[40] Plaintiffs also point out that although LDHH claims it has received permission from CMS to offer ABA through the Children's Choice waiver, it has not evidenced this, and it is thus uncertain whether such approval is final, tentative, or dependent upon details not yet worked out.

Plaintiffs argue that LDHH has not shown that "sufficient qualified providers" will be available to provide ABA therapy to all class members through the Children's Choice waiver, because the proposed rule that includes ABA services in the Children's Choice waiver requires that:

> [s]ervices must be provided by a licensed psychologist or an unlicensed assistant with a Master's degree working under the direction of a licensed Psychologist. All work performed by the unlicensed assistant must be approved by the licensed Psychologist.[41]

Plaintiffs assert that BCBAs are educated, trained, and credentialed to be independent providers of ABA therapy and that most BCBAs in Louisiana are not licensed as psychologists and are not practicing under the direct supervision of a licensed psychologist.[42] Plaintiffs argue that if such supervision were to be required, it would greatly reduce the available BCBA services

---

[40] (Mulick Decl., Rec. Doc. 364-6, ¶¶ 13, 38)

[41] (Proposed Children's Choice Waiver regulations, Rec. Doc. 371-1, p. 25)

[42] (Second Melville Decl., Rec. Doc. 379-1, p. 29, ¶ 9)

and result in many fewer children being able to access ABA therapy through a qualified provider.

Plaintiffs also note that the Children's Choice Waiver has an annual cap of $16,412.00 on all services received under the waiver. Plaintiffs argue that the amount of ABA therapy that could be provided within a child's entire Children's Choice Waiver budget would often be less than the amount the child needed and that most, if not all, of the recipients' annual budgets would likely be expended on ABA therapy leaving recipients with little access to other Children's Choice Waiver services. Plaintiff points out that the cap can be exceeded on the basis of a "crisis" designation only for "catastrophic changes" like the death or incapacitation of a caregiver, with no other source of support. (Rec. Doc. 371-1, pp. 43-44) Plaintiff also points out that the proposed waiver rule clearly states that "[e]xhausting available funds through the use of therapies does not qualify as justification for crisis designation." (Rec. Doc. 371-1, pp. 43-44) In sum, Plaintiffs contend that provision of ABA therapy through the Children's Choice waiver will not satisfy the Medicaid mandate to provide all medically necessary services. In addition, Plaintiffs assert because children placed on the Children's Choice Waiver are no longer on the waiting list for NOW services, children given priority on the Children's Choice waiver would no longer be class members. As a result, Plaintiffs' counsel and the Court would lose the ability to enforce all Court-ordered and agreed upon remedies as to class members who received ABA therapy through priority

43

placement on the Children's Choice waiver.

Plaintiffs contend that LDHH's argument that BCBAs must be licensed by the State to provide Medicaid services ignores the fact that the Medicaid statute, in particular 42 U.S.C. § 1396d(a)(6) defines the "medical assistance" that must be provided under EPSDT to include

> other ... preventive, and rehabilitative services, including any medical or remedial services ... recommended by a physician or other licensed practitioner of the healing arts within the scope of their practice under State law, for the maximum reduction of physical or mental disability and restoration of an individual to the best possible functional level.

Plaintiffs also argue that neither the Louisiana Psychology Practice Act nor La. R.S. 22:1050 — the Louisiana statute requiring private health insurance plans to cover ABA therapy provided by BCBAs — should prevent the Court from requiring Louisiana Medicaid to compensate BCBAs as independent providers. Plaintiffs contend that as of February 1, 2013, there were 65 BCBAs in Louisiana. Plaintiffs contend that these Louisiana BCBAs are currently providing services to children with autism and PDD and receiving payment from these children's private insurance companies. Plaintiffs also contend that BCBAs' national board certification from the Behavior Analyst Certification Board establishes their training, education, supervised experience, and knowledge of ABA methods.[43] Plaintiffs assert that Behavior Analyst

---

[43] Plaintiffs support this contention with a declaration under penalty of perjury from Gina Green, Ph.D., an international expert in ABA and the current Executive Director of the Association of Behavior Analysts. (Greene Decl., Rec. Doc. 379-1, pp. 1-7, ¶¶ 1-14) Dr. Greene received a bachelor's degree in psychology with high honors and a master's degree in educational

Certification Board credentials have been accepted in laws and regulations in many states as appropriate qualifications to practice ABA and are the foundational requirement for licensure in the ten states that require the licensing of ABA practitioners.[44] Plaintiffs assert that it is not surprising that Louisiana has not yet adopted a licensing statute for BCBAs givent that (a) all of the 65 Louisiana BCBAs who were listed by the Behavior Analyst Certification Board as of February 1, 2013 received their BCBA credentials after 2002 and the Louisiana statute requiring private health insurance plans to cover ABA therapy by BCBAs was passed in 2008.[45]

Plaintiffs assert that while efforts are underway to pass Senate Bill 134, children with autism or PDD who receive Medicaid should be able to receive the same ABA services as children who have private insurance. Although Plaintiffs concede that private insurance coverage is not *required* by La. R.S. 22:105 unless it is given under the supervision of a physician or licensed

---

psychology with high honors from Michigan State University. (Greene Decl., Rec. Doc. 379-1, p. 2, ¶ 1) In 2005, she was awarded a Doctor of Science degree from the Queen's University of Belfast, Northern Ireland for her work in autism. (Greene Decl., Rec. Doc. 379-1, p. 2, ¶ 1) She has extensive professional experience, has received several awards, has authored several books and articles, has delivered hundreds of professional conference papers, addresses, and lectures, and has served as an expert witness in numerous legal cases. (Greene Decl., Rec. Doc. 379-1, pp. 2-4, ¶¶ 2-7)

[44]   (Greene Decl., Rec. Doc. 379-1, p. 5, ¶ 11)

[45]  That statute, La. R.S. 22:1050, requires private health insurance plans to cover ABA therapy provided by (a) BCBAs or (b) others with documented evidence of equivalent education, professional training, and supervised experience in ABA, for individuals diagnosed with an autism spectrum disorder if it is recommended by a licensed physician or psychologist who supervises the provision of the care. See La. R.S. 22:1050.

psychologist, they assert that in practice, BCBAs who are not supervised by licensed psychologists are being reimbursed by private insurance companies cover for their services, as well as the services of "line" therapists[46] supervised by the BCBA.[47] Plaintiffs assert that the private insurance companies do not require that the BCBA be supervised by a licensed psychologist in order to reimburse them for ABA services.[48]

According to Plaintiffs, the typical Louisiana service model is that (a) children with autism or PDD are diagnosed by a physician or psychologist who recommends ABA therapy and (b) BCBAs actually provide the ABA therapy in conjunction with "line therapists"[49] who are closely monitored by the BCBA.[50] Plaintiffs contend that the McNeese Autism Program operates under this typical service model and is compensated by private insurance companies for both the services of the BCBA and the "line therapists."[51]

Plaintiffs assert that in 2012, the Louisiana Legislature passed SR 110, which established a Behavior Analysts Licensure and Regulation Study Commission ("the Study Commission") to study the

---

[46] A line therapist is an individual with training in ABA therapy who provides ABA therapy under the supervision of a BCBA but lacks a masters degree or a doctoral degree. (Tilley Decl. 2, Rec. Doc. 379-1, p. 33, ¶ 5)

[47] To support this contention, Plaintiffs submitted a second declaration from Christine Tilley, the BCBA who provides ABA therapy to class representative F.F. (Tilley Decl. 2, Rec. Doc. 379-1, p. 33, ¶¶ 3-7).

[48] (Tilley Decl. 2, Rec. Doc. 379-1, pp. 33, ¶ 7).

[49] See supra n. 46.

[50] Plaintiffs support his contention with a second declaration from Cam L. Melville, Ph.D. (Melville Decl. 2, Rec. Doc. 379-1, pp. 30-31, ¶ 12)

[51] (Melville Decl. 2, Rec. Doc. 379-1, pp. 30-31, ¶¶ 12-13)

licensing and regulation of behavior analysts. Plaintiffs assert
that one of their experts, Dr. Melville,[52] served on the Study
Commission as the designee of the McNeese State University
Psychology Department. Plaintiffs contend that despite the fact
that BCBAs perform services that fall within the scope of the
Louisiana Psychology Practice Act, La. R.S. 37:2352(5), no actions
have been taken to stop BCBAs from practicing in Louisiana.
Plaintiffs assert that the Study Commission — rather than
recommending that BCBAs cease providing ABA therapy until they were
licensed under state law or practice under the supervision of
licensed psychologists — acknowledged the need for ABA services,
recognized that there are many BCBAs in Louisiana who are being
compensated by private insurers for providing ABA therapy to
children with autism and PDD, and sought to expand access to ABA
therapy rendered by BCBAs. Plaintiffs contend that the Study
Commission accepted certification by the Behavior Analyst
Certification Board as the only necessary credential to establish
the education, training, and supervised experience of behavior
analysts. Plaintiffs contend that BCBAs are well qualified to
provide the ABA therapy that has been recommended by class
members's physicians to ameliorate their autism. Plaintiffs argue
that the Court should order Medicaid to enroll BCBAs as providers
and establish competitive rates to allow class members access to
the same medical or remedial services that are available to other

---

[52] See supra n. 25.

children in the state through private insurance.

Plaintiffs assert that although LDHH originally indicated in its initial responses to Plaintiffs' discovery that it does not know which enrolled providers provide ABA therapy, it has since become apparent that LDHH does not currently reimburse for ABA services through Medicaid, regardless of the type of provider involved. In support of this claim, Plaintiffs report that they propounded a discovery request on LDHH for, *inter alia*, "documents sufficient to show whether intensive ABA therapy (20 hours a week or more) has actually been authorized through Magellan for any class members with autism or PDD." Plaintiffs assert that Magellan's counsel responded via email on April 12, 2013, "None. The State Plan does not offer ABA therapy."[53] Plaintiffs also assert that Kimberlee Owens, class representative F.F.'s mother, was informed by a Magellan representative that, as far as he knew, ABA therapy was not covered.[54] Plaintiffs further assert that the McNeese Autism Program has attempted to provide services through Louisiana Medicaid, but has not been able to do so.[55]

Plaintiffs argue that LDHH has not shown that the other services it makes available to class members with autism or PDD compensate the class for LDHH's failure to comply with the 2001 Remedial Order. LDHH suggests in its opposition that ABA therapy is

---

[53] (April 12, 2013 Winters email, Rec. Doc. 379-1, p. 38)

[54] (Owens Depo, Rec. Doc. 379-1, p. 52, line 11; p. 54, line 11)

[55] (Melville Decl., Rec. Doc. 364-8, pp. 6-7, ¶ 10)

not the only evidence-based therapeutic intervention for autism and refers to eleven other established treatments set forth in the Findings and Conclusions of the National Autism Center's National Standards Project.[56] Plaintiffs assert, based on Dr. Melville's declaration, that the eleven "established treatments" are not necessarily separate treatment methodologies distinct from ABA.[57] They also assert that Defendant has not even attempted to demonstrate that any of these treatments identified in the National Autism Center's National Standards Project are available to class members through Louisiana Medicaid providers. Although Plaintiffs concede that licensed psychologists might be providing some of these treatments, they assert that if they are, they are providing very little, based on the fact that less than fifty class members have received services from psychologists for non-evaluation services in each of the last two years and that Medicaid spent less than $26,000 per year on these services. Plaintiffs also dispute LDHH's assertions that its expenditures figures are inaccurate and contend that they did not omit any information provided by Magellan.[58]

As to all of the other services listed in LDHH's Louisiana Behavioral Health Partnership Service Definition Manual, Plaintiffs contend that they are insufficient to compensate LDHH's failure to

---

[56] (Rec. Doc. 371-8, pp. 11-15)

[57] (Melville Decl. 2, Rec. Doc. 379-1, p. 31, ¶ 15)

[58] (Pl.'s Reply, Rec. Doc. 379, pp. 14-16)

comply with the 2001 Remedial Order as none are specifically geared toward autism and many are not available to many class members.[59] Thus, Plaintiffs request that the Court modify the 2002 Contempt Order to provide ABA therapy to class members through direct enrollment of BCBAs rather than through a Children's Choice Waiver or a modification to reflect other services available through Magellan.

**LEGAL STANDARD**

Civil contempt is "a failure of a litigant to do something ordered to be done by a court in a civil action for the benefit of the opposing party therein." <u>Walling v. Crane</u>, 158 F.2d 80, 83 (5th Cir. 1946). A contempt sanction is considered civil if it "'is remedial and for the benefit of the complaining party.'" <u>Int'l Union, United Mine Workers of America v. Bagwell</u>, 512 U.S. 821, 827 (1994). The purpose of a civil contempt sanction is "to coerce the contemnor into compliance with a court order, or to compensate another party for the contemnor's violation." <u>American Airlines, Inc. v. Airline Pilots Ass'n</u>, 228 F.3d 574, 584 (5th Cir. 2000); <u>Lamar Fin. Corp. v. Adams</u>, 918 F.2d 564, 566 (5th Cir. 1990). Because civil contempt sanctions are considered coercive and may be avoided through obedience, they "may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard." <u>Alberti</u>, 46 F.3d at 1359-60. (internal quotations and citations omitted). "The paradigmatic civil contempt sanction order . . .

---

[59] (Pl.'s Reply, Rec. Doc. 379, pp. 16-17, n. 39)

50

involves confining a contemnor indefinitely until he complies with an affirmative command such as an order to pay alimony, or to surrender property ordered to be turned over to a receiver, or to make a conveyance." Id. at 1359 (internal quotations and citations omitted). Another typical civil contempt sanction is "a per diem fine imposed for each day a contemnor fails to comply with an affirmative court order." Id. (internal quotations and citation omitted). Nevertheless, because "'[c]ourts have and must have, the inherent authority to enforce their judicial orders and decrees in cases of civil contempt," the Fifth Circuit has recognized that "discretion . . . must be left to a court in the enforcement of its decrees.'" U.S. v. Alcoa, Inc., 533 F.3d 278, 287 (5th Cir. 2008) (quoting Cook v. Ochsner Foundation Hosp., 559 F.2d 270, 272 (5th Cir. 1977)). The Fifth Circuit reviews remedial civil contempt measures that a district court imposes for abuse of discretion. See id. at 283 (explaining that if a district court's action constituted a remedy for a party's contempt of a consent decree, as opposed to a modification of the consent decree, the issue is whether the district court abused its discretion in implementing the remedial measure).

## DISCUSSION

Typically, "[a] movant in a civil contempt proceeding bears the burden of establishing by clear and convincing evidence: 1) that a court order was in effect, 2) that the order required certain conduct by the respondent, and 3) that the respondent

failed to comply with the court's order." <u>Am. Airlines, Inc.</u>, 228 F.3d at 581 (internal quotations and citations omitted). However, in the 2002 Contempt Order, the Court found that LDHH was in contempt by clear and convincing evidence and placed the onus on LDHH to purge itself of its contempt by, *inter alia*, a showing that it has fully implemented the Court's previous orders. (2002 Contempt Order, Rec. Doc. 140, p. 3, ¶ 10) The Court also ordered in the 2002 Contempt Order that the civil contempt remedy could be ended, without any showing by LDHH that it had purged itself of its contempt, upon an agreement of the parties approved by the Court, or by further Court order. (2002 Contempt Order, Rec. Doc. 140, p. 4, ¶ 10) Given that the record demonstrates that subsequent to the 2002 Contempt Order: (1) LDHH never made a showing that it fully implemented the Court's previous orders;[60] (2) the parties never reached any agreement that was approved by the Court, and (3) the Court never issued an order purging LDHH of the 2002 contempt, LDHH remains in continuing contempt of the Court's 2001 Remedial Order.

Although the 2002 Contempt Order, like all civil contempt remedies, was designed, in part, to coerce LDHH's compliance with the 2001 Remedial Order, it has clearly failed in this regard. LDHH implemented the remedial provisions of the 2002 Contempt Order requiring it to permit direct enrollment of licensed psychologists. Nevertheless, over a decade later, despite (a) LDHH's estimation in

---

[60] LDHH also admitted in oral argument that it has not yet purged itself of its contempt by fully implementing the Court's previous orders or establishing the fifteen teams to which the parties agreed in 2001. (May 8, 2013 Oral Arg. Tr., p. 30, lines 21-25; p. 31, lines 1-11).

2002 that it was merely three months away from implementing the 2001 Remedial Order and (b) an intervening overhaul of LDHH's behavioral health services system, the provisions of the 2001 Remedial Order remain unfulfilled.

Although the Court is skeptical that the extensive modifications Plaintiffs seek will coerce LDHH's compliance with the 2001 Remedial Order, the Court finds that Plaintiffs' proposed modifications to the 2002 Contempt Order are necessary to adequately compensate Plaintiffs for LDHH's failure to implement the 2001 Remedial Order for over a decade. Although the Court's 2001 Findings of Fact and Conclusions of Law were limited to LDHH's obligation to provide class members with autism or PDD with the services of licensed psychologists, the 2001 Remedial Order did not restrict the class of persons authorized to provide class members with behavioral and psychological services to licensed psychologists. The 2001 Remedial Order contemplated that LDHH would make services available to class members by establishing fifteen teams, which would be dispersed throughout Louisiana according to population distribution and consist of at least: one psychologist who would act as team leader, one person with a master's degree in psychology to work with the team leader, one licensed clinical social worker, and three behavior intervention specialists. Under that team model, the team leader psychologists were to be responsible for developing and implementing family-centered treatment plans that were designed to achieve the maximum improvement of the child's functioning based on treatments grounded

in solid, empirical evidence. Under the 2001 Remedial Order, LDHH was obligated to provide class members diagnosed with autism or PDD with all necessary psychological and behavioral services to correct or ameliorate their conditions, including necessary clinical interventions. LDHH was also obligated to ensure that sufficient qualified providers would be available so that the necessary services may be provided to all class members with reasonable promptness. In line with these provisions, the 2001 Remedial Order provided that further relief could be considered if the fifteen teams proved to be insufficient to meet the needs of class members diagnosed with autism or PDD. (2001 Remedial Order, Rec. Doc. 124, p. 4, ¶ 6(c)).

The Court agrees with Plaintiffs that the 2002 Contempt Order has not compensated Plaintiffs by providing services as extensive as those provided for in the 2001 Remedial Order. The team model contemplated in the 2001 Remedial Order, by supplementing the services of licensed psychologists with behavior intervention specialists whose services could be accessed more frequently, facilitated the implementation of the intense behavioral interventions necessary to reverse autism. By contrast with the current contempt remedy, it would have provided this subset of class members with a ready means of locating treatment specifically focused on their autism. Under the 2002 Contempt Order, class members, such as A.B. and F.F. have not been able to obtain the ABA therapy that they need to correct or ameliorate their conditions, because they only way they have been able to access ABA therapy is

54

through BCBAs, most of whom are neither licensed psychologists nor operating under the supervision of licensed psychologists.

Moreover, LDHH's expenditures on psychological services for class members diagnosed with autism or PDD under the 2002 Contempt Order are properly characterized as *de minimis*. Having reviewed the issue, the Court is convinced that LDHH's allegation that the figures in Plaintiffs' table for state fiscal years 2012 and 2013 omit data that LDHH provided to Plaintiffs in their discovery responses is factually incorrect for the reasons expressed by Plaintiffs in their reply memorandum. (Pl.'s Reply, Rec. Doc. 379, pp. 16-17) However, even if LDHH were correct, those relatively inconsequential understatements would only impact the figures for state fiscal years 2012 and 2013 and would not affect the Court's conclusion that the provision of services under the 2002 Contempt Order has been insufficient. Under the Insurance Code provisions which will apply to policies issued in Louisiana by private insurers on or after January 1, 2014, coverage for autism treatment, which includes ABA therapy, will be subject to a yearly benefit cap of $36,000 *per covered individual*.[61] In state fiscal years 2010, 2011, and 2012, LDHH's expenditures on the services of licensed psychologists for the entire class were within the range

---

[61] The Insurance Code provision that mandates that private insurers provide coverage for diagnosis and treatment of autism spectrum disorders, including ABA therapy, provides that *coverage shall be subject to a maximum benefit of $36,000 per year*. La. R.S. 22:1050(B), (D)(1). An insurer or issuer of a health coverage plan is prohibited from applying any payments it makes for covered individuals for services that are not related to autism spectrum disorders towards the $36,000 per year maximum benefit. La. R.S. 22:1050(D)(2).

of $28,122.00 and approximately $50,000.00. The parties' best estimate is that there are, at present, approximately 1,027 class members with a diagnosis of autism or pervasive development disorder.[62] In addition, in every state fiscal year, a significant fraction of these funds went toward testing and evaluation rather than treatment for class members diagnosed with autism. These amounts that LDHH paid for the entire subset of the class per year are either less than or only slightly more than the maximum that a private insurer may be compelled to pay *per covered individual*.

Given that LDHH has conceded that ABA is a recognized, valid treatment for autism that should be made available to class members diagnosed with autism (May 8, 2013 Oral Arg. Tr., p. 32, lines 8-13), the dispute centers on the manner in which ABA therapy should be made available to class members diagnosed with autism. (May 8, 2013 Oral Arg. Tr., p. 32, lines 8-16) When recommended by a physician or licensed psychologist, ABA therapy provided (a) by BCBAs or (b) through behavior interventions designed and supervised by BCBAs and administered through programs like the McNeese Autism Program, are within the scope of the federal EPSDT mandate. In addition to those services specifically enumerated in the definition of EPSDT, federal law mandates that LDHH provide other services, not specifically described in the definition of EPSDT, if

---

[62] As of October of 2000, the date of the trial in this case, the parties had stipulated that there were 350 class members diagnosed with autism. (2001 Findings of Fact and Conclusions of Law, Rec. Doc. 118, p. 4) The estimate of 1,027 class members with an autism or PDD diagnosis is based on LDHH's Fifth Supplemental Response to an interrogatory Plaintiffs propounded on LDHH in October of 2012. (Rec. Doc. 364-9, p. 4)

those services are a type of "medical assistance," as defined in Section 1396d(a), that is "necessary . . . to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services, whether or not such services are covered under the State plan." 42 U.S.C. §§ 1396d(r)(5), 1396d(a). In <u>S.D. ex rel. Dickson v. Hood</u>, 391 F.3d 581, 590 (5th Cir. 2004), the Fifth Circuit held that "[s]tates must cover every type of health care service necessary for EPSDT corrective or ameliorative purposes that is allowable under 1396d(a)." To qualify as "medical assistance" under Section 1396d(a)(13), the remedial service only needs to be "*recommended* by a physician or other licensed practitioner of the healing arts within the scope of their practice under State law, for the maximum reduction of physical or mental disability and restoration of an individual to the best possible functional level." <u>Id.</u> § 1396d(a)(13)(C) (emphasis added). The Court finds that ABA therapy, when recommended by a physician or licensed psychologist, constitutes "medical assistance" under Section 1396d(a)(13), regardless of whether it is rendered by a BCBA or through an intensive behavior intervention designed and supervised by a BCBA through the McNeese Autism Program.

As to the class representatives, A.B. and F.F., it is clear that ABA therapy is medical assistance that is necessary to correct or ameliorate the debilitating effects of their autism. Both class representatives' physicians have recommended that they receive ABA therapy. (Owens Decl., Rec. Doc. 364-2, ¶ 7; Schneider Decl., Rec. Doc. 364-4, ¶ 4) In addition, Dr. Mulick's testified that both A.B.

and T.M. should be in an ABA program receiving 30 or more hours of
services per week. (Mulick Decl., Rec. Doc. 364-6, pp. 17, 20 ¶¶
42-43, 46) LDHH has offered no countervailing opinions. Similarly,
for class members for whom ABA therapy has been recommended or will
be recommended by a physician or licensed psychologist, the Court
finds that ABA therapy is necessary to correct or ameliorate the
debilitating effects of their autism and PDD, within the meaning of
42 U.S.C. §1396d(r)(5), based on Dr. Mulick's testimony that:

> It is generally well accepted among psychologists and
> physicians with expertise in treating autism that a
> sufficient amount of ABA is (for most children) medically
> necessary to ameliorate the problematic aspects of autism
> . . . If a child diagnosed with autism does not receive
> sufficient behavioral health services, the child is at
> grave risk of remaining unnecessarily disabled for the
> remainder of the child's natural life span. There is also
> a risk that an untreated person could become even more
> disabled through injury or loss of skills previously
> demonstrated . . . [I]t is well established that autistic
> children need intensive behavioral health services as
> early as possible in order to achieve the maximum
> reduction of their disability and restore them to their
> best possible functional level. It is also well
> established that ABA is a highly effective form of
> behavioral health service.

(Mulick Decl., Ex. 5 to Pl.'s Mot., Rec. Doc. 364-6, p. 14, ¶¶ 35-
38) Thus, LDHH is obligated to provide this service to class
members. Although LDHH has contended that ABA therapy is only one
of eleven established treatments for individuals based with autism
spectrum disorders based on the National Autism Center's National
Standards Project,[63] Dr. Melville has testified that the eleven

---

[63] In their Findings and Conclusions, the National Autism Center stated
that it had"identified 11 treatments as Established (i.e., they were
established as effective) for individuals with Autism Spectrum Disorders

"established treatments" the National Autism Center identified are not necessarily separate treatment methodologies distinct from ABA therapy. (Melville Decl. 2, Rec. Doc. 364-8, pp. 6-7) In addition, LDHH has failed to establish that any of the other treatment methodologies identified are accessible to class members through Magellan.

The Court agrees with Plaintiffs that the best way to provide this service to class members, as compensation for LDHH's continued failure to implement the 2001 Remedial Order, is (a) to require LDHH to allow BCBAs to enroll as independent Medicaid providers and submit claims for their services, and (b) to require LDHH to make provision for the McNeese Autism Program and other programs that employ BCBAs to be reimbursed by Louisiana Medicaid for intensive behavior interventions that are designed and supervised by BCBAs. LDHH contends that it is premature to allow BCBAs to enroll as independent Medicaid providers and bill independently for providing ABA services to class members diagnosed with autism. LDHH asserts that the state legislature must pass legislation providing for the licensure of BCBAs and actually license BCBAs before they may practice independently of a licensed psychologist, enroll as independent Medicaid providers, and bill independently for providing ABA services to class members diagnosed with autism. In

---

(ASD). Established Treatments are those for which several well-controlled studies have shown the intervention to produce beneficial effects."

(National Standards Project Findings and Conclusions, Rec. Doc. 371-8, pp. 11-15)

an attempt to dissuade the Court from ordering direct enrollment of BCBAs, LDHH also points out that under La. R.S. 22:1050, ABA therapy must be provided under the supervision of a physician or licensed psychologist.

The Court disagrees with LDHH's argument that it would be premature to order direct enrollment of BCBAs until the state has created a licensing board and begun issuing licenses. This argument is a red herring. LDHH has a *present* obligation under federal law to provide ABA therapy to class members when it is recommended by a physician or licensed psychologist. LDHH is not presently complying with this obligation,[64] and it should not be allowed to continue its noncompliance while the State updates its licensing law to reflect developments in autism treatment and creates a state board to issue licenses. Delaying direct enrollment until BCBAs can be licensed would create needless delay in providing class members with services that the evidence demonstrates are medically necessary, must be provided early to achieve their maximum effect, and are currently being provided to children with private insurance by independent BCBAs.

Although, BCBAs providing ABA therapy independently are engaging in an activity that constitutes the practice of psychology under the Louisiana Psychology Practice Act, La. R.S. 37:2352(5), the state has taken no action taken to stop them from practicing. (Melville Decl. 2, Rec. Doc. 379-1, p. 28, ¶ 6) Rather, the Study

---

[64] (Winters email, Rec. Doc. 379-1, p. 38) (stating that "[t]he State Plan does not offer ABA therapy).

Commission, which was established by Senate Commission to study the
licensure and regulation of behavior analysis in 2012, recognized
that despite the lack of a state licensing statute, there were
approximately 70 BCBAs in Louisiana who are currently providing ABA
therapy to numerous children with autism and PDD and sought to
expand access to BCBA services, finding that they are needed by
more individuals than are currently receiving them. (Melville Decl.
2, Rec. Doc. 379-1, p. 29, ¶ 7) The Study Commission never
recommended that BCBAs (a) be licensed as psychologists, (b)
practice under the supervision of licensed psychologists, or (c) be
licensed under some other board for consumer protection purposes.
(Melville Decl. 2, Rec. Doc. 379-1, p. 29, ¶ 7) Under these
circumstances, the Court finds that there is no need to prevent
BCBA from enrolling as Medicaid providers until they have a state
license. A BCBA's certification by the Behavior Analyst
Certification Board, a national independent nonprofit credentialing
body, is sufficient to demonstrate his or her qualification to
independently provide ABA therapy and supervise the provision of
ABA therapy through programs following a service model like the
McNeese Autism Program. (Green Decl., Rec. Doc. 379-1, pp. 4-6, ¶¶
10-14)

Similarly, the Court finds that it would be counterproductive
to impose a requirement that BCBAs be supervised by licensed
psychologists. Technically, private insurance coverage is not
required under La. R.S. 22:1050 unless it is provided under the
supervision of a physician or licensed psychologist. However, in

61

practice, private insurance companies are reimbursing independent BCBAs, who are providing ABA therapy in Louisiana, for both their services and the services of line therapists that they supervise based solely on their Behavior Analyst Board Certification. (Tilley Decl. 2, Rec. Doc. 379-1, p. 33, ¶¶ 2-7; Melville Decl. 2, Rec. Doc. 379-1, pp. 28-29, ¶ 6) A requirement that BCBAs provide ABA therapy under the supervision of licensed psychologists is inconsistent with the current practice model in Louisiana (Melville Decl. 2, Rec. Doc. 379-1, p. 29, ¶ 9) and would needlessly impede class members ability to access necessary ABA therapy that children with private insurance have been accessing.

Moreover, the Court agrees with Plaintiffs, for the reasons expressed in their reply, that LDHH's proposal to provide ABA therapy to class members diagnosed with autism through an amendment to its Children's Choice Waiver would not adequately compensate Plaintiffs for LDHH's failure to implement the 2001 Remedial Order. Although LDHH asserts that it could accomodate class members through the Childrens' Choice Waiver in approximately six months and that the modifications Plaintiffs request will necessitate a State Plan Amendment that will probably take years, the Court is skeptical of LDHH's projected timelines. In its opposition to Plaintiffs' 2002 Contempt Motion, LDHH represented to the Court that it was approximately three months away from implementation of the 2001 Remedial Order by August of 2002. Over a decade later, LDHH still has not implemented it. LDHH has provided no basis for its contention that the State Plan Amendment that would be required

to accomodate Plaintiffs' request could take years. The Court finds this contention particularly suspect given that there is no indication that LDHH was unable to comply with the 2002 Contempt Order, which stated that "[e]ffective immediately" [LDHH] shall implement coverage for services provided by licensed psychologists," and directed LDHH to issue individual notice of the availability of these services to class members within seven days of the Court's order. (2002 Contempt Order, Rec. Doc. 140, p. 2, ¶¶ 2-3)

Finally, LDHH did not oppose any of the other modifications to the 2002 Contempt Remedy that Plaintiffs proposed. The Court specifically inquired whether counsel for LDHH objected to any of the Plaintiffs' other proposed modifications during oral argument. (May 8, 2013 Oral Arg. Tr., p. 42, lines 13-19) Although counsel for LDHH requested that the State be discretion with respect to rate setting, counsel ultimately agreed with the Court that the rates should be set to allow or cause sufficient numbers of providers to enroll. (May 8, 2013 Oral Arg. Tr., p. 43, lines 5-21) Counsel for LDHH also acknowledged that even though Magellan does not currently capture information about providers enrolled in Medicaid with documented evidence of equivalent education, professional training, and supervised experience in ABA, it could easily obtain the information through inquiries to its enrolled providers. (May 8, 2013 Oral Arg. Tr., p. 42, lines 13-25, p. 43, lines 1-2) Given that LDHH has not opposed Plaintiffs' other proposed modifications, the Court finds that they should be

granted.

New Orleans, Louisiana, this 18th day of July, 2013.


_____
CARL J. BARBIER
UNITED STATES DISTRICT JUDGE