UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

MELANIE CHISHOLM, ON BEHALF                    CIVIL ACTION
OF MINORS, CC AND MC, ET AL


VERSUS                                         NO: 97-3274


KATHY KLIEBERT, INTERIM                        SECTION: "J"(5)
SECRETARY OF THE LOUISIANA
DEPARTMENT OF HEALTH AND
HOSPITALS


**<u>ORDER AND REASONS</u>**

Before the Court is a Motion to Clarify and Temporarily Stay the Court's May 21, 2013 Order Pending Appeal **(Rec. Doc. 384).** The motion was filed by Defendant, Kathy Kliebert, Secretary of the Louisiana Department of Health and Hospitals ("LDHH").[1] Plaintiffs have opposed LDHH's motion. (Rec. Doc. 388) The motion was set for hearing on Wednesday, July 3, 2013, on the briefs. Having considered the motion, the memoranda, the record, and the applicable law, the Court finds that LDHH's motion should be **DENIED**, for reasons explained more thoroughly below.

---

[1]  Given that Plaintiffs sued Defendant, Kathy Kliebert, in her official capacity as the Secretary of LDHH, the Court will refer to the Defendant as "LDHH" throughout this Order.

## PROCEDURAL HISTORY AND BACKGROUND FACTS

In October 1997, Plaintiffs filed suit under 42 U.S.C. § 1983 against LDHH alleging numerous Medicaid violations.[2] On March 17, 1998, the Court certified this case as a class action, defining the class as:

> All current and future recipients of Medicaid in the State of Louisiana under age twenty-one who are now or will in the future be placed on the Mental Retardation/Developmental Disabilities ("MR/DD") waiver waiting list.

The instant motion concerns a subset of the class consisting of those class members diagnosed with autism or other Pervasive Developmental Disorders ("PDD"). On February 21, 2013, Plaintiffs filed a Motion for Modification of Contempt Remedy. (Rec. Doc. 364) In their motion, Plaintiffs requested that the Court make extensive modifications to a 2002 Contempt Order (Rec. Doc. 140) requiring LDHH to allow direct enrollment of licensed psychologists as a remedy for LDHH's contempt of an earlier order – the 2001 Remedial Order. (Rec. Doc. 124) The 2001 Remedial Order required LDHH, among other things, to establish fifteen teams statewide to provide behavioral and psychological treatment to class members diagnosed with autism or PDD. (Rec. Doc. 124) After hearing oral argument on Plaintiffs' Motion on May 8, 2013, the Court took the matter under advisement. On May 21, 2013, the Court issued a short order granting Plaintiffs' Motion and indicating that the Court's written

---

[2] The Court's written reasons for its May 21, 2013 Order contain a more thorough account of the procedural history and background facts in this case. (See Rec. Doc. 391, pp. 1-17)

reasons would be forthcoming at a later date. (Rec. Doc. 380) The
May 21, 2013 Order directed LDHH:

> (1) to make provisions for the numerous Board Certified
> Behavior Analysts who specialize in ABA therapy to
> enroll as independent Medicaid providers, to submit
> claims for their services, and to be listed as a resource
> for class members in all resources informing EPSDT
> recipients of services governed by orders in this case;[3]

> (2) to make provisions for Board Certified Behavior
> Analysts, the McNeese Autism Program, and other programs
> and agencies employing Board Certified Behavior Analysts
> to be reimbursed by Medicaid for intensive behavior
> interventions designed and supervised by Board Certified
> Behavior Analysts;

> (3) to identify any other providers who are enrolled in
> Medicaid who have documented evidence of equivalent
> education, professional training, and supervised
> experience in ABA;

> (4) to provide reimbursement rates such that sufficient
> qualified providers are available and that necessary
> services are provided to class members with reasonable
> promptness;

> (5) to develop and maintain outreach and referral systems
> to direct class members to providers who possess this
> certification or evidence of equivalent qualifications,
> for evaluation and treatment;

> (6) to arrange for intensive ABA therapy for class
> representatives, F.F. and A.B.;

> (7) to report to the Court within forty-five days of
> entry of its Order as to LDHH's implementation of the
> relief;

> (8) to provide monthly reports to class counsel, as to
> the following, in order to insure that the modified
> remedy is working:

> > a) the number of Board Certified Behavior Analysts
> > or equivalently - qualified providers of ABA
> > therapy enrolled in Medicaid and their locations;

---

[3] First Stipulation and Order, Rec. Docs. 43, 17, 31, 37-51.

b) the number of class members diagnosed with PDD and their locations;

c) the number of class members with PDD receiving intensive ABA therapy;

d) the number of class members with PDD receiving other psychological or behavioral services, and the type of practitioners from whom they are receiving services; and

e) the amount of Medicaid expenditures on each of these types of services for class members with PDD.

(May 21, 2013 Order, Rec. Doc. 380)

On June 14, 2013, LDHH filed a Notice of Appeal of the Court's May 21, 2013 Order. (Rec. Doc. 383) and the instant motion to clarify and temporarily stay the May 21, 2013 Order. (Rec. Doc. 384) On June 25, 2013, Plaintiffs filed their opposition. (Rec. Doc. 388) The instant motion came on for hearing on the briefs on July 3, 2013. (Rec. Doc. 384) On July 18, 2013, the Court issued its written reasons for its May 21, 2013 Order. (Rec. Doc. 391)

## PARTIES' ARGUMENTS

### A.    LDHH's Arguments Regarding Clarification of the Order

In the instant motion, LDHH first requests clarification of the provisions of the May 21, 2013 Order using the term Pervasive Developmental Disorders or "PDD," due to recent changes in the terminology and diagnostic criteria used in the Diagnostic and Statistical Manual ("DSM").[4] LDHH asserts that the Fourth Edition of the DSM ("DSM-IV") identifies a set of Pervasive Developmental Disorders, considered "autism spectrum disorders," that include

---

[4] The DSM is a manual published by the American Psychiatric Association that is used by clinicians to diagnose autism and related disorders.

4

Autistic Disorder, Asperger's Disorder, and Pervasive Developmental
Disorder Not Otherwise Specified ("PDD-NOS"). LDHH asserts that the
Fifth Edition of the DSM ("DSM-V"), which was published on May 27,
2013, eliminates the separate diagnostic labels of Autistic
Disorder, Asperger's Disorder, and PDD-NOS and replaces them with
one umbrella term, "Autism Spectrum Disorder," with further
distinctions made according to severity levels. The severity levels
in the DSM-V are based on the amount of support needed as a result
of the individual's restricted interests, repetitive behaviors, and
challenges with social communication. LDHH points out that PDD, a
term that is used in the May 21, 2013 Order and the DSM-IV, is not
included in the DSM-V and asserts that its program will need to be
modified to accommodate these changes to terminology and diagnostic
criteria in the DSM. LDHH requests that the Court clarify its
ruling "to provide guidance on how [LDHH] should proceed."

Second, LDHH requests clarification of the provision of the
May 21, 2013 Order pertaining to reimbursement rates. LDHH appears
to assert that it sets reimbursement rates consistent with federal
regulations, in particular 42 C.F.R. § 447.204, which requires that
LDHH provide reimbursement "sufficient to enlist providers so that
services under the plan are available to beneficiaries at least to
the extent that those services are available to the general
population." (Rec. Doc. 384-1, p. 3) LDHH also contends that the
reimbursement provision of the Court's May 21, 2013 Order
"overlooks the fact that Louisiana does not recognize the specific
provider type, BCBAs, and therefore has not implemented the Board

or licensing rules and regulations which will set forth the qualifications for licensure." (Rec. Doc. 384-1, p. 3) LDHH reiterates that the provider type – BCBAs – "is simply not set up within Louisiana Medicaid." (Rec. Doc. 384-1, p. 3)

Third, LDHH asserts that the Court must "clarify" the provisions of the May 21, 2013 Order imposing reporting requirements, because it does not currently capture the information that it is required to report to class counsel on a monthly basis and "must create a computer program and integrate the program with the various program offices in order to capture the requisite information." (Rec. Doc. 384-1, p. 4) LDHH also points out that there is no termination date for the required monthly reporting and contends that these circumstances warrant "clarification" of the reporting provisions of the Court's May 21, 2013 Order.[5]

Fourth, LDHH contends that the Court must clarify the provision of the May 21, 2013 Order requiring it to "identify any other providers who are enrolled in Medicaid who have documented evidence of equivalent education, professional training, and supervised experience in ABA." (Rec. Doc. 384-1, p. 5) LDHH contends that as of the date of the filing of the instant motion, ABA falls within the scope of the practice of psychology under Louisiana law, and thus, every licensed psychologist in Louisiana enrolled in Medicaid has documented evidence of equivalent

_____

[5] LDHH also asserted that it would be unable to gather the required information before July 15, 2013, the date on which its first report was due to class counsel and the Court. However, this contention is now moot, considering that LDHH's deadline to submit its first report has passed and LDHH has already submitted the report. (Rec. Doc. 393)

education, professional training, and supervised experience in ABA therapy. LDHH contends that psychologists use ABA therapy as a form of treatment and that this circumstance necessitates "clarification" of the provision in the May 21, 2013 Order requiring it to identify enrolled providers with training in ABA therapy equivalent to that of BCBAs.

**B. LDHH's Arguments Regarding a Stay of the Order Pending Appeal**

LDHH contends that a stay of the Court's May 21, 2013 Order is warranted for several reasons. First, LDHH contends that BCBAs must be licensed under Louisiana law before they can enroll as Medicaid providers and that the May 21, 2013 Order requiring LDHH to allow direct enrollment of BCBAs should be stayed while LDHH creates a Board to license and regulate BCBAs. The factors a court must consider in evaluating the propriety of a stay pending appeal include: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." Hilton v. Braunskill, 481 U.S. 770, 776 (1987). LDHH argues that all four factors support a stay of the May 21, 2013 Order pending its appeal.

With respect to the second factor, LDHH asserts that it will suffer irreparable harm if the May 21, 2013 order is not stayed,

because it will spend inordinate amounts of time and resources working toward an objective that requires statutory authority and approval from the Centers for Medicaid Services ("CMS"). LDHH asserts that (a) it lacks the resources to perform work towards an objective that is subject to change based on what is handed down from the Legislature, what is approved by CMS, and changes in the DSM, and (b) that it lacks resources to incorporate a new provider type. With respect to the first factor, LDHH asserts that "the dictates of due process and the balancing of the need of Plaintiffs to have ABA therapy against the interest of protecting the health, safety, and welfare of Louisiana citizens that LDHH has been charged to protect and serve, increases the probability of success on appeal." (Rec. Doc. 384-1, p. 7) With respect to the third factor, LDHH merely states in a conclusory manner that a stay would not harm Plaintiffs. With respect to the fourth factor, LDHH argues that a stay will further the public's interest by promoting judicial efficacy and the efficiency of LDHH.

**C. Plaintiffs' Arguments Regarding Clarification of the Order**

In their opposition, Plaintiffs preliminarily note that LDHH has failed to articulate either (a) the reasons why clarification of the May 21, 2013 Order is needed or (b) the substance of the desired clarifications in a manner sufficient for Plaintiffs to evaluate them. However, in regard to LDHH's concerns about changes in the terminology and diagnostic criteria in the DSM, Plaintiffs note that the DSM-V was published on May 27, 2013 and that existing

class members' current diagnoses obviously could not have been done under the provisions of the DSM-V, given that they were diagnosed when the DSM-IV was still in effect. Plaintiffs also point out that the records available to LDHH from which it can report on: (a) the number of class members with PDD, (b) the number of class members with PDD who are receiving ABA therapy, (c) the number of class members with PDD receiving other psychological and behavioral services, (d) the type of practitioner from whom they are receiving services, and (e) Medicaid expenditures on these services for those class members with PDD, could not reflect any of the changes in terminology or criteria in the DSM-V. Plaintiffs contend that if LDHH has specific questions about whether persons who are diagnosed using the terminology of the DSM-V should be included or omitted from the reports, it should articulate them for the parties and the Court. Plaintiffs assert that while these issues involving the new terminology of the DSM-V may need to be addressed in the future, there does not appear to be a real need for clarification at present.

With respect to LDHH's request for clarification of the provisions of the May 21, 2013 Order pertaining to reimbursement rates, Plaintiffs assert that LDHH has failed to explain why it needs clarification of these provisions. Plaintiffs (a) point out that in its motion, LDHH merely notes the requirements of 42 C.F.R § 447.204 and 42 C.F.R § 447.200, and (b) contend that nothing in the Court's May 21, 2013 Order is inconsistent with these federal regulations. Plaintiffs assert that the May 21, 2013 Order goes

further than these federal regulations by requiring that rates be set so that necessary ABA services are provided to class members with "reasonable promptness," and contends that this additional requirement in the May 21, 2013 Order is consistent with the requirements of paragraph three of the Court's 2001 Remedial Order (Rec. Doc. 124),[6] of which LDHH continues to be in contempt.

Plaintiffs further assert that LDHH's contention that it needs to create a computer program and implement it before it can report on some of the information required by the May 21, 2013 Order is not grounds for seeking clarification of the Order. Plaintiffs also point out that the 2001 Remedial Order (Rec. Doc. 124), the 2002 Contempt Order, and the discovery that Plaintiffs propounded on LDHH in October 2012 all requested information that is subsumed within the reporting requirements of the May 21, 2013 Order. Plaintiffs assert that it is time for LDHH to end its willful ignorance of class members' needs and of the providers who are available to treat them.

Plaintiffs also assert that there is no need for a termination date for any of the provisions of the May 21, 2013 Order. Plaintiffs assert that the Order is a remedy for LDHH's continuing contempt of the 2001 Remedial Order, an order that both parties crafted and agreed to, and that LDHH should not be permitted to escape the requirements of the contempt remedy until it has purged itself of contempt, either by complying with the original 2001

---

[6] Paragraph three of the 2001 Remedial Order provides, similar to the May 21, 2013 Order, that "sufficient qualified providers will be available to insure that the necessary services may be provided to all class members with reasonable promptness." (Rec. Doc. 124, p. 2, ¶ 3)

Remedial Order, by order of the Court, or by agreement of the parties.

### D. Plaintiffs' Arguments Regarding a Stay Pending Appeal

Plaintiffs contend that the arguments LDHH advances for obtaining a stay of the Court's May 21, 2013 Order pending appeal are essentially the same arguments it made in opposing Plaintiffs' Motion for Modification of Contempt Remedy. In particular, Plaintiffs note that LDHH continues to insist that in order to be covered by Medicaid, ABA therapy rendered by BCBAs must fit within 42 U.S.C. § 1396d(a)(6), which authorizes Medicaid coverage for "remedial care recognized under State law, furnished by licensed practitioners within the scope of their practice as defined by state law." Plaintiffs assert that they refuted this argument in their reply to LDHH's Opposition to their Motion to Modify Contempt Remedy by pointing out that ABA therapy rendered by BCBAs are within the scope of a parallel provision, 42 U.S.C. § 1396d(a)(13), which encompasses, "other … preventive, and rehabilitative services, including any medical or remedial services … recommended by a physician or other licensed practitioner of the healing arts within the scope of their practice under State law, for the maximum reduction of physical or mental disability and restoration of an individual to the best possible functional level." Plaintiffs note that LDHH never responded to this argument at oral argument and have not addressed it in their instant motion. Plaintiffs also

contend that they have already dealt with the argument that the Louisiana Psychology Practice Act should prevent the Court from requiring LDHH to compensate BCBAs.

Plaintiffs assert that LDHH's only new argument in favor of the stay is the claim that it must seek and obtain permission from CMS before it may offer ABA services to class members through BCBAs. Plaintiffs assert that regulations implementing the Medicaid Act, in particular, 42 C.F.R. § 431.250(b)(2), make it clear CMS approval is not a prerequisite to obtaining federal financial participation in the cost of these services, because they are provided pursuant to this Court's Order. Plaintiffs also point out that courts have rejected contentions by States that they must amend their State Medicaid plans before implementing court-ordered compliance with federal Medicaid requirements. Plaintiffs acknowledge that LDHH will wish to file an amendment to its State Plan to include ABA services, but asserts that even before LDHH does so, federal financial participation is available for the services this Court ordered in the May 21, 2013 Order.

Plaintiffs agree with LDHH on the substance of the factors that should be used in evaluating the appropriateness of a stay pending appeal but argue that LDHH has failed to satisfy any of the factors and that all factors weigh in favor of denying a stay. First, Plaintiffs argue that LDHH has failed to show likelihood of success on the merits of its appeal. Plaintiffs contend that LDHH has not articulated any basis for appeal, other than reiterating its assertion that it cannot enroll BCBAs who are not licensed as

psychologists under the Louisiana Psychology Practice Act as
independent Medicaid providers. Plaintiffs assert that, as LDHH
predicted at the oral argument on Plaintiffs' Motion to Modify
Contempt Remedy, Senate Bill 134 — which makes it clear that ABA
therapy is neither within the scope of "practice of psychology" nor
subject to regulation to the Louisiana State Board of Examiners of
Psychologists — was signed into law by the Louisiana governor as
Act 351 after the Court issued the May 21, 2013 Order. Plaintiffs
contend that the Louisiana Behavior Analyst Board is to be
constituted and have its first meeting by October 1, 2013 and that
the practice of behavior analysis will soon be tied to state
licensure. Plaintiffs also assert that starting December 31, 2013,
it will be a misdemeanor for a person not licensed, state
certified, or registered by the Louisiana Behavior Analyst Board to
engage in the practice of behavior analysis. However, Plaintiffs
contend that although it is not explicitly mentioned by name in Act
351, the National Behavior Analyst Certification Board
credentialing process for BCBAs[7] clearly satisfies the major
qualifications for state licensure embodied in Act 351, La. R.S.
37:3706(6) and (8).

Second, Plaintiffs contend that LDHH has failed to show that
it will suffer any irreparable injury if a stay is not granted.
Plaintiffs assert that although LDHH has claimed that the
implementation of the Order will require the expenditure of

---

[7]  This process is described in detail in the declaration of Gina Green, which
was attached as Exhibit 13 to Plaintiffs' Motion to Modify Contempt Remedy.
(Rec. Doc. 377-2, pp. 4-5, ¶¶ 10-11)

"inordinate amounts of time and resources" towards what it characterizes as a contingent objective, it has failed to explain why it will be burdensome to: (a) enroll qualified providers of ABA therapy in Medicaid, (b) to establish fair and reasonable rates for their services, and (c) to publicize the availability of this necessary therapy. Plaintiffs contend that given that LDHH's primary objection to the provisions of these services has been resolved by the state legislature's action, the only purpose that a stay of the Court's May 21, 2013 Order will serve is that of delay.

Plaintiffs contend that they will suffer irreparable injury if a stay is granted. Plaintiffs assert that the Fifth Circuit has found that threatened or actual denial of necessary Medicaid services constitutes irreparable harm and rely on several authorities in support of their position that the denial of services to class members would give rise to substantial injury to class members diagnosed with autism. Plaintiffs also point out that in connection with their Motion for Modification of Contempt Remedy, they have presented evidence demonstrating that (a) autistic children need intensive behavioral health services as early as possible to achieve the maximum reduction of their disability, (b) autistic children are at grave risk of remaining unnecessarily disabled for the rest of their lives unless they receive adequate services early, and (c) autistic children are at risk of becoming more disabled through injury or loss of skills previously attained if they do not receive adequate services

early.[8] Given these circumstances, Plaintiffs contend that a stay would substantially harm class members and is contrary to the public interest.

## DISCUSSION

### A. Clarification of the Court's Order is Not Warranted

The Court is not convinced that the changes in the terminology used in the DSM-V warrant any clarification of the Court's May 21, 2013 Order at present. LDHH has not articulated the substance of the "clarifications" it believes to be necessary, instead generally asserting that it will at some time in the future need to modify its program to accommodate the changes and seeking "guidance on how it should proceed." If LDHH has specific questions about whether, and if so, how, the provisions of the May 21, 2013 Order apply to individuals diagnosed under the new criteria and terminology used in the DSM-V, the Court will address them once LDHH has properly articulated and raised them. The Court agrees with Plaintiffs that the changes in the DSM-V should not, at present, impact LDHH's ability to comply with the requirements of the May 21, 2013 Order, given that class members were diagnosed under the DSM-IV. As Plaintiffs point out, the records that LDHH has access to, which bear on the categories of information it is required to report on under the May 21, 2013 Order, should not reflect the changed criteria and terminology in DSM-IV.

---

[8] See Declaration of James A. Mulick, Exhibit 5 to Plaintiffs' Motion to Modify Contempt Remedy. (Rec. Doc. 364-6, ¶¶ 12-14, 33, 37)

The Court also finds that no clarification is necessary to the provisions of the May 21, 2013 Order regarding reimbursement rates. Paragraph four of the May 21, 2013 Order directs LDHH to "provide reimbursement rates such that sufficient qualified providers are available and that necessary services are provided to class members with reasonable promptness." (Rec. Doc. 380, ¶ 4) LDHH has failed to explain why clarification of this provision is needed. Under 42 C.F.R § 447.204, LDHH is required to set rates "sufficient to enlist enough providers so that services under the plan are available to beneficiaries at least to the extent that those services are available to the general population." Under 42 C.F.R § 447.200, payments must be "consistent with efficiency, economy, and quality of care." As Plaintiffs point out, there is nothing in paragraph four of the May 21, 2013 Order that is inconsistent with these federal regulations. To the extent that the reimbursement provision in the May 21, 2013 Order goes further than these regulations by requiring LDHH to set rates sufficient to ensure that class members receive services with reasonable promptness, the difference is to be expected given that the reimbursement provision is part of a contempt remedy designed to compensate Plaintiffs for LDHH's decades long failure to implement the 2001 Remedial Order. Moreover, LDHH should be familiar with and understand the reimbursement provision, given that it is nearly identical to the

provision in paragraph three of the 2001 Remedial Order that counsel for LDHH agreed to over a decade ago.[9]

The Court also notes that counsel for LDHH touched on the subject of reimbursement rates during the May 8, 2013 oral argument on Plaintiffs' Motion for Modification of Contempt Remedy. After an extensive discussion of the provision in the May 21, 2013 Order requiring LDHH to allow direct enrollment of BCBAs, the Court inquired whether LDHH objected to any other of the provisions of the Order. (May 8, 2013 Oral Arg. Tr., p. 42, lines 13-19) After stating that she was "not sure" whether LDHH objected to certain other provisions of the Order, counsel for LDHH requested that LDHH be given discretion with respect to rate setting, stating:

> Well, as far as the rate setting, Medicaid, as you know, is strapped financially and whenever we're ordered to provide funding in one area, that usually means that funds are taken away from another program. So I think the State should have discretion and leeway as to the rates that were set. *We already have rates that are set*.

(May 8, 2013 Oral Arg. Tr., p. 43, lines 5-10) (emphasis added).

Thereafter, the Court reiterated its conclusion that rates be set to cause sufficient numbers of providers to enroll:

> It doesn't look good to order the remedy if the rates are so low that no one enrolls … it's a hollow remedy then. I don't know what the proper rate is or should be … but it certainly has to be sufficient that it would allow or cause sufficient numbers of providers to enroll.

(May 8, 2013 Oral Arg. Tr., p. 43, lines 11-16).

---

[9] Paragraph three of the 2001 Remedial Order provides that "sufficient qualified providers will be available to insure that the necessary services may be provided to all class members with reasonable promptness." (2001 Remedial Order, Rec. Doc. 124, p. 2, ¶ 3)

Counsel for LDHH then re-suggested that Medicaid has an established rate structure:

> Right. Currently, *I think, the rate structure is based on the percentage of what a psychiatrist is paying other licensed professionals. It's in the State plan.*

(May 8, 2013 Oral Arg. Tr., p. 43, lines 17-19) (emphasis added).

This exchange between counsel for LDHH and the Court bolsters the Court's conclusion that  there is no need to "clarify" the provision of its Order pertaining to reimbursement rates. Given (a) that the Order is perfectly clear that LDHH must set reimbursement rates that cause a sufficient number of providers to enroll, (b) that LDHH has conceded that the State Plan contains the rate structures, and (c) that Plaintiffs have not yet challenged the rate structure in LDHH's State Plan on the grounds that it is insufficient to cause a sufficient number of providers to enroll, the Court finds that there is no need to "clarify" the provisions in the May 21, 2013 Order pertaining to reimbursement rates at this time.

LDHH's contention that the reimbursement provision of the Court's Order "overlooks the fact that Louisiana does not recognize the specific provider type, BCBAs, and therefore has not implemented the Board or licensing rules and regulations which will set forth the qualifications for licensure," (Rec. Doc. 384-1, p. 3) provides no basis for "clarification" of the May 21, 2013 Order. The Court has clearly ordered LDHH to recognize BCBAs based on their national certification alone and allow them to enroll as independent Medicaid providers. This contention is merely LDHH's

attempt to reiterate their argument that it is premature to order direct enrollment of BCBAs, which the Court has already rejected both in the May 8, 2013 oral argument on Plaintiffs' Motion for Modification of Contempt Remedy and in its written reasons for the May 21, 2013 Order. Counsel for LDHH contended at oral argument that it was premature to allow direct enrollment of BCBAs, before they could obtain state licenses. (May 8, 2013 Oral Arg. Tr., p. 38, lines 1-2) The Court responded that it saw "no logical reason why we should allow some kind of bureaucratic morass to delay or red tape to delay services." (May 8, 2013 Oral Arg. Tr., p. 40, lines 2-4) When the Court pressed LDHH on whether her argument regarding state licensing requirements for BCBAs amounted to a bureaucratic morass, even counsel for LDHH ultimately conceded: "If I had to say 'yes' or 'no', I would have to say 'yes.'" (May 8, 2013 Oral Arg. Tr., p. 40, lines 14-15) In its written reasons for the May 21, 2013 Order, the Court again rejected LDHH's argument that direct enrollment of BCBAs was premature:

> The Court disagrees with LDHH's argument that it would be premature to order direct enrollment of BCBAs until the state has created a licensing board and begun issuing licenses. This argument is a red herring. LDHH has a *present* obligation under federal law to provide ABA therapy to class members when it is recommended by a physician or licensed psychologist. LDHH is not presently complying with this obligation, and it should not be allowed to continue its noncompliance while the State updates its licensing law to reflect developments in autism treatment and creates a state board to issue licenses. *Delaying direct enrollment until BCBAs can be licensed would create needless delay in providing class members with services that the evidence demonstrates are medically necessary, must be provided early to achieve their maximum effect, and are currently being provided to children  with private insurance by independent BCBAs* .

> *. .the Court finds that there is no need to prevent BCBA from enrolling as Medicaid providers until they have a state license. A BCBA's certification by the Behavior Analyst Certification Board, a national independent nonprofit credentialing body, is sufficient to demonstrate his or her qualification to independently provide ABA therapy and supervise the provision of ABA therapy through programs following a service model like the McNeese Autism Program.*

(Written Reasons for May 21, 2013 Order, Rec. Doc. 391, pp. 60-61) (emphasis added).

The Court finds no more merit to LDHH's prematurity argument now than it did then. The fact that BCBAs, at present, lack state licenses is inconsequential. The practice of behavior analysis in Louisiana is not yet tied to licensure by a state licensing board, although the board is to be constituted and have its first meeting by October 1, 2013. La. R.S. 37:3703(C). In addition, the major requirements for state licensure are the same as the requirements to obtain the national BCBA certification. (See Greene Aff., Rec. Doc. 379-1, pp. 5-6, ¶¶ 10-11; La. R.S. 37:3706(1)-(8)). To be eligible for the BCBA designation, an applicant must demonstrate that they have at least a master's degree in behavior analysis or a closely related field from an accredited institution of higher learning. (Greene Aff., Rec. Doc. 379-1, p. 6, ¶ 10) To obtain a state license under La. R.S. 37:3706(8), the applicant is similarly required to prove that he or she "holds a master's degree from any regional accredited university or other institutions of higher learning."La. R.S. 37:3706(8). To obtain the BCBA certification, an applicant is required to pass a professional examination in behavior analysis administered by the Behavior Analyst

Certification Board ("BACB"), an independent nonprofit credentialing body that is accredited by the National Commission on Certifying Agencies. (Greene Aff., Rec. Doc. 379-1, pp. 5-6, ¶ 10) Under La. R.S. 37:3706(5), an applicant for state licensure is required to prove that he or she "has passed a nationally recognized examination administered by a nonprofit organization accredited by the National Commission for Certifying Agencies." La. R.S. 37:3706(5). Under La. R.S. 37:3706(7), the applicant for state licensure is required to prove that he or she conducts their activities in accordance with accepted standards, including the . . . Ethical Standards of the Behavior Analyst Certification Board . . ." La. R.S. 37:3706(7). Clearly, any applicant for state licensure who has already obtained a national BCBA certification has simultaneously satisfied the major requirements for state licensure. Moreover, although the law was effective August 1, 2013, it is currently impossible for BCBAs to attempt to satisfy the remaining state licensure requirements, given that there is no board yet established to accept completed applications, application fees, and proofs of good moral character, or to administer background checks or examinations on Louisiana law. La. R.S. 37:3706(1)-(4), (7). Whether BCBAs who enroll in the near future as independent Medicaid providers on the basis of their BCBA credential alone might later be required to satisfy these additional state licensure requirements is a question the Court may address at a later time, if the need arises.

Similarly, LDHH's contention that the provider type – BCBAs – "is simply not set up within Louisiana Medicaid" (Rec. Doc. 384-1, p. 3) provides no basis for the Court to "clarify" its Order. LDHH's apparent admission that it has not yet complied with the Court's clear orders to "make provisions for the numerous [BCBAs] who specialize in ABA therapy" to: (1) "enroll as independent Medicaid providers," (2) "submit claims for their services," and (3) "be reimbursed by Medicaid for intensive behavior interventions designed and supervised by [BCBAs],"[10] does not somehow render those orders unclear.

The Court also finds that there is no need to "clarify" the reporting requirements in the May 21, 2013 Order. Paragraph eight of the May 21, 2013 Order requires LDHH to provide monthly reports to class counsel, as to the following, in order to insure that the modified remedy is working:

> a) the number of Board Certified Behavior Analysts or equivalently - qualified providers of ABA therapy enrolled in Medicaid and their locations;
> b) the number of class members diagnosed with PDD and their locations;
> c) the number of class members with PDD receiving intensive ABA therapy;
> d) the number of class members with PDD receiving other psychological or behavioral services, and the type of practitioners from whom they are receiving services; and
> e) the amount of Medicaid expenditures on each of these types of services for class members with PDD.

The Court agrees that the fact that LDHH must create and implement a computer program before it can report on some of the

---

[10] (May 21, 2013 Order, Rec. Doc. 380, ¶¶ 1-2)

information required under the May 21, 2013 Order does not warrant clarification of the Order. The Court also notes that these reporting requirements are very similar to reporting requirements that were included in both the 2001 Remedial Order and the 2002 Contempt Order.[11] Consistent reporting on the categories of information outlined in the May 21, 2013 Order is necessary to monitor the effectiveness of the modified contempt remedy in compensating Plaintiffs for LDHH's continued failure to implement the 2001 Remedial Order, just as it was necessary to monitor and discover the ineffectiveness of the 2002 Contempt Order. Furthermore, the Court agrees with Plaintiffs that the absence of

---

[11] Paragraph seven of the 2001 Remedial Order provided in pertinent part that:

> [LDHH] will report to Plaintiffs' counsel bi-monthly on the following: the number of providers enrolled and the locations from which the providers offer services; the total number of class members, and, if available, the total number of children, with a diagnosis of PDD (whether or not they have been evaluated by a provider, and their parishes of residence; the number of class members, and, if available, the total number of children, evaluated, and their diagnosis, and whether behavioral services were recommended, by provider and parish of residence; numbers and reasons for discontinuations of services, sorted by provider and parish.

(2001 Remedial Order, Rec. Doc. 124, p. 4, ¶ 7)

Paragraph seven of the 2002 Contempt Order provided in pertinent part that:

> [LDHH's] counsel shall provide weekly updates to the Court and plaintiffs' counsel in writing on the implementation of the remedy, until further order of the Court. These reports shall also, to the extent practicable, cover the following elements from the Court's previous order:
>
> > a. The number of providers enrolled;
> > b. The locations from which the providers offer services;
> > c. The total number of class members;
> > d. To the extent available, the total number of class members with a diagnosis of PDD, and their parishes of residence.

(2002 Contempt Order, Rec. Doc. 140, p. 3, ¶ 7)

a termination date for the reporting requirement, or any other provision of the May 21, 2013 Order provides no basis for clarification. Moreover, as Plaintiffs point out, the May 21, 2013 Order is a remedy for LDHH's continuing contempt of the 2001 Remedial Order, an order that both parties crafted and agreed to, and that LDHH should not be permitted to escape until it has purged itself of contempt, either by compliance with the original 2001 Remedial Order, by order of the Court, or by agreement of the parties. Given that (a) the Court shares Plaintiffs' frustration with LDHH's ongoing willful ignorance of class members' needs and the providers available to treat them, and (b) LDHH has articulated no basis for clarification, the Court finds no reason to alter or clarify the reporting provisions of the May 21, 2013 Order.

Similarly, the Court finds no merit in LDHH's contention that the Court must clarify paragraph five of the May 21, 2013 Order, because ABA fell within the scope of the practice of psychology as of the date of the filing of the instant motion. Paragraph five requires LDHH to "identify any other providers who are enrolled in Medicaid who have documented evidence of equivalent education, professional training, and supervised experience in ABA." LDHH contends that because ABA fell within the scope of the practice of psychology, as of the date of filing of the instant motion, every licensed psychologist in Louisiana enrolled in Medicaid had documented evidence of equivalent education, professional training, and supervised experience in ABA therapy. Even assuming the truth of this dubious proposition, it would not warrant any

24

"clarification" of paragraph five of the May 21, 2013 Order. The May 21, 2013 Order is clear that if every licensed psychologists enrolled in Medicaid had documented evidence of training in ABA therapy equivalent to that of BCBAs, LDHH should identify every licensed psychologist in its reports pursuant to paragraph five. In any event, the Court notes that LDHH's contention has been undermined by the enactment of Senate Bill 134 as Act 351, La. R.S. §§ 37:3701-3717, subsequent to the filing of the instant motion.

**B. A Stay of the May 21, 2013 Order Pending Appeal Is Not Warranted**

The Court finds that all factors weigh against staying the May 21, 2013 Order. The Court agrees with Plaintiffs that LDHH has not made a strong showing of likely success on appeal. As Plaintiffs correctly observe, LDHH's only new contention related to the likelihood of success on appeal is that it must obtain approval from the Centers for Medicare and Medicaid Services ("CMS") before it may offer ABA therapy to class members through BCBAs. LDHH has offered no support for this contention. As Plaintiffs point out, federal regulations implementing the Medicaid Act make it clear that CMS approval is not a prerequisite for obtaining federal financial participation in the cost of these services, because the services are being provided pursuant to this Court's May 21, 2013 Order. 42 C.F.R. § 431.250(b)(2)(providing that federal financial participation is available in expenditures for payments made for "services provided within the scope of the Federal Medicaid program

and made under a court order.") As Plaintiffs acknowledge, although LDHH will wish to file an amendment to its State Plan to include ABA services, even before it does so, federal financial participation is available for these Court ordered services. Moreover, the Court has already addressed the argument that the May 21, 2013 Order should be stayed until BCBAs can obtain state licenses. Such a stay, and the delay occasioned by it, would undermine the most critical imperative of the May 21, 2013 Order — to provide class members with access, as soon as possible, to essential ABA services that the evidence demonstrates must be administered early to achieve their maximum effect. (Written Reasons for May 21, 2013 Order, Rec. Doc. 391, pp. 57-58; Mulick Decl., Rec. Doc. 364-6, p. 14, ¶¶ 35-38) Considering that there is no risk in class members obtaining sub par treatment, because BCBAs, by virtue of their national certification, have satisfied the most important requirements for state licensure, any additional delay that would be occasioned by a stay of the March 21, 2013 Order is unacceptable.

LDHH alleges that without a stay, it will expend inordinate amounts of time and resources working toward what it characterizes as an objective contingent on CMS approval. As discussed above, the direct enrollment objective is not contingent on CMS approval, because LDHH may obtain federal financial participation for ABA services provided to classmembers without CMS approval by virtue of the Court's order. The Court finds LDHH's vague explanation of the hardships it anticipates in the absence of a stay unsatisfactory,

especially when contrasted with the irreparable injury that
Plaintiffs will endure and the harm to the public interest that
will result if Plaintiffs are denied access to necessary ABA
services while LDHH appeals the May 21, 2013 Order. LDHH has
offered no more than an unexplained allegation that a stay will
further the public interest by promoting judicial efficacy and
LDHH's efficiency. Rather than promote judicial efficacy or LDHH's
efficiency, the Court finds that a stay would achieve exactly the
opposite. It would effectively: (a) guarantee that the Court's
Order does not achieve the desired result of providing class
members with ABA services as soon as possible, and (b) lend
official sanction to LDHH's attempts to continue its decade-long
inefficiency in providing necessary services to class members.

Accordingly,

**IT IS HEREBY ORDERED** that LDHH's Motion for Clarification and
Stay of the May 21,
2013 Order **(Rec. Doc. 384)** is **DENIED**.

New Orleans, Louisiana, this 13th day of August, 2013.

CARL J. BARBIER
UNITED STATES DISTRICT JUDGE