UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| MELANIE CHISHOLM, ON BEHALF OF MINORS, CC AND MC, ET AL | CIVIL ACTION |
| VERSUS | NO: 97-3274 |
| REBEKAH GEE, SECRETARY OF THE LOUISIANA DEPARTMENT OF HEALTH AND HOSPITALS | SECTION: "J"(5) |

**ORDER AND REASONS**

Before the Court is a *Motion to Vacate the 2014 Stipulated Order* **(Rec. Doc. 420)** filed by Dr. Rebekah Gee, in her official capacity as the Secretary of the Louisiana Department of Health ("LDH"). Plaintiffs filed an opposition to LDH's motion (Rec. Doc. 424), LDH filed a reply (Rec. Doc. 432), and Plaintiffs filed a supplemental memorandum (Rec. Doc. 437). On July 19, 2017, the Court heard oral argument on the motion and took the matter under advisement. Having considered the motion and legal memoranda, the record, and the applicable law, the Court finds that the motion should be **DENIED**.

**FACTS AND PROCEDURAL BACKGROUND**

This litigation dates back to 1997, when Plaintiffs first alleged that the Louisiana Department of Health and Hospitals ("LDHH") (now called the Louisiana Department of Health ("LDH" or "the Department")) violated federal Medicaid law by not providing

1

people with Autism Spectrum Disorder ("ASD") sufficient access to behavioral and psychological services. Plaintiffs were certified as a class of "all current and future recipients of Medicaid under the age of twenty-one who are now and will in the future be placed on the Mental Retardation/Developmental Disabilities ("MR/DD") Waiver waiting list." (Rec. Doc. 118 at 1.) Following a bench trial, the Court issued Findings of Fact and Conclusions of Law on February 2, 2001 determining that LDHH violated federal law by failing to make behavioral and psychological services available. *Id*. at 21-22. The Court ordered the parties to confer and jointly submit a proposed remedy for the violations. *Id.* at 23.

The parties agreed on a proposed remedy which the Court entered as a remedial order on June 27, 2001 ("2001 Remedial Order"). (Rec. Doc. 124.) Nearly a year later, on June 14, 2002, the Court found LDHH to be in contempt of the 2001 Remedial Order and entered an Order to that effect ("2002 Contempt Order"). The 2002 Contempt Order was intended to improve compliance by LDHH and compensate class members for the failure to comply. (Rec. Doc. 140 at 3-4.) It stated that the "remedy may . . . be ended by agreement of the parties, approved by the Court, or by further Order of the Court." *Id*. at 4. Additionally, the 2002 Contempt Order provided that "[e]ither party may by motion seek modification of the alternative remedy ordered herein." *Id*.

2

Nearly a decade later, Plaintiffs requested that the Court modify the 2002 Contempt Order to adapt to changes in treatment of ASD. (*See* Rec. Doc. 364). The treatment of children with ASD had evolved significantly in the decade since 2001 and new therapies had become available. In particular, a therapy called Applied Behavioral Analysis ("ABA") developed and proved to be successful in improving the intellectual functioning of people with ASD. A new type of professional also developed; specialists called Board Certified Behavior Analysts ("BCBAs") became prevalent and often provided ABA services. On February 27, 2013, Plaintiffs moved the Court to modify the 2002 Contempt Order by requiring LDHH to enroll BCBAs as Medicaid providers. The Department opposed this request. On May 21, 2013, after hearing oral argument on the motion, the Court modified the 2002 Contempt Order to require LDHH to enroll BCBAs in Louisiana Medicaid as independent providers ("2013 Contempt Order").

As LDHH began implementing the 2013 Contempt Order, the parties entered into negotiations to replace some of the obsolete obligations left from the previous three orders and to consolidate the Department's responsibilities. (*See* Rec. Doc. 404-1 at 3-4.) The parties jointly proposed a stipulated order ("2014 Stipulated Order"), which the Court approved and entered on April 1, 2014. (Rec. Doc. 408.) The 2014 Stipulated Order vacated the 2002 and 2013 Contempt Orders and modified the 2001 Remedial Order "such

that its terms are superseded by and replaced with the terms in the revised remedial order submitted by the parties." (Rec. Doc. 407.)

The 2014 Stipulated Order provides that after thirty months from its entry, "[LDH] may move to vacate this Order on the grounds that [LDH] has achieved and maintained compliance for a sufficient period of time to warrant relief under Federal Rule of Civil Procedure 60(b)." (Rec. Doc. 408 at 14.) The thirty month anniversary of the 2014 Stipulated Order was October 1, 2016. LDH now moves to vacate the 2014 Stipulated Order and Plaintiffs oppose this motion.

## **LEGAL STANDARD**

LDH filed this motion pursuant to Federal Rule of Civil Procedure 60(b)(5) ("Rule 60(b)(5)"). Rule 60(b)(5) permits the Court to "relieve a party or its legal representative from a final judgment, order, or proceeding" when the movant has established that one of three independent grounds has been met: (1) "the judgment has been satisfied, released, or discharged;" (2) "it is based on an earlier judgment that has been reversed or vacated;" or (3) "applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5); *See Frew v. Janek*, 780 F.3d 320, 327 (5th Cir. 2015). Here, LDH requests relief based upon the first ground for having satisfied the 2014 Stipulated Order or based upon the third ground because it argues that applying the 2014 Stipulated Order

4

prospectively would no longer be equitable. However, the briefing for this motion focuses primarily upon whether LDH has satisfied its obligations under the 2014 Stipulated Order and not upon whether prospective application would be equitable.

Motions for termination of consent decrees are rarely based upon the state agency having satisfied the terms of the order. *See Frew*, 780 F.3d at 327 (noting that Rule 60(b)(5) motions based upon the first ground of Rule 60(b)(5) are "almost never applied to consent decrees"). As the Fifth Circuit has acknowledged, there is "very little applicable precedent interpreting this clause" in the context of consent decrees that involve institutional reform. *Id*. However, the court in *Frew v. Janeck* applied general principles of contract interpretation to a consent decree to determine whether the judgment had been satisfied. *See id*. at 327-28.

More often, movants bring Rule 60(b)(5) motions pursuant to the third ground, that prospective application is no longer equitable. The standard for modification of consent decrees based on that ground is a "flexible one." *Frazar v. Ladd*, 457 F.3d 432, 436 (5th Cir. 2006) (quoting *Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 393 (1992)). The moving party "bears the burden of establishing that a significant change in circumstances warrants revision of the decree." *Id*. The movant can meet this burden by demonstrating that a "significant change either in factual

conditions or in law" has occurred. *Id*. at 436. The court then determines if the "proposed modification is suitably tailored to the changed circumstance." *Id*. It should be noted that although LDH requests vacatur on this ground, neither party has briefed whether prospective application would be equitable.

## **DISCUSSION**

The issue before the Court is whether LDH has achieved and maintained compliance sufficient to vacate the 2014 Stipulate Order. The 2014 Stipulated Order contains several requirements, some of which have undisputedly been met. For instance, LDH has ensured that a wide range of mental health and family services are provided to the class and managed through Louisiana's Medicaid system. Additionally, LDH has established a program for providing ABA therapy services to class members. However, Plaintiffs claim that LDH has failed to comply with five requirements of the 2014 Stipulated Order: (1) the requirement to provide services with reasonable promptness of 42 U.S.C. § 1396a(a)(8); (2) the equal access requirement of 42 U.S.C. § 1396a(a)(30)(A); (3) the provision of emergency mental health services; (4) the provision of psychological and behavioral health services other than ABA; and (5) updating informing and training manuals. Of these disputed issues, the requirement to provide services with reasonable promptness was the most thoroughly discussed topic. Because the Court finds that LDH has not demonstrated compliance with the

reasonable promptness provision, the other disputed issues need not be taken up at this time.

## I. Reasonable Promptness

The 2014 Stipulated Order includes a provision that states: "Medical assistance provided under this Order, including but not limited to Applied Behavioral Analysis (ABA) therapy, shall be furnished with reasonable promptness to all eligible class members, as required by 42 U.S.C. § 1396a(a)(8)." (Rec. Doc. 408 at 3.) Section 1396a(a)(8) requires state plans for medical assistance to permit all individuals the right to apply for medical assistance and requires that "such assistance shall be furnished with reasonable promptness to all eligible individuals." The parties disagree about whether LDH has satisfied its obligation to provide medical assistance to the class members with reasonable promptness. Plaintiffs argue that despite the changes implemented by LDH pursuant to the 2014 Stipulated Order, many class members still have to wait too long before receiving ABA services. They point to evidence that suggests many class members are on waitlists for a year or longer before receiving ABA services and argue that waitlists of that length put LDH out of compliance with the reasonable promptness provision. LDH acknowledges that some class members experience a delay in receiving ABA services, but the Department disputes the number of class members who are actually waiting for extended periods. LDH also attributes the delays to

a lack of qualified professionals in Louisiana licensed to provide ABA services.

## II. Definition of "Medical Assistance"

As an initial matter, the Court must address the definition of "medical assistance" in the Medicaid Act. In 2009, the Fifth Circuit held that medical assistance, as defined in the Medicaid Act, referred to the payment for various medical services rather than the actual provision of the services. *Equal Access for El Paso, Inc. v. Hawkins*, 562 F.3d 724, 727 (5th Cir. 2009). The court noted that the Medicaid Act defined medical assistance as the "payment of part or all of the cost of . . . care and services" for eligible individuals. *Id.; see* § 1396d(a) (2006). Because medical assistance was defined in "financial terms," the court found that the reasonable promptness requirement of § 1396a(a)(8) "refers to financial assistance and not actual medical services." *Id*. at 727, 728. However, Congress amended the definition of medical assistance one year after the Fifth Circuit made this ruling. As part of the Patient Protection and Affordable Care Act, the definition of medical assistance under § 1396d(a) was expanded to include "payment of part or all of the cost of the . . . care and services *or the care and services themselves, or both*. . . ." § 1396d(a) (amended March 23, 2010) (emphasis added). Although the Fifth Circuit has not had occasion to revisit its holding in *Equal Access for El Paso, Inc. v. Hawkins* since the

amendment of § 1396d(a), the new language of the statute clarifies that medical assistance involves the provision of services. *See John B. v. Emkes*, 852 F. Supp. 2d 944, 951 (M. D. Tenn. 2012), *aff'd* 710 F.3d 394 (6th Cir. 2013). Thus, the Court is satisfied that the Medicaid Act's reasonable promptness requirement now requires timely provision of care and services, and not just payment for those services.

**III. Evidence of Delays in Obtaining ABA Services**

Plaintiffs have submitted evidence tending to demonstrate that class members must wait significant periods before receiving ABA services. Their submissions include a declaration by Jeanne Abadie, the Compliance Specialist for the Advocacy Center of Louisiana. Ms. Abadie provided a review of all reports made to the LDH call center[1] from May 2014 through December 2016. In her declaration, Ms. Abadie stated that approximately fifty-nine percent of the callers were waiting to obtain ABA services and only eleven percent of the callers were receiving ABA services. (Rec. Doc. 424-4 at 2.) Plaintiffs also report that eleven class members who had been in contact with the call center in the month of December 2016 had been waiting to receive ABA services for at

---

[1] LDH maintains a telephone call center staffed by one or more LDH employees or contractors so that class members can call to receive assistance with being connected with services. (Rec. Doc. 408 at 4.) The maintenance of this call center is required by the 2014 Stipulated Order. *Id.*

least six months, and three of these class members had been waiting for over a year. *Id*.

Plaintiffs also submitted a chart that is based on declarations from seven providers of ABA services in Louisiana.[2] Each ABA provider's declaration included the number of people on waitlists to receive ABA services. In aggregate, the number of people on the waitlists was 1,141, and 717 of the people were on Medicaid. Of those people on the waitlist, eighty-five had been on it for five-to-six months, ninety had been on the waitlist for six-to-nine months, 196 had been on the waitlist nine months-to-one year, and 318 had been on the waitlist for longer than one year. (Rec. Doc. 434-2 at 2.) The chart does not distinguish whether or not the people received Medicaid when breaking down the amount of time they have been on the waitlist.

LDH argues that Plaintiffs fail to present the whole picture and that their argument equates to isolated examples of individual class members waiting to receive services. To make this point, LDH attempts to discredit Plaintiffs' examples of delays by either blaming parties independent from LDH (*see* Rec. Doc. 432 at 2-3) or stating that Plaintiffs' assertions lack sufficient detail.

---

[2] The seven providers are: the Emerge Center, which provides services in Baton Rouge; the Touchstone Center, which provides services in Southeastern Louisiana; Butterfly Effects, which provides services in New Orleans and Baton Rouge; Behavioral Developmental Services, LLC, which provides services in Monroe, West Monroe, Ruston, Olla Jena, and Winnsboro; Spears Learning Center, which provides services in New Orleans; Northshore Autism Center, which provides services in Mandeville; Autism Spectrum Therapies, which provides services in Southeast Louisiana.

Nevertheless, LDH acknowledges that some class members experience delays before receiving ABA services. At oral argument, counsel for LDH reported that the Louisiana Medicaid office sent out an anonymous survey in June 2017 to all eighty-eight ABA providers in Louisiana that are enrolled in Louisiana Medicaid. Thirty-seven providers responded to the survey. Of that number, only twenty providers reported the length of time that applicants must wait before receiving ABA services.[3] These wait times varied from two weeks at the shortest to greater than one year at the longest. Counsel for LDH stated that two providers reported wait times that exceeded a year. About half of the respondents reported that the wait times were the same for children with Medicaid as for children without Medicaid.

**IV. Analysis**

Although "reasonable promptness" is not defined by hard and fast parameters, the term "is not so 'vague and amorphous' as to exceed the judiciary's competence." *Romano v. Greenstein*, 721 F.3d 373, 378 (5th Cir. 2013) (quoting *Blessing v. Freestone*, 520 U.S. 329, 340 (1997)). The phrase "presents a sufficiently specific and definite standard readily susceptible to judicial assessment." *Doe 1-13 ex rel. Doe, Sr. 1-13 v. Chiles*, 136 F.3d

---

[3] Counsel for the LDH stated that these responses included: five from Region One; three from Region Two; two from Region Eight; one from Region Four; one from Region Six; one from Region Seven; one from Region Nine; and four from Region Five.

709, 717 (11th Cir. 1998). The Medicaid regulations accompanying § 1396a(a)(8) clarify its scope. 42 C.F.R. § 435.930. They require the agency to:

A. Furnish Medicaid promptly to beneficiaries without any delay caused by the agency's administrative procedures;

B. Continue to furnish Medicaid regularly to all eligible individuals until they are found to be ineligible; and

C. Make arrangements to assist applicants and beneficiaries to get emergency medical care whenever needed, 24 hours a day and 7 days a week.

*Id*. These regulations requires the state agency to create procedures that "establish adequate measures of timeliness" to ensure that reasonable promptness is being achieved. *See Kirk T. v. Houstoun*, No. CIV. A. 99-3253, 2000 WL 830731, at *4 (E.D. Pa. June 27, 2000). They also require that the state's own procedures do not inhibit the prompt delivery of services. *See Guggenberger v. Minnesota*, 198 F. Supp. 3d 973, 1012 (D. Minn. 2016) (recognizing that a violation can occur when the state's mismanagement of allocated funding leads to an unreasonable delay in the provision of services).

Some courts have found that agencies violated the reasonable promptness provision by placing eligible individuals on waitlists for medically necessary services as a response to budgetary constraints. *See, e.g., Sobky v. Smoley*, 855 F. Supp. 1123, 1148 (E.D. Cal. 1994) (discussing the Congressional history of the

reasonable promptness provision and stating that § 1396a(a)(8) prohibits states from responding to budgetary constraints in such a way as to cause otherwise eligible recipients to be placed on waiting lists for treatment"). Other courts have "found objectionable" the failure by state agencies to create time lines for the beginning of treatment after the necessity of Medicaid services had been decided. *Kirk T.*, 2000 WL 830731, at *3. The Eleventh Circuit has suggested that there may be a range of reasonable time periods for the provision of assistance. *Chiles*, 136 F.3d at 717. However, it reasoned that certain delays, such as delays of several years would be "far outside the realm of reasonableness." *Id.; see also Benjamin H. v. Ohl*, No. CIV.A. 3:99-0338, 1999 WL 34783552, at *15 (S.D.W. Va. July 15, 1999) (granting a preliminary injunction when the court found that "[m]any eligible individuals remain on waiting lists for months, or even years, for services which never materialize").

One district court looked to Early Periodic Screening Diagnosis and Treatment ("EPSDT") requirements for determining what constitutes reasonable promptness. *See Rosie D. v. Romney*, 410 F. Supp. 2d 18, 27 (D. Mass. 2006) The Medicaid Act requires all Medicaid-eligible beneficiaries under age twenty-one have access to "early and periodic screening, diagnostic, and treatment services." *See* § 1396d(r). The class members in this case qualify as EPSDT eligible. (*See* Rec. Doc. 391 at 5, 8.) EPSDT regulations

include a provision that sets a timeline for services. According to this provision, "the agency must set standards for the timely provision of EPSDT services which meet reasonable standards of medical and dental practice . . . , and must employ processes to ensure timely initiation of treatment, if required, *generally within an outer limit of 6 months after the request for screening services*." 42 C.F.R. § 441.56(e) (emphasis added). The court in *Rosie D. v. Romney* referred to this regulation when analyzing whether medical assistance had been provided with reasonable promptness to EPSDT eligible plaintiffs. 410 F. Supp. 2d at 27.

At this time, questions remain about how long class members are currently waiting to receive ABA services. However, Plaintiffs have provided sufficient evidence that some class members are waiting more than six months, and in some cases even longer than a year, before receiving ABA therapy. A multitude of evidence has been presented over the course of this lengthy litigation that children with autism require early and intensive intervention. Given that context, the wait times experienced by some class members falls outside the range that can be considered reasonably prompt. *See Oklahoma Chapter of Am. Acad. of Pediatrics (OKAAP) v. Fogarty*, 366 F. Supp. 2d 1050, 1109 (N.D. Okla. 2005) (holding that the state health authority violated the reasonable promptness provision after the plaintiffs provided "substantial evidence that the delays in treatment for children with specific conditions are

14

medically inappropriate"); *J.E. v. Wong*, No. 14-00399 HG-KJM, 2016 WL 4275590, at *10 (D. Haw. Aug. 12, 2016) ("A period of twelve months is significant for children whose development depends on effective treatment for the serious condition of autism.")

Much of the debate between the parties revolves around whether the delays experienced by class members have been caused by the Department's administrative procedures or by factors outside the Department's control. *See* 42 C.F.R. § 435.930(a). LDH blames the delay on a lack of BCBAs and psychologists in Louisiana who provide ABA services. According to LDH, "[s]ervice providers are desperate for new BCBA hires," but Louisiana institutions of higher education cannot provide enough graduates to meet the demand. LDH refers the Court to a recent report by a Louisiana non-profit organization called the Baton Rouge Area Foundation ("BRAF"). (Rec. Doc. 432-2 at 14.) The BRAF report addressed the availability of ASD resources in the area around Baton Rouge and found that there is a shortage of trained BCBAs. The BRAF report recommended that educational institutions of Louisiana invest in training for these positions. In short, LDH blames any delay in services on a shortage of professionals in Louisiana and not on its own shortcomings.

Plaintiffs argue that the delays have been caused, at least in part, by the insufficient rate that LDH pays providers for ABA services. When the parties entered into the 2014 Stipulated Order,

15

the Louisiana Medicaid reimbursement rate was $72 per hour for ABA therapy provided by a licensed behavior analyst and $50 per hour for ABA services provided by a behavior technician. (*See* Rec. Doc. 424 at 16.) On January 1, 2017, LDH reduced the reimbursement rate it provided to all Louisiana Medicaid ABA providers. (*See* Rec. Doc. 424-7 at 1.) The new reimbursement rate is $46 per hour for ABA therapy provided by a licensed behavior analyst, $38 per hour for ABA services provided by a behavior technician without a bachelor's degree, and $46 per hour for behavior technicians with a bachelor's degree. *Id*. at 2. In an Emergency Rule published on December 20, 2016, the LDH made clear that the reimbursement rate reduction was part of a plan to avoid a budget deficit in the Medicaid program. (Rec. Doc. 424-17 at 5.)

LDH argues the reduction in the reimbursement rate has not substantially contributed to the delays experienced by class members because the current rates match the reimbursement rate of Louisiana's largest insurance provider: Blue Cross Blue Shield of Louisiana ("BCBS-La"). The agency points out that the 2014 Stipulated Order explicitly noted that "in January 2014 DHH increased its payment rate to the rate that the State's largest commercial group pays BCBAs for providing ABA therapy in Louisiana." (Rec. Doc. 408 at 6.) In 2016, BCBS-La reduced its reimbursement rates for providing ABA services and LDH corresponded by reducing its reimbursement rates to match those of

BCBS-La. Thus, LDH argues that the decision to match the rate paid by BCBS-LA was made in compliance with the 2014 Stipulated Order and therefore cannot be considered an administrative procedure that has caused delays.

Although the cause of the delays has not been conclusively established, there is evidence that the reduced reimbursement rates have played a role in increasing the period class members must wait to receive ABA services. Plaintiffs submitted a statement from the president of a large ABA provider who confirmed that the reduction in rates will result in that provider placing Medicaid recipients at the lowest priority on the waitlist because Louisiana Medicaid "now pays lower than all other payers in the market." (Rec. Doc. 424-3 at 2.) Plaintiffs also submitted surveys of ABA providers conducted by the Louisiana Coalition for Access to Autism Services ("LCAAS"). (Rec. Doc. 424-20.) The summary of the survey suggested that clinics will be forced to cease accepting Medicaid patients due to the reduced rate and, as a result, wait times will increase. *Id*. at 2. Additionally, counsel for LDH stated at oral argument that six of the twenty ABA therapy providers that responded to the Louisiana Medicaid office survey listed the reduction in reimbursement rates as a cause for delays.

Enough evidence has been presented to conclude that terminating the 2014 Stipulated Order at this time would be

premature. The evidence before the Court suggests that numerous class members are waiting in excess of six months, and in some cases greater than one year before receiving ABA treatment. The evidence also suggests that these delays have been caused, at least in part, by the reduction in reimbursement rates for ABA services. Even if, as LDH argues, a major contributor to the delays is a dearth of qualified licensed professionals in Louisiana, the Department still must take efforts to mitigate this problem. The reimbursement rate for ABA services must not be set so low as to "frustrate[] the reasonable promptness provision." *Health Care For All, Inc. v. Romney*, No. CIV.A. 00-10833RWZ, 2005 WL 1660677, at *10 (D. Mass. July 14, 2005) ("Setting reimbursement levels so low that private dentists cannot afford to treat Medicaid enrollees effectively frustrates the reasonable promptness provision by foreclosing the opportunity for enrollees to receive medical assistance at all, much less in a timely manner.") The reduced reimbursement rate has been in effect for less than one year, and the extent to which it has caused class members to experience delays in receiving ABA services is uncertain. At this point, the LDH has not satisfied its burden of demonstrating that it has complied with the 2014 Stipulated Order's requirement that it provide the treatment with reasonable promptness.

## CONCLUSION

Accordingly,

**IT IS ORDERED** that the *Motion to Vacate the 2014 Stipulated Order* **(Rec. Doc. 420)** is **DENIED**.

New Orleans, Louisiana, this 30th day of August, 2017.

_____
CARL J. BARBIER
UNITED STATES DISTRICT JUDGE